# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, the STATE OF TEXAS, the STATE OF COLORADO, the STATE OF INDIANA, the STATE OF IOWA, the STATE OF MINNESOTA, the STATE OF NEW MEXICO, the STATE OF TENNESSEE, the STATE OF WASHINGTON, *ex rel.* HICHEM CHIHI, <br><br> Plaintiff-Relator, <br><br> v. <br><br> CATHOLIC HEALTH INITIATIVES; CHI-ST. LUKE∅S HEALTH; BAYLOR COLLEGE OF MEDICINE; BAYLOR COLLEGE OF MEDICINE HEALTHCARE, D/B/A BAYLOR MEDCARE; APNIX; BONE AND JOINT CLINIC OF HOUSTON; GREATER HOUSTON GASTROENTEROLOGY; HOUSTON THYROID & ENDOCRINE SPECIALISTS; KIDNEY ASSOCIATES; KIDNEY AND HYPERTENSION CONSULTANTS; LEACHMAN CARDIOLOGY ASSOCIATES; PULMONARY CRITICAL CARE & SLEEP MEDICINE CONSULTANTS; SURGICAL ASSOCIATES OF TEXAS; TEXAS ENDOCRINOLOGY GROUP; THE CENTER FOR ENT; CRISTINA BOCCALANDRO, M.D.; LAZARO CHEREM, M.D.; ALBERTO COLOMER, M.D.; CARL DAHLBERG, M.D.; BRIAN DOUGLAS, M.D.; FAREED ELHAJ, M.D.; IRVING FISHMAN, M.D.; ALAN HOFFMAN, M.D.; RICHARD HUNG, M.D.; MEDHAVI JOGI, M.D.; MARCIA KATZ, M.D.; ZVONIMIR KRAJCER, M.D.; DEWITT LEACHMAN, M.D.; JAMES LIVESAY, M.D.; ALBERTO LOPEZ, M.D.; ANDRES MESA, M.D.; RON MOSES, M.D.; ISAAC RAIJMAN, M.D.; JOSE FERNANDO SANTACRUZ, M.D.; NAVNEET SINGH, M.D.; and RAMACHANDRA SISTA, M.D.; <br> Defendants. | Civil Action No. 4:18-cv-00123 <br><br><br> **PLAINTIFF'S SECOND AMENDED COMPLAINT PURSUANT TO 31 U.S.C. §§3729-3732, FEDERAL FALSE CLAIMS ACT JURY TRIAL DEMANDED** |

## [PROPOSED] SECOND AMENDED COMPLAINT

Plaintiff the United States of America, through Relator Hichem Chihi, based upon personal knowledge and relevant documents, states and alleges as follows:

### INTRODUCTION

1.     This is an action to recover damages and civil penalties on behalf of the United States of America ("USA") and the State of Texas ("Texas") for false claims arising out of a kickback scheme perpetrated by multiple healthcare providers.

2.     Defendants Catholic Health Initiatives ("CHI") and CHI-St. Luke's Health ("CHI-St. Luke's") (collectively, the "Hospital Defendants") illegally leveraged their business encouraging wealthy international, private-pay medical patients to travel to the United States for treatment at the Baylor St. Luke's Medical Center in Houston, Texas, to induce Medicare and Medicaid referrals.

3.     The scheme worked as follows: CHI and CHI-St. Luke's gifted their Medicare and Medicaid referral sources with referrals of full-paying international patients; complimentary interpreter services; complimentary administrative assistance in the form of scheduling, billing, and collection services; and free international travel-related perks— all with the goal of inducing Medicare and Medicaid referrals from referring physicians and practices. In return, the Hospital Defendants received referrals for vast numbers of Medicaid/Medicare patients.

4.     The Hospital Defendants determined which physicians and practices would receive the lucrative international patient referrals and related kickbacks based in no small part on the number of Medicare and Medicaid referrals those physicians and practices would refer back to the Hospital Defendants for tests, procedures, and medical services at the BSLMC.

5.     The Hospital Defendants treated the international patient referral exchange as if it was an end-run around the laws prohibiting kickbacks for Medicare/Medicaid patient referrals. But the scheme, which plainly provided valuable consideration for the Medicare/Medicaid referrals, clearly violates core requirements of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), which prohibits offering any sort of remuneration to referral sources when one purpose is to induce the referral of patients for services billed to a federal health care program. Likewise, the scheme violated the Stark Act, which prohibits physicians from referring Medicare and Medicaid patients to hospitals with which they have a financial relationship pursuant to which they receive such kickbacks, and prohibits hospitals for billing the government for services provided pursuant to such referrals.

6.     The Hospital Defendants also knew that billing federal health care programs for services provided to patients referred in this way violated the AKS and the Stark Act. As a result, the Hospital Defendants also violated the False Claims Act ("FCA") every time they submitted such claims to a federal health care program for payment.

7.     The referring physicians and practices that participated in this kickback scheme included, but were not limited to, APNIX, Bone and Joint Clinic of Houston, Greater Houston Gastroenterology, Houston Thyroid & Endocrine Specialists, Kidney Associates, Kidney and Hypertension Consultants, Leachman Cardiology Associates, Pulmonary Critical Care & Sleep Medicine Consultants, Surgical Associates of Texas, Texas Endocrinology Group, The Center for ENT, Baylor College of Medicine ("BCM"), Baylor College of Medicine Healthcare, d/b/a Baylor MedCare ("Medcare"); Drs. Boccalandro, Colomer, Cherem, Dahlberg, Douglass, Elhaj, Fishman, Hoffman, Hung, Jogi, Katz, Krajcer, Leachman, Livesay, Lopez, Mesa, Moses, Raijman,

Santacruz, Singh, Sista; and as-yet-unknown physicians and practice groups, together with their agents and employees (collectively, "the Referring Physicians").

8.     The Hospital Defendants and Defendant Referring Physicians are liable to the USA for violating the False Claims Act ("FCA"), as amended, 31 U.S.C § 3729 *et seq.*, and to the State of Texas, for violating the Texas Medicaid Fraud Prevention Act, as amended, TEX. HUM. RES. CODE §§ 36.001 *et seq* ("MFPA").

9.     Relator Hichem Chihi has personal knowledge of this scheme through his work as an International Patient Relations Representative in the International Services Department ("ISD") at Baylor St. Luke's Medical Center ("BSLMC").

**PARTIES**

**<u>Plaintiffs and Relator</u>**

10.     The USA is the plaintiff for whom recovery is sought for false and fraudulent claims submitted to the federal government by Defendants.

11.     The USA, acting though the Department of Health and Human Services, administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* ("Medicare") and the Grants to States for Medical Assistance Programs pursuant to Title XIX of the Act, 42 U.S.C. §§ 1396 *et seq.* ("Medicaid").

12.     The State of Texas is an additional plaintiff for whom recovery is sought for false and fraudulent claims submitted by Defendants to the state government. The State of Texas, acting through Texas Health and Human Services, is responsible for the administration of the Texas Medicaid Program and of the Children's Health Insurance Program.

13.     Relator Hichem Chihi is a resident of Houston, Texas. From 2011 through the present, Mr. Chihi has worked as an International Patient Representative for the Hospital Defendants in the International Services Department located at Baylor St. Luke's Medical Center. As an International Patient Representative, Relator is responsible for, among other things, referring international patients to outside physicians, scheduling appointments for international patients with these physicians, scheduling follow-up consultations, testing, or other procedures, and scheduling language interpreters for each international patient visit.

14.     Through his work and experience, Mr. Chihi has direct, personal, and independent knowledge that, through the International Services Department, the Defendants have engaged in a scheme in which the Hospital Defendants compensated and/or otherwise rewarded the Referring Physicians with remuneration to induce inpatient and outpatient referrals to CHI and CHI-St. Luke's hospitals and clinics. Mr. Chihi gathered the information in this Complaint from his own experience and observations; his review of hospital records; his administrative involvement in the medical care of patients treated through the International Services Department; his communications with employees, agents, and representatives of the International Services Department and the Hospital Defendants; his communications with medical and administrative personnel, including the Referring Physicians and their agents, representatives, and administrative personnel; and other aspects of his job duties. A memorandum setting forth all relevant material evidence and information in the possession of Mr. Chihi regarding the allegations of fraud described herein has been served pursuant to 31 U.S.C. §§ 3730(e)(4)(B) and 3730(b)(2).

## The Hospital Defendants

15.     Defendant Catholic Health Initiatives ("CHI") is one of the nation's largest health systems. Headquartered in Englewood, Colorado, Defendant CHI operates in 17 states and

5

comprises 3900 health care providers across 100 hospitals, including three academic medical centers and major teaching hospitals, 30 critical-access facilities, as well as community health services organizations, long-term care facilities, assisted-living and residential living facilities, nursing colleges, and home health agencies.

16.    Defendant CHI is organized nationally into ten regions that are operated as integrated health systems, including several joint operating agreements, joint operating companies, and joint ventures. Defendant CHI's Texas region of operation is comprised of seven acute care facilities operating in the greater Houston area, including multiple hospitals, emergency, and diagnostic centers operating under Defendant CHI-St. Luke's Health.

17.    Defendant CHI-St. Luke's Health is a part of Defendant CHI. Defendant CHI-St. Luke's Health is comprised of three Texas markets.  One of those markets is CHI-St. Luke's Health in Greater Houston which includes eight hospitals, eight emergency centers, as well as a Diagnostic and Treatment Center, and a Radiation and CyberKnife Center. The majority of these hospitals and centers, together form the Baylor St. Luke's Medical Center, an 850-bed super hospital partnered with Baylor College of Medicine. The BSLMC has nearly twenty-five thousand patient admissions annually, with a further seventy-five thousand plus annual emergency department visits.

18.    Defendant CHI purchased Defendant CHI-St. Luke's Health in 2013. At the time of the purchase, Defendant CHI-St. Luke's Health was known as St. Luke's Episcopal Health System. As part of the acquisition, ownership of St. Luke's Episcopal Hospital (renamed St. Luke's Medical Center, and subsequently, Baylor St. Luke's Medical Center) was transferred to Defendant CHI, which maintained the continuity of its operations, including retaining most of its employees. CHI and CHI-St. Luke's Health assumed control and responsibility of the operations

of St. Luke's Episcopal Hospital, including its International Services Department, and continued to provide substantially the same services as were provided prior to the purchase and maintained many of the hospital's business relationships, including with referring physicians and practices. The fraudulent practices described in this Complaint began when the International Services Department was operated by St. Luke's Episcopal Health, and the Hospital Defendants continued the same fraudulent conduct, ratifying it.

19.     The Hospital Defendants rely for a significant proportion of their income on federal health care programs, including Medicare and Medicaid. Defendant CHI, for example, derives 42% of its gross revenue from Medicare patients, and a further 16% of its gross revenue from Medicaid patients. Medicare billings likewise are the single largest source of gross revenue for CHI-St. Luke's (and the BSLMC), and CHI-St. Luke's also derives a sizeable share of its gross revenue from Medicaid billings.

20.     Both of the Hospital Defendants play a significant role in promotion, management, oversight, and/or operation of the International Services Department at Baylor St. Luke's Medical Center and supervision, management, oversight, and payment of ISD's employees. For example:

a.     The employees of the ISD receive paychecks and employment evaluations from CHI and are considered employees of CHI. Mr. Chihi's 2016 Staff Performance evaluation, as an example, comes on CHI letterhead and refers to Mr. Chihi as an "employee of Catholic Health Initiatives," and his paychecks likewise come from CHI.

b.     However, Vice President Tania Matar, Associate Director Angelita Sanchez, and other representatives and agents of the International Services Department send emails using CHI-St. Luke's Health corporate email signature logo. *See, e.g.*, Exh. 3. Employees of the ISD also have email addresses ending in @stlukeshealth.org. *See, e.g.*, Exh. 3.

c.       Furthermore, on its website, CHI-St. Luke's Health promotes the ISD, refers to ISD employees as "our multilingual, professional team," and boasts that "we have cared for patients from more than 85 countries."

d.       ISD's management and representatives, including Matar and Sanchez, sometimes document or distribute policies specific to the ISD on CHI-St. Luke's Health letterhead. *See, e.g.*, Exh. 1. Likewise, ISD management and representatives frequently send out routine correspondence and forms used by the ISD, such as patient information authorization forms for international patients, credit card authorization forms, and letters from the ISD to embassies and other recipients on CHI-St. Luke's Health letterhead. *See, e.g.*, Exh. 1, 2, 11, 12, 13.

e.       However, ISD management and representatives also distribute other policies of the International Services Department, such as policies on billing and collections, including those described below, on CHI letterhead.

f.       On routine payment forms, the ISD requests that international patients, their families and representatives, and embassies send checks for payment to CHI-St. Luke's Health. *See, e.g.*, Exhs. 12, 13.

g.       However, payments from the ISD to outside physicians such as the Referring Physicians for their services treating international patients are sent on checks provided by CHI.  *See, e.g.*, Exhs. 2, 11.

21.      Thus, ISD employees including Vice President of the ISD Tania Matar and the Associate Director of the ISD Angelita Sanchez act as representatives and agents of both CHI and CHI-St. Luke's Health. Prior to the Hospital Defendants' acquisition of St. Luke's Episcopal Hospital, Matar and Sanchez served as the Director, and Associate Director, respectively of the International Services Department at St. Luke's Episcopal Hospital.

22.     Both of the Hospital Defendants, acting through their employees, agents, and representatives, participate in the workings of the ISD; caused and are responsible for the conduct described in this Complaint, including the illegal remuneration provided by the ISD; and committed knowing and purposeful violations of federal and state law, as described below.

<u>**The Defendant Referring Physicians**</u>

23.     At the relevant times, Defendant Houston Thyroid & Endocrine Specialists was a Texas corporation and/or private medical practice doing business in the Greater Houston area that provides endocrinology services, and Defendants Fareed Elhaj, M.D. and Medhavi Jogi, M.D. were physicians that were acting as agents and/or representatives of Defendant Houston Thyroid & Endocrine Specialists when committing the misconduct described herein. Each of these Defendants received illegal kickbacks from the ISD that included free collection services, billing services, interpreters, and scheduling services. *See, e.g.*, Exh. 11, pp. 35-36 (reflecting complimentary collection by the ISD of a bill for two international patients referred by the ISD to Houston Thyroid & Endocrine Specialists, for three charges totaling $1,894.72, that were disbursed by the ISD to Houston Thyroid & Endocrine Specialists on 4/12/16); Exh. 13, p. 17 (reflecting complimentary billing by the ISD to the Embassy of the United Arab Emirates on behalf of Houston Thyroid & Endocrine Specialists for services totaling $1200 billed on behalf of an international patient referred by the ISD to Houston Thyroid & Endocrine Specialists); Exh. 7, pp. 60 (reflecting that the ISD provided a complimentary interpreter in Arabic, Ahmed Fadel, to Dr. Elhaj on 5/17/16 at 3:45pm at 6624 Fannin Street, Suite 2260, in Houston, Texas, for an international patient referred by the ISD to Dr. Elhaj for an evaluation); *id.*, pp. 69 (reflecting that the ISD provided a complimentary interpreter in Arabic, Interpreter Hossam, to Dr. Elhaj on 5/15/16 at 4:30pm, at 6624 Fannin Street, Suite 2260, in Houston, Texas, for an international

patient referred by the ISD to Dr. Elhaj for an evaluation); Exh. 7, pp. 21, 22, 23, 39, 41, 60 (reflecting additional complimentary interpreters provided by the ISD to Dr. Elhaj and Dr. Jogi at 6624 Fannin, Suite 2260, in Houston, Texas, and through language line phone services, to facilitate appointments with international patients referred by the ISD); Exh. 6, p. 11 (reflecting an international patient from Qatar referred by the ISD to Dr. Jogi for an evaluation on 11/15/16 at 1:00pm, for which the ISD also provided a complimentary interpreter and complimentary appointment reminder services); Paragraph 240, below (reflecting details of request by Dr. Jogi to the ISD for scheduling assistance for international patient P.M.).

24.     At the relevant times, Defendant Leachman Cardiology Associates was a Texas corporation and/or private medical practice doing business in the Greater Houston area that provides cardiology services, and Defendants Zvonimir Krajcer, M.D., Dewitt Leachman, M.D., and Alberto Lopez, M.D., were physicians that were acting as agents and/or representatives of Defendant Leachman Cardiology Associates when committing the misconduct described herein. Each of these Defendants received illegal kickbacks from the ISD that included free collection services, interpreters, and scheduling services. *See, e.g.*, Exh. 11, pp. 21-24 (reflecting free collection by the ISD of a bill for four international patients referred by the ISD to Leachman Cardiology Associates, for four charges totaling $2,488.00, that were disbursed by the ISD to Leachman Cardiology Associates on 2/25/16); Exh. 13, pp. 2 (reflecting free collection by the ISD of six different charges billed by the ISD on behalf of Leachman Cardiology Associates for international patients referred by the ISD to Leachman Cardiology Associates; the charges, reflecting unique identification numbers, were in various bill-collection statuses including õpre-payment,ö õinsurance,ö and õadjusted closed billö); Exh. 13, pp. 19 (international patient referred by the ISD to Leachman Cardiology Associates); Exh. 7, pp. 73 (reflecting that the ISD provided

a complimentary interpreter in Arabic, Interpreter Alexandra, to Dr. Krajcer on 9/20/16 at 1:00pm, at 6624 Fannin Street, at the ISD's International Patient Center, in Houston, Texas, to facilitate an evaluation of an international patient from the United Arab Emirates referred by the ISD to Dr. Krajcer); *id.* at 74 (reflecting that the ISD provided a complimentary interpreter in Arabic, Interpreter Alexandra, to Dr. Krajcer on 9/21/16 at 2:00pm, at 6624 Fannin Street, Suite 2780, in Houston, Texas, to facilitate an evaluation for an international patient from the United Arab Emirates referred by the ISD to Dr. Krajcer); *id.* at 75 (reflecting that the ISD provided a complimentary interpreter in Arabic, Interpreter Ihab, to Dr. Krajcer on 9/26/16 at 9:30am, at 6624 Fannin Street, Suite 2780, in Houston, Texas, to facilitate an evaluation for an international patient from the United Arab Emirates referred by the ISD to Dr. Krajcer); *id.* at 81 (reflecting that the ISD provided a complimentary interpreter in Arabic, Interpreter Hossam, to Dr. Krajcer on 10/17/16 at 12:15pm, at 6624 Fannin Street, Suite 2780, in Houston, Texas, to facilitate an evaluation for an international patient from the United Arab Emirates referred by the ISD to Dr. Krajcer); Exh. 5, p. 6 (reflecting more information about the previous 10/17/16 appointment); Exh. 7 at 82 (reflecting that the ISD provided a complimentary interpreter in Arabic, Interpreter Alexandra, to Dr. Lopez on 10/17/16 at 1:00pm, at 6624 Fannin Street, Suite 2780, in Houston, Texas, to facilitate an evaluation for an international patient from the United Arab Emirates referred by the ISD to Dr. Lopez); Exh. 7 at 76 (reflecting that the ISD provided a complimentary interpreter in Arabic, Interpreter Alexandra, to Dr. Lopez on 9/27/16 at 11:30am, at 6624 Fannin Street, Suite 2780, in Houston, Texas, to facilitate an evaluation for an international patient from the United Arab Emirates referred by the ISD to Dr. Lopez); Exh. 6 at 6-7 (reflecting complimentary interpreters and appointment reminders provided for the patient seen by Dr. Lopez on 9/29/16 in the previous parenthetical); Paragraph 214, below (discussing free interpreter

services provided by the ISD for Dr. Krajcer); Paragraphs 259-267, below (discussing free international travel perks provided to Dr. Krajcer by the ISD); Paragraph 163, below (Defendants Krajcer, Leachman, and Lopez were on the ISD's referral roster).

25.　At the relevant times, Defendant Alan Hoffman, M.D., was a physician providing primary care and internal medicine services in the Houston area. Defendant Hoffman received illegal kickbacks from the ISD that included lucrative referrals of international patients; complimentary scheduling, billing, collection, and interpreter services; and free international travel perks. *See, e.g.*, Exh. 9 (thirty-five pages of records, reflecting the dates, times, and medical service associated with hundreds of appointments scheduled by the ISD on a complimentary basis for Dr. Hoffman with international patients referred to Dr. Hoffman by the ISD); Exh. 6 at 3 (reflecting international patients from the United Arab Emirates and Honduras referred by the ISD to Dr. Hoffman for appointments on 8/23/16, for which the ISD also provided complimentary interpreters and complimentary appointment reminders); Exh. 6 at 11 (reflecting referral by the ISD of international patient from the United Arab Emirates to Dr. Hoffman for an appointment on 11/15/16, for which the ISD also provided a complimentary interpreter and complimentary appointment reminder services); Exh. 11 at 17-18 (reflecting free collection by the ISD of bills for six international patients referred by the ISD to Dr. Hoffman, for six charges totaling $4,992 that were disbursed by the ISD to Dr. Hoffman on 2/25/16); Exh. 11 at 19-20 (reflecting free collection by the ISD of bills for one international patient referred by ISD to Dr. Hoffman, for a charge totaling $1,300 that was disbursed by the ISD to Dr. Hoffman on 4/6/16); Exh. 13 at 9 (reflecting free billing by the ISD to the Embassy of the United Arab Emirates on behalf of Dr. Hoffman for services billed on behalf of an international patient referred by the ISD to Dr. Hoffman); Exh. 13 at 16 (reflecting free billing by the ISD to the Embassy of the United Arab Emirates on behalf of

Dr. Hoffman for services totaling $110 billed on behalf of an international patient referred by the ISD to Dr. Hoffman); Exh. 5 at 11-12 (reflecting complimentary interpreter provided by the ISD on 11/17/16 to Dr. Hoffman for an international patient referred by the ISD to Dr. Hoffman); Paragraphs 259-267, below (discussing international travel perks provided to Dr. Hoffman by the ISD); Paragraph 163, below (Defendant Hoffman was on the ISD's referral roster).

26.     At the relevant times, Defendant Texas Endocrinology Group was a Texas corporation and/or private medical practice doing business in the Greater Houston area whose services include endocrinology services, and Defendant Cristina Boccalandro, M.D. was a physician that was acting as an agent and/or representative of Defendant Texas Endocrinology Group when committing the misconduct described herein. Defendants Texas Endocrinology Group and Boccalandro received illegal kickbacks from the ISD that included lucrative international patient referrals and complimentary interpreters. *See* Exh. 7 at 4 (reflecting that ISD provided a complimentary interpreter to Dr. Boccalandro on 7/8/14 at 10:00 am for an international patient from Qatar referred by the ISD to Dr. Boccalandro for an evaluation); Exh. 7 at 9-10; (reflecting that ISD provided complimentary interpreters to Dr. Boccalandro on 8/8/14 at 8:00 am and at 2:00 pm for international patients from Saudi Arabia and Oman respectively, referred by the ISD to Dr. Boccalandro for evaluations); Exh. 7 at 13 (reflecting that ISD provided a complimentary interpreter to Dr. Boccalandro on 3/4/15 at 2:30 pm for an international patient from Kuwait referred by the ISD to Dr. Boccalandro for an evaluation); Exh. 7 at 34-35, 37 (reflecting that the ISD provided a complimentary interpreter to Dr. Boccalandro from Language Line Co. for evaluations of international patients referred to Dr. Boccalandro by the ISD); Exh. 7 at 56 (reflecting that ISD provided a complimentary interpreter to Dr. Boccalandro on 3/29/16 at 3:00 pm at 6624 Fannin St., Suite 2380 in Houston, TX for an international patient from Saudi

Arabia referred by the ISD to Dr. Boccalandro for an evaluation); Exh. 7 at 67 (reflecting that the ISD provided a complimentary interpreter to Dr. Boccalandro on 6/9/16 at 3:25 pm at 6624 Fannin St., Suite 2380 in Houston, TX for an international patient from Kuwait referred by the ISD to Dr. Boccalandro for an evaluation); Exh. 7 at 71 (reflecting that ISD provided a complimentary interpreter from Universal Medical Services to Dr. Boccalandro on 8/15/16 at 1:00 pm at OQMT, 6624 Fannin St., Suite 140 in Houston, TX for an international patient from Kuwait referred by the ISD to Dr. Boccalandro for diabetes education); Exh. 7 at 85 (reflecting that ISD provided a complimentary interpreter Dr. Boccalandro on 10/26/16 at 1:00 pm at 6624 Fannin St., Suite 2380 in Houston, TX for an international patient from Kuwait referred by the ISD to Dr. Boccalandro for an evaluation); *see also* Exh. 7 at 39-40 (reflecting that ISD provided additional complimentary interpreters to Dr. Boccalandro from Language Line Co. for evaluations); Paragraph 163, below (Defendant Boccalandro was on the ISD's referral roster).

27.      At the relevant times, Defendant Bone and Joint Clinic of Houston was a Texas corporation and/or private medical practice doing business in the Greater Houston area provides orthopedic medical services and acted through agents and/or representatives including Dr. William Watters. Defendant Bone and Joint Clinic of Houston received illegal kickbacks from the ISD that included lucrative international patient referrals, free collection services, interpreters, and scheduling services. *See* Exh. 11, pp. 29-30 (reflecting free collection by the ISD of a bill for an international patient referred by the ISD to Bone and Joint Clinic of Houston, for a charge of $927.00, that was disbursed by the ISD to Bone and Joint Clinic of Houston on 2/25/16); Exh. 13, pp. 4 (reflecting free collection and disbursement by the ISD to the Bone and Joint Clinic of Houston of a check billed by the ISD on behalf of the Bone and Joint Clinic of Houston for an international patient referred to the Bone and Joint Clinic of Houston by the ISD); *see also*

14

Paragraphs 163, 182, below (during relevant time periods, eight of the ten orthopedic physicians on the ISD's referral roster were agents and representatives of the Bone and Joint Clinic of Houston, including Dr. Watters); Paragraph 183, below (discussing referral by the Bone and Joint Clinic of Houston, through physician Dr. William Watters, of Medicare patient W.P. to Defendant CHI-St. Luke's Health for pre-surgical testing on October 17, 2015, and an orthopedic surgery on October 24, 2015 at BSLMC).

28.     At the relevant times, Defendant Pulmonary Critical Care & Sleep Medicine Consultants was a Texas corporation and/or private medical practice doing business in the Greater Houston area whose services include treatment of lung and sleep disorders, and Defendants Jose Fernando Santacruz, M.D, Naveet Singh, M.D., Alberto Colomer, M.D., and Carl Dahlberg, M.D., are physicians that were acting as agents and/or representatives of Defendant Pulmonary Critical Care & Sleep Medicine Consultants when committing the misconduct described herein. Each of these Defendants received illegal kickbacks from the ISD that included lucrative international patient referrals and free collection services, interpreters, and scheduling services. *See, e.g.*, Exh. 11, pp. 25-26 (reflecting free collection by the ISD of a bill for two international patients referred by the ISD to Pulmonary Critical Care & Sleep Medicine Consultants, for two charges totaling $2,370.00, that were disbursed by the ISD to Pulmonary Critical Care & Sleep Medicine Consultants on 2/25/16); Exh. 11, pp. 33-34 (reflecting free collection by the ISD of a bill for two international patients referred by the ISD to Pulmonary Critical Care & Sleep Medicine Consultants, for two charges totaling $2,658.00, that were disbursed by the ISD to Pulmonary Critical Care & Sleep Medicine Consultants on 4/5/16); Exh. 7, at 4 (reflecting that the ISD provided a complimentary interpreter to Dr. Santacruz on 5/20/14 at 2:30pm, at 6560 Fannin Street, Suite 1760, in Houston, Texas, for an international patient from Saudi Arabia referred by

the ISD to Dr. Santacruz for an evaluation); Exh. 7, at 12 (reflecting that the ISD provided a complimentary interpreter to Dr. Santacruz on 2/17/15 at 1:30pm, at OʻQuinn Medical Tower, Suite 1730, in Houston, Texas, for an international patient from Qatar referred by the ISD to Dr. Santacruz and Pulmonary Critical Care & Sleep Medicine Consultants for an evaluation); Exh. 6, pp. 6-7 (reflecting complimentary interpreters and appointment reminders provided for international patient from Venezuela referred by the ISD to Dr. Santacruz and seen by Dr. Santacruz on 9/27/16 at 10:30am); Exh. 7 at 84 (reflecting that the ISD provided a complimentary interpreter to Dr. Singh on 10/24/16 at 10:00 am for an international patient from Saudi Arabia referred by the ISD to Dr. Singh for an evaluation); Exh. 7 at 19, 37 (reflecting that the ISD provided complimentary interpreters to Dr. Singh at 6550 Fannin St., Suite 2137, and through a language line); Exh. 13, at 9 (reflecting the ISDʼs efforts to collect payments on 1/29/14 of $3,436 billed by Pulmonary Critical Care & Sleep Medicine Consultants to an international patient referred by the ISD to Pulmonary Critical Care & Sleep Medicine Consultants). The ISD also provided a complimentary interpreter to Defendant Colomer for an appointment with international patient G.N. on 2/15/17. *See also* Paragraph 257, below, reflecting details of complimentary bill payment and collection services provided to Dr. Dahlberg, Dr. Manion, and Dr. Connolly of Pulmonary Critical Care & Sleep Medicine Consultants); Paragraph 198, below, discussing the ISDʼs lucrative international referrals to Dr. Santacruz); Paragraph 163, below (Defendants Singh, Colomer, Santacruz, and Dahlberg were on the ISDʼs referral roster).

29.     At the relevant times, Defendant Greater Houston Gastroenterology was a Texas corporation and/or private medical practice doing business in the Greater Houston area, that provided gastroenterology services, and Defendant Dr. Isaac Raijman was a physician that was an agent and/or representative of Greater Houston Gastroenterology. Dr. Raijman and Greater

Houston Gastroenterology received illegal kickbacks from the ISD that included lucrative international patient referrals. For example, the ISD referred international patient A.A. to Dr. Raijman for an appointment with Dr. Raijman on 2/13/17 and referred international patient C.O. for an appointment with Dr. Raijman on 2/17/17. *See also* Paragraph 156, below (describing the ISD's referrals to Dr. Raijman to "keep him happy"); Paragraph 163, below (Defendant Raijman was on the ISD's referral roster).

30.     At the relevant times, Defendant Kidney Associates was a Texas corporation and/or private medical practice doing business in the Greater Houston area, that provides nephrology care. Defendant Kidney Associates received illegal kickbacks from the ISD that included lucrative international patient referrals and complimentary billing and collection services. *See, e.g.*, Exh. 11 at 37-38 (reflecting free collection services provided by the ISD to Kidney Associates of a bill for three international patients referred by the ISD to Kidney Associates, for three charges totaling $1,317.09, payment of which was disbursed by the ISD to Kidney Associates on 2/25/16).

31.     At the relevant times, Defendant Kidney and Hypertension Consultants was a Texas corporation and/or private medical practice doing business in the Greater Houston area, that provides care for kidney disease and hypertension. Defendant Kidney and Hypertension Consultants received illegal kickbacks from the ISD that included lucrative international patient referrals and complimentary collection services. *See, e.g.*, Exh. 2, p. 4 (reflecting free collection by the ISD of a bill for an international patient referred by the ISD to Kidney and Hypertension Consultants, for a charge totaling $29,110.00, payment of which was disbursed by the ISD to Kidney and Hypertension Consultants on 4/6/16).

32.     At the relevant times, Defendant Surgical Associates of Texas was a Texas corporation and/or private medical practice doing business in the Greater Houston area, whose

services included surgical services, and Defendant James Livesay, M.D., was a physician providing thoracic surgery and related medical services that was acting as an agent and representative of Surgical Associates of Texas when committing the misconduct described herein. Defendants Surgical Associates of Texas and Livesay received illegal kickbacks from the ISD that included lucrative international patient referrals, complimentary interpreters, and complimentary billing and collection services. *See, e.g.*, Exh. 6 at 9 (reflecting that the ISD referred an international patient from the United Arab Emirates to Dr. Livesay for an evaluation on 10/4/16 at 1:00pm, for which the ISD also provided a complimentary interpreter and complimentary appointment reminder services); Exh. 11 at 27-28 (reflecting free collection by the ISD of a bill for an international patient referred by the ISD to Surgical Associates of Texas, for a charge totaling $70.00, payment of which was disbursed by the ISD to Surgical Associates of Texas on 2/25/16). Dr. Livesay also received illegal remuneration from the ISD in his separate role working for the Texas Heart Institute. *See, e.g.*, Exh. 7 at 78 (reflecting that the ISD provided a complimentary interpreter to Dr. Livesay on 10/4/16 at 1:00pm at the Texas Heart Institute for an international patient from United Arab Emirates referred by the ISD to Dr. Livesay for an evaluation); Exh. 7 at 33 (reflecting that the ISD provided a complimentary interpreter from Language Line Co. to Dr. Livesay, for an international patient referred by the ISD to Dr. Livesay for registration and an evaluation at the Texas Heart Institute); Paragraph 163, below (Defendant Livesay was on the ISD's referral roster).

33.     At the relevant times, Defendant The Center for ENT was a Texas corporation and/or private medical practices doing business in the Greater Houston area, that provided otolaryngology services, and Defendants Richard Hung, M.D. and Ron Moses, M.D., were physicians that were acting as agents and/or representatives of The Center for ENT when

committing the misconduct alleged herein. These Defendants received illegal kickbacks from the ISD that included lucrative international patient referrals and complimentary billing and scheduling services. *See, e.g.*, Exh. 11 at 53-56 (reflecting free collection by the ISD of bills for an international patient referred by the ISD to The Center for ENT, for charges totaling $2,129.00, payment of which was disbursed by the ISD to The Center for ENT on 2/25/16); Exh. 13 at 4 (reflecting free billing and collection by the ISD on behalf of The Center for ENT for services billed on behalf of an international patient referred by the ISD to The Center for ENT, with a check provided by ISD staff to The Center for ENT on 11/7/12); Paragraph 217, below, providing details regarding a complimentary interpreter the ISD provided to Dr. Moses); Paragraph 163, below (Defendants Hung and Moses were on the ISD's referral roster).

34.     At the relevant times, Defendant Apnix was a Texas corporation and/or private medical practice doing business in the Greater Houston area, whose medical services include sleep apnea diagnostics testing and treatment. Defendant Apnix received illegal kickbacks from the ISD that included lucrative international patient referrals and complimentary billing and collection services. *See, e.g.*, Exh. 11 at 31-32 (reflecting free collection by the ISD of a bill for an international patient referred by the ISD to Apnix, for a charge totaling $2,094.00, that was disbursed by the ISD to Apnix on 4/12/16); Paragraph 251, below (reflecting additional free billing and collection services by the ISD provided to Apnix).

35.     At the relevant times, Defendant Andres Mesa, M.D., was a cardiologist that was self-employed with an office at 888 Normandy Street in Houston, and at times, also worked for Cardiology Associates at 6624 Fannin, Suite 2320, in Houston, and the Cardiovascular & Vein Institute at 888 Normandy Street in Houston. Defendant Mesa received illegal kickbacks from the ISD that included lucrative international patient referrals, complimentary billing and collection

services, complimentary scheduling services, and complimentary interpreters. *See, e.g.*, Exh. 11 at 39-40 (reflecting free collection by the ISD of a bill for two international patients referred by the ISD to Dr. Mesa, for charges totaling $4,928.00, payment of which was disbursed by the ISD to Dr. Mesa on 2/25/16); Exh. 6 at 3 (reflecting an international patient from Kuwait referred by the ISD to Dr. Mesa for an evaluation on 8/23/16 at 9:00am, for which the ISD also provided a complimentary interpreter and complimentary appointment reminder services); Paragraph 163, below (Defendant Mesa was on the ISD's referral roster).

36.     At the relevant times, Defendant Lazaro Cherem, M.D., was a physician providing nephrology and internal medicine services in the Houston area. Defendant Cherem received illegal kickbacks from the ISD that included lucrative international patient referrals and complimentary billing, collection, interpreter, and scheduling services. *See, e.g.*, Exh. 11 at 4 (reflecting free collection by the ISD of a bill for an international patient referred by the ISD to Dr. Cherem, for charges totaling $800.00, payment of which was disbursed by the ISD to Dr. Cherem on 4/12/16); Exh. 6 at 2-3 (reflecting the ISD's referral of an international patient from the Cayman Islands to Dr. Cherem for a bone density examination on 8/23/16 at 2:00pm, for which the ISD also provided a complimentary interpreter and complimentary appointment reminder services); Paragraph 163, below (Defendant Cherem was on the ISD's referral roster).

37.     At the relevant times, Defendant Brian Douglas, M.D., was a physician providing gastroenterology services in the Houston area. Defendant Douglas received illegal kickbacks from the ISD that included lucrative international patient referrals, complimentary interpreters, and complimentary scheduling, billing, and collection services. *See, e.g.*, Exh. 7 at 75 (reflecting that the ISD provided a complimentary interpreter to Dr. Douglas on 9/26/16 at 4:00 pm at 6624 Fannin St., Suite 2560 in Houston, TX for an international patient from Kuwait referred by the ISD to Dr.

Douglas for an evaluation); Exh. 13 at 16 (reflecting free billing and collection by the ISD on behalf of Dr. Douglas for services totaling $3,050 billed on behalf of an international patient referred by the ISD to Dr. Douglas); Exh. 6 at 13 (reflecting an international patient from the United Arab Emirates referred by the ISD to Dr. Douglas for an evaluation on 12/23/16 at 3:00pm, for which the ISD also provided a complimentary interpreter and complimentary appointment reminder services); Paragraph 163, below (Defendant Douglas was on the ISD's referral roster).

38.     At the relevant times, Defendant Irving Fishman, M.D., was a physician providing urology services in the Houston area. Defendant Fishman received illegal kickbacks from the ISD that included lucrative international patient referrals and complimentary interpreters. *See, e.g.*, Exh. 5 at 2 (Update report indicating a complimentary interpreter provided by the ISD to Dr. Fishman for an evaluation on 91/15/16 with an international patient referred by the ISD to Dr. Fishman); Exh. 7 at 15 (reflecting that the ISD provided a complimentary interpreter to Dr. Fishman at 6624 Fannin Street, Suite 2180, in Houston, Texas, for an international patient referred by the ISD to Dr. Fishman); Exh. 7 at 57 (reflecting that the ISD provided a complimentary interpreter to Dr. Fishman on 4/14/16 at 3:00 pm at 6624 Fannin Street, Suite 2180, in Houston, Texas, for an international patient from Saudi Arabia referred by the ISD to Dr. Fishman); Exh. 7 at 73 (reflecting that the ISD provided a complimentary interpreter to Dr. Fishman on 9/20/16 at 10:00am at St. Luke's Hospital (6720 Bertner Avenue), for an international patient from Kuwait referred by the ISD to Dr. Fishman for surgery); Exh. 7 at 83 (reflecting that the ISD provided a complimentary interpreter to Dr. Fishman on 10/19/16 at 6624 Fannin Street, Suite 2180, in Houston, Texas, for an international patient from Kuwait referred by the ISD to Dr. Fishman for an evaluation); Paragraph 163, below (Defendant Fishman was on the ISD's referral roster).

39.     Defendant Baylor College of Medicine is a health sciences university located in the Texas Medical Center in Houston, Texas, and Defendant Baylor College of Medicine Healthcare, d/b/a Baylor MedCare ("MedCare") is a Texas corporation that has as its sole member Baylor College of Medicine. MedCare was formed in 1994 by Baylor College of Medicine to centralize the professional practices of the physicians within the academic departments of Baylor College of Medicine who see patients in private settings. Defendant Baylor College of Medicine is also part owner of the Baylor St. Luke's Medical Center. At the relevant times, Defendant Marcia Katz, M.D. and Ramachandra Sista, M.D., were physicians that were acting as agents and/or representatives of Defendants MedCare and Baylor College of Medicine in committing the misconduct alleged herein. Defendants Baylor College of Medicine, MedCare, Dr. Katz, and Dr. Sista each received illegal kickbacks from the ISD that included lucrative international patient referrals, complimentary interpreters, and complimentary billing and collection services. *See, e.g.*, Exh. 7 at 70 (reflecting that the ISD provided a complimentary interpreter to Dr. Katz on 6/22/16 at 4:30 pm at 6620 Main St., Suite 1225, in Houston, Texas, for an international patient from Qatar referred by the ISD to Dr. Katz for an evaluation); *id.* at 52 (reflecting that the ISD provided a complimentary interpreter by Language Line Co. to Defendant Baylor College of Medicine and/or MedCare on 3/9/16 at 9:30am at 6620 Main St., Suite 1450, in Houston, Texas, for a Mandarin-speaking international patient referred by the ISD for a hepatology evaluation); *id.* at 56 (reflecting that the ISD provided a complimentary interpretation by Aala Ibrahim to Defendant Baylor College of Medicine and/or MedCare on 3/29/16 at 11:00am at 6620 Main St., Suite 1320, in Houston, Texas, for an Arabic-speaking international patient from the United Arab Emirates referred by the ISD to Defendant Baylor College of Medicine for an evaluation); *id.* at 57 (reflecting that the ISD provided a complimentary interpretation by Interpreter Alexandra to

Defendant Baylor College of Medicine and/or MedCare on 04/14/16 at 10:45a.m. at 6620 Main St., Suite 1450, in Houston, Texas, for an Arabic-speaking international patient from Saudi Arabia referred by the ISD to Defendant Baylor College of Medicine for an evaluation); *id.* at 58 (reflecting that the ISD provided a complimentary interpretation by Interpreter Aala Ibrahim to Defendant Baylor College of Medicine and/or MedCare on 04/20/16 at 3:30p.m. at 6620 Main St., Suite 1350, in Houston, Texas, for an Arabic-speaking international patient from Qatar referred by the ISD to Defendant Baylor College of Medicine for an evaluation); *id.* at 61 (reflecting that the ISD provided a complimentary interpretation by Interpreter Aala Ibrahim to Defendant Baylor College of Medicine and/or MedCare on 3/29/16 at 11:00am at 6620 Main St., Suite 1320, in Houston, Texas, for an Arabic-speaking international patient from the United Arab Emirates referred by the ISD to Defendant Baylor College of Medicine for an evaluation); Exh. 7 at 61 (reflecting two additional instances in which the ISD provided complimentary interpreters to Defendants Baylor College of Medicine and/or Medcare); Paragraph 250, below (reflecting the details of the ISD billing nine international patients $138,320.99 on behalf of MedCare and collecting that sum on behalf of MedCare); Exh. 13 at 19 (reflecting free billing and collection services provided by the ISD on 1/29/14 on behalf of Defendant MedCare to collect $1,398 in services billed on behalf of an international patient referred by the ISD to MedCare); Exh. 5 at 3 (reflecting that the ISD provided a complimentary interpreter on 9/19/16 at the Baylor College of Medicine for physician Dr. Zhang, who is an agent or representative of Defendants Baylor College of Medicine and MedCare); *id.* at 5, 8, 10 (reflecting similar complimentary interpreters provided to Defendants Baylor College of Medicine and/or MedCare, or their agents or representatives); Paragraph 163, below (Dr. Katz, and Dr. Sista were on the ISD's referral roster).

40.     Each of the Defendant Referring Physicians accepted patients that were beneficiaries of federal health care programs (Medicare and/or Medicaid).

41.     Each of the Defendant Referring Physicians billed and received money from the government for services to Medicare and/or Medicaid beneficiaries.

42.     Each of the Defendant Referring Physicians regularly chose to refer their patients, including their Medicare and/or Medicaid patients, to the Hospital Defendants, for inpatient or outpatient services at BSLMC. They referred such patients to BSLMC for testing; selected BSLMC as the hospital at which they would perform their own procedures on such patients, generating claims and billings for the Hospital Defendants; and/or referred such patients to BSLMC for other medical services. For example, Defendant Bone and Joint Clinic referred a Medicare patient to the Hospital Defendants for testing and surgery at BSLMC as set forth in more detail in paragraph 183, below.

## FEDERAL JURISDICTION AND VENUE

43.     The acts proscribed by 31 U.S.C. § 3729 *et seq.* and complained of herein occurred in part in the Southern District of Texas, and Defendants do business in the Southern District of Texas. Therefore, this Court has jurisdiction over this case under 31 U.S.C. § 3732(a), as well as under 28 U.S.C. § 1345. This Court has jurisdiction over this case for the claims brought on behalf of the states pursuant to 31 U.S.C. § 3732(b), inasmuch as recovery is sought on behalf of said states which arises from the same transactions and occurrences as the claim brought on behalf of the United States.

44.     Venue is proper in this District under 28 U.S.C. § 1391 (b) and (c) and 31 U.S.C. § 3732 because Defendants do business in this District and the events and/or transactions giving rise to the claims asserted in this complaint occurred in this District.

24

45.     The facts and circumstances which give rise to Defendants' violation of the False Claims Act have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office report, hearing, audit, or investigation, nor in the news media.

46.     Relator is the original source of the information upon which this complaint is based, as that phrase is used in the False Claims Act and other laws at issue herein.

47.     Relator brings this action based on his direct knowledge and, where indicated, on information and belief.  None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. § 3730(3)(4), and Relator is an original source of the facts alleged in this Complaint.

48.     At all times, Defendants acted through their agents and/or employees, and the acts of Defendants' agents and/or employees were within the scope of their agency and/or employment. The policies and practices alleged in this Complaint were, on information and belief, established and/or ratified at the highest corporate levels of Defendants.

## STATUTORY AND REGULATORY BACKGROUND

### The Federal Anti-Kickback Statute

49.     Paying or accepting remuneration for arranging for care under federally funded healthcare programs is expressly prohibited by the Medicare and Medicaid Protection Act, 42 U.S.C. § 1320a-7b(b) ("Anti-Kickback Statute" or "AKS").

50.     Participation in Medicare is conditioned on compliance with the AKS. Thus, claims submitted by a noncompliant hospital that is paying illegal remuneration in violation of the AKS are false claims which are actionable under the FCA.

51.     The AKS prohibits any person or entity from offering, paying, soliciting, making or accepting payments to induce or reward any person for referring, recommending, or arranging for federally-funded medical services, including services provided pursuant to the Medicare and Medicaid programs.

52.     In pertinent part, the AKS states:

(b) Illegal remunerations

(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kindô

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such personô

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

53.     The United States Department of Health and Human Services Office of Inspector General ("HHS-OIG") has promulgated "safe harbor" regulations that identify payment practices that are not subject to the AKS because such practices are unlikely to result in fraud or abuse. 42 C.F.R. § 1001.952. Safe harbor protection is afforded only to those arrangements that meet all of the specific conditions set forth in the safe harbor. 42 C.F.R. § 1001.952(d) (2000) (Payments to a physician under a personal service agreement must be "set in advance, [must be]... consistent with fair market value in arms-length transactions and [must]... not [be] determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare or a State health care program"). Defendants' conduct does not fall within any safe harbor.

54.     The AKS arose out of congressional concern that payments to those who can steer or direct patients or otherwise influence healthcare decisions, such as the Defendant private practices and/or doctors here, could result in goods and services being provided that are medically unnecessary, too costly, of poor quality, or even harmful to a vulnerable patient population. The AKS was partially based on studies demonstrating that physicians, even those intending to act in good faith, were likely to refer significantly more patients when there is a financial incentive to generate business.

55.     To protect the integrity of federal Healthcare Programs (i.e., Medicare and Medicaid) from these difficult to detect harms, and realizing the difficulty for regulators and law enforcement to review medical necessity in every case, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization of federal healthcare services or to poor quality of care. First enacted in

27

1972, Congress strengthened the AKS in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade the statute's reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

56.     As such, "[i]f any one purpose of remuneration is to induce or reward referrals of federal healthcare program business, the [Anti-Kickback] statute is violated." 66 Fed. Reg. 919 (citing *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68 (3rd Cir. 1985)). In other words, even if payments were made both for a legitimate purpose and to induce referrals or otherwise maintain a physician's business, this arrangement would still violate the AKS. *Id.* Indeed, under the AKS, any time any form of remuneration is exchanged between referral sources (*i.e.*, the Defendant private practices and/or doctors) and a provider of health care services to a federal health care program (*i.e.*, Defendant CHI-St. Luke's Health), the arrangement must be highly scrutinized because private physicians are the primary source of referrals of patients to hospitals. *See generally*, HHS-OIG, *Supplemental Compliance Program Guidance for Hospitals*, 70 Fed. Reg. 4858.

57.     Violation of the AKS may subject the perpetrator to exclusion from participation in federal Healthcare Programs, civil monetary penalties of $50,000 per violation, and three times the amount of remuneration paid, regardless of whether any part of the remuneration is a for a legitimate purpose. 42 U.S.C. § 1320-7(b)(7) and 42 U.S.C. §1320a-7a(a)(7).

## The Federal *Stark* Law

58.     The federal *Stark* Law "was enacted to address overutilization, anti-competitive behavior, and other abuses of health care services that occur when physicians have financial

relationships with certain ancillary service entities to which they refer Medicare or Medicaid patients." 69 Fed. Reg. 16123 (March 26, 2004). "Physician financial arrangements may have some anti-competitive effects to the extent that those relationships discourage other providers from entering a market in which patients are primarily referred to physician-owned entities or [designated health services] ("DHS") entities that maintain generous compensation arrangements with physicians." *Id*. "Anti-competitive behavior can increase program costs if the DHS entities with which physicians have financial relationships are favored over other, more cost-efficient providers or providers that furnish higher quality care." *Id*. "Overutilization increases program costs because Medicare (or Medicaid) pays for more items or services than are medically necessary." *Id*.

59.     "The approach taken by Congress in enacting section 1877 of the Act is preventive because it essentially prohibits many financial arrangements between physicians and entities providing DHS." 66 Fed. Reg. 859. "Specifically, Section 1877 of the Act imposes a blanket prohibition on the submission of Medicare claims (and payment to the States of federal financial participation under the Medicaid program) for certain DHS when the service provider has a financial relationship with the referring physician, unless the financial relationship fits into one of several relatively specific exceptions." *Id*.

60.     Congress enacted the *Stark* Law in two parts, commonly known as *Stark I* and *Stark II*. Enacted in 1989, *Stark I* applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

61.     In 1993, Congress extended the *Stark* Law (*Stark II*) to referrals for ten additional designated health services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562; Social

Security Act Amendments of 1994, P.L. 103-432, §152. As of January 1, 1995, *Stark II* applied to patient referrals by physicians with a prohibited financial relationship for the following ten additional õdesignated health servicesö: 1) inpatient and outpatient hospital services; 2) physical therapy; 3) occupational therapy; 4) radiology; 5) radiation therapy (services and supplies); 6) durable medical equipment and supplies; 7) parenteral and enteral nutrients, equipment and supplies; 8) prosthetic, orthotics, and prosthetic devices and supplies; 9) outpatient prescription drugs; and 10) home health services. *See* 42 U.S.C. § 1395nn(h)(6).

62.     The *Stark* Law provides that if a physician has a financial relationship with a hospital or entity, then:

> (A) The physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and
>
> (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under sub paragraph (A).

42 U.S.C. § 1395nn(a)(1).

63.     The *Stark* Law broadly defines prohibited õfinancial relationshipsö to include an õownership or investment interestö in an entityö or a õcompensation arrangementö in which õremunerationö is paid by a hospital to a referring physician õdirectly or indirectly, overtly or covertly, in cash or in kind.ö 42 U.S.C. § 1395nn(a)(2)(B), (h)(1); 42 C.F.R. § 411.354(c).

64.     The *Stark* Law defines both õownership or investment interestö and õcompensation arrangementö in broad terms: A prohibited ownership or investment interest õmay be through equity, debt, or other means and includes an interest in an entity that holds an ownership or investment interest in any entity providing the designated health service.ö 42 U.S.C. § 1995nn(a)(2)(B). A prohibited õcompensation arrangementö is defined as õany arrangement

30

involving any remuneration between a physician (or an immediate family member of such physician) and an entity other than an arrangement involving only remuneration described in subparagraph (C)." 42 U.S.C. § 1995nn(h)(1)(A). The term "remuneration" is similarly broad and "includes any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. §1995nn(h)(1) (B).

65.     The *Stark* Law defines "referral" as "the request or establishment of a plan of care by a physician which includes the provision of designated health services." 42 U.S.C. § 1395nn(h)(5)(A). The accompanying regulations applying the *Stark* Law broadly define "referral" as, among other things, "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare, the establishment of a plan of care by a physician that includes the provision of such a designated health service, or the certifying or recertifying of the need for such a designated health service" 42 U.S.C. § 411.351. A referring physician is defined in the same regulation as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." *Id*.

66.     In short, this language makes clear that Congress intended the definition of "financial relationship" to include essentially any type of financial relationship in which physicians receive any remuneration of any kind from a hospital, directly or indirectly, overtly or covertly, and a "referral" as any request for the provision of a DHS where payment may be made under Medicare or Medicaid.

67.     In addition to prohibiting a hospital from submitting claims where it has a financial relationship with a referring physician, the *Stark* Law also prohibits payments by federal Healthcare Programs of such claims: "No payment may be made under this subchapter for a

31

designated health service which is provided in violation of subsection (a)(1) of this section." 42 U.S.C. § 1395nn(g)(1). If a hospital submits prohibited claims and collects payment, the regulations implementing 42 U.S.C. § 1395nn require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353.

68.    The *Stark* Law and the AKS are "complementary and although overlapping in some aspects, not redundant." 66 Fed. Reg. 863. "We believe the Congress intended to create an array of fraud and abuse authorities to enable the government to protect the public fisc, beneficiaries of federal programs, and honest health care providers from the corruption of the health care system by unscrupulous providers." *Id*. "Congress only intended [the Stark laws] to establish a minimum threshold for acceptable financial relationships, and that potentially abusive financial relationships that may be permitted under Section 1877 of the Act could still be addressed through other statutes that address health care fraud and abuse, including the anti-kickback statute (Section 1128B(b) of the Act)." 66 Federal Register 860. "In some instances, financial relationships that are permitted under Section 1877 of the Act might merit prosecution under Section 1128B(b) of the Act." *Id*. "Conversely, conduct that may be proscribed by Section 1877 of the Act may not violate the anti-kickback statute." *Id*.

## Government Healthcare Programs

69.    Government Healthcare Programs cover the Hospital Defendants' services. They include, but are not limited to, the following programs.

## I.    The Medicare Program

70.    Medicare is a government financial health insurance program administered by the Social Security Administration of the United States. Medicare was promulgated to provide

payment for medical services, durable medical equipment and other related health items for individuals 65 and over. Medicare also makes payment for certain health services provided to needy classes of individual healthcare patients pursuant to federal regulation.  In 1965, Congress enacted the Health Insurance Program for the Aged and Disabled through Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*  ("Medicare").

71.     The Department of Health and Human Services ("HHS") is responsible for the administration and supervision of the Medicare Program. The Centers for Medicare and Medicaid Services ("CMS") is an agency of HHS and is directly responsible for the administration of the Medicare program. Individuals who receive benefits under Medicare are referred to as Medicare beneficiaries.

72.     The Medicare Program is divided into four parts. Medicare Part A authorizes payment for institutional care, including hospital, nursing facility, and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4. Part B of the Medicare Program authorizes payment for outpatient health care expenses, including physician services, diagnostic services, and radiology services. *See* 42 U.S.C. 1395-1395w-4.

73.     Medicare enters into provider agreements with hospitals to establish the hospitals' eligibility to participate in the Medicare Program. Under the Medicare Program, CMS makes payments retrospectively to hospitals for inpatient services. Medicare does not prospectively contract with hospitals to provide particular services for particular patients. Any benefits derived from those services are derived solely by the patients and not by Medicare or by the United States.

74.     Hospital providers who participate in Medicare must sign and submit to CMS an application for participation in the Medicare program, otherwise known as a Hospital Insurance Benefit Agreement (Form HCFA-1561). By signing and submitting this form, hospital providers

agree to "conform to the provisions of Section 1866 of the Social Security Act and [the] applicable provisions in 42 CFR, Parts 405, 466, 420, and 489."

75.    The Hospital Defendants, acting through their agents, employees, and representatives, have executed and submitted to CMS one or more Hospital Insurance Benefit Forms (Form HCFA-1561).

76.    Providers who participate in Medicare must also sign and submit to CMS a Medicare Enrollment Application for Institutional Providers (Form 855A). By signing and submitting this form, hospital providers agree to abide by "Medicare laws, regulations, and program instructions," and expressly certify their understanding "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the federal anti-kickback statute and the *Stark* laws)…" *Id*. The Enrollment Application also summarizes the False Claims Act, explaining the penalties for falsifying information to "gain or maintain enrollment in the Medicare program." *Id*.

77.    The Hospital Defendants, acting through their agents, employees, and representatives, have executed and submitted to CMS at least one Medicare Enrollment Application for Institutional Providers (Form 855A).

78.    To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. § 1395h. Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and auditing cost reports.

79.    Hospitals submit claims for interim reimbursement for items and services delivered to Medicare beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments on a Form UB-92.

34

80.     As a condition of payment by Medicare, CMS requires hospitals to submit annually a Form CMS-2552, more commonly known as the hospital cost report. A cost report is the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

81.     At the end of each hospital's fiscal year, the hospital files its cost report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year, See 42 U.S.C. § 1359g; 42 C.F.R. § 413.20. Medicare relies upon the cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

82.     Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular discharges (specifically listed on Form UB-92 or Form UB-04 after March of 2007) during the course of the fiscal year. On the cost report, this Medicare liability for services is then totaled with any other Medicare liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider are subtracted to determine the amount due Medicare or the amount due the provider.

83.     At all times relevant to this Complaint, the Medicare Program, through its fiscal intermediaries, had the right to audit the cost reports and financial representations made by the hospital Defendants, including by CHI-St. Luke's, to ensure their accuracy and protect the integrity of the Medicare Program. This includes the right to adjust cost reports previously submitted by a provider if any overpayments have been made. 42 C.F.R. § 413.64(f).

84.     Just as with Forms 1561 and 855A submitted to CMS, each cost report contains mandatory certifications of compliance with the *Stark* and Anti-Kickback laws. This certification must be signed by the chief administrator of the hospital provider or by a responsible designee of the administrator.

85.     The Hospital Defendants were required to submit hospital cost reports to their fiscal intermediary for each Fiscal Year between 2007 and the present.

86.     Each hospital cost report submitted by the Hospital Defendants included the following notice: "Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil, and administrative action, fine and/or imprisonment under federal law. ***Furthermore, if services provided in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.***" (Emphasis added).

87.     For each hospital cost report submitted by the Hospital Defendants, the chief administrative officer or designee were required to certify that: "I have read the above statement… and that I have examined the accompanying electronically filed or manually submitted cost report… and that to the best of my knowledge and belief, it (the cost report) is a true, correct, and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. ***I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.***" (Emphasis added).

88.     In short, for each hospital cost report, the Hospital Defendants were required to certify that their reports were (1) truthful, i.e., that the cost information contained in the report is true and accurate; (2) correct, i.e., that the provider is entitled to reimbursement for the reported

costs in accordance with applicable instructions; (3) complete, i.e., that the cost report is based upon all knowledge known to the provider; (4) that the services in the cost report were not linked to kickbacks; and (5) that the provider complied with laws and regulations regarding the provision of health care services, such as the *Stark* and Anti-Kickback laws.

89.     The Hospital Defendants were also required to disclose all known errors and omissions in their claims for Medicare reimbursement including in any hospital cost reports submitted to a fiscal intermediary. Indeed, 42 U.S.C. § 1320a-7b(a)(3) specifically confirms the duty to disclose known errors in any hospital cost report: õWhoeverí having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or paymentí conceals or fails to disclose such event with an intent fraudulently to secure such benefits or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorizedí shall in the case of such aí concealment or failureí be guilty of a felony.ö

90.     Once these cost reports (and the accompanying certifications) are submitted by a hospital provider, CMS issues a Notice of Provider Reimbursement (NPR) based on the financial data and certifications submitted in the cost reports. In accordance with 42 C.F.R. § 415.1885, a cost report may be reopened even after the NPR has been issued for a number of reasons, including for the provision of inaccurate cost report data or the submission of false claims.

91.     Indeed, even after the submission of a cost report, hospital providers themselves have an ongoing duty to request the reopening of previously submitted cost reports if those reports are known to contain or to be based on false information submitted to federal healthcare programs (*i.e.* Medicare or Medicaid).

92. Private practitioners/physicians (including private practice groups) bill for services provided to Medicare beneficiaries under Medicare Part B. In order to participate in and be reimbursed by Medicare, these private practitioners/physicians must submit Form CMS-1500.

93. As with the various forms submitted by the hospital providers described above, Form CMS-1500 requires the physician to certify that they are eligible for participation in the Medicare Program, and that they have complied with all applicable regulations and law governing Medicare, such as the *Stark* and Anti-Kickback laws: õI certify that: 1) the information on this form is true, accurate, and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contract; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; and 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the federal anti-kickback state and the Physician Self-Referral law (commonly known as the Stark Law)í   .ö

94. The submission of CMS-1500 also requires the practitioner to certify that he or she õunderstand(s) that payment and satisfaction of this claim will be from federal and State funds, and that any false claims, statements, documents, or concealments of a material fact, may be prosecuted under applicable federal or State laws.ö

95. The Medicare Program uses the Medicare beneficiary data included in these hospital cost reports and in the CMS-1500s submitted by private practitioners to determine the payments due to each facility and/or private practitioner.

96. Defendants submitted claims to Medicare that were based in part on their Medicare hospital cost reports and/or their CMS-1500, as well as their false certifications of compliance with

federal *Stark* and Anti-Kickback Laws. The Medicare Program relied upon such certifications as mandatory conditions of payment before paying such claims submitted by Defendants.

## II.     The Medicaid Program

97.     The federal government enacted the Medicaid program in 1965 as a cooperative undertaking between the federal and state governments to help the states provide health care to low-income individuals. The Medicaid program pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") Secretary through CMS. See 42 U.S.C. §§ 1396a(a)-(b).  States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates.  See 42 U.S.C. §§ 1396b(a)(1), 1903(a)(1).  The federal government then pays each state a statutorily established share of "the total amount expended ... as medical assistance under the State plan ..." See 42 U.S.C. §1396b(a)(1).  This federal-to-state payment is known as federal financial participation ("FFP").

98.     Medicaid is a public assistance program providing for payment of medical expenses for approximately 55 million low-income patients. Funding for Medicaid is shared between the federal government and state governments. The Medicaid program subsidizes the purchase of more prescription drugs than any other program in the United States.

99.     The federal Medicaid statute sets forth certain minimum requirements for state Medicaid programs to qualify for federal funding, or the FFP. 42 U.S.C. §§1396, *et seq*. As part of such minimum requirements, each state's Medicaid program must cover hospital and physician services. 42 U.S.C. § 1396(a)(1)-(2), (5).

100.     The federal matching rate for the Texas Medicaid Program from 2007 through the present was as follows: 2017 (56.18%); 2016 (57.13%); 2015 (58.05%); 2014 (58.69%); 2013

(59.30%); 2012 (58.22%); 2011 (60.56%); 2010 (70.94%); 2009 (69.85%); 2008 (60.53%); 2007 (60.78%).

101.    "Section 13624 of the Omnibus Budget Reconciliation Act of 1993, entitled 'Application of Medicare Rules Limiting Certain Physician Referrals,' extended aspects of the Medicare prohibition on physician referrals to Medicaid." 66 Fed. Reg. 857. "This provision bars FFP in State expenditures for DHS furnished to an individual based on a physician referral that would result in denial of payment for these services under the Medicare program if Medicare covered the services to the same extent and under the same terms and conditions as under the State Medicaid plan." 66 Fed. Reg. 858. In other words, the same prohibitions on physician referrals in exchange for illegal remuneration, including kickbacks, discussed above in the context of the Medicare program also apply to Medicaid.

102.    "The statute also made certain reporting requirements in section 1877(f) of the Act, and the civil monetary penalty provision in section 1877(g)(5) (related to reporting requirements), applicable to providers of DHS for which payment may be made under Medicaid in the same manner as they apply to providers of such services for which payment may be made under Medicare." 66 Federal Register 858.

103.    The Medical Assistance Program ("MAP") was enacted in 1967 to implement Medicaid within the state of Texas.  TEX. HUM. RES. CODE §§ 32.001 *et seq.*  The purpose of the statute was to "provide medical assistance on behalf of needy individuals and enable the state to obtain all benefits for those persons authorized under the Social Security Act or any other federal act." § 32.001.

104.    A provider must file an enrollment application with the Texas Health and Human Service Commission ("HHSC") and the Texas Medicaid and Healthcare Partnership ("TMHP") to

participate in the Texas Medicaid program.  1 TEX. ADMIN. CODE § 352.5(a).  The provider is required to submit a new enrollment application every five years to continue its participation in the Medicaid program.  *Id*. at § 352.5(c).

105.    The provider is required to "comply with all terms and conditions of the provider agreement."  1 TEX. ADMIN. CODE § 352.7(a)(8).  The HHSC Medicaid Provider Agreement ("Provider Agreement") requires the provider to "comply with all of the requirements of the Provider Manual, as well as all state and federal laws governing or regulating Medicaid."  *See* HHSC Medicaid Provider Agreement, eff. July 1, 2017 at 3-1.  Furthermore, the Provider Agreement is "subject to all state and federal law and regulations relating to fraud, abuse and waste in health care and the Medicaid program.  *Id*.

106.    Lastly, the Provider Agreement requires the provider to acknowledge and certify its compliance with Medicaid rules and regulations, including the AKS and the *Stark* law:

> Provider agrees to abide by all Medicaid regulations, program instructions, and Title XIX of the Social Security Act. The Medicaid laws, regulations, and program instructions are available through the Medicaid contractor. **Provider understands that payment of a claim by Medicaid is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law**), and on the provider's compliance with all applicable conditions of participation in Medicaid.

*See* Provider Agreement at 3-7 (emphasis added).

107.    In addition to the federal AKS, Texas has its own anti-kickback provision in MAP. Pursuant to § 32.039(b), a provider commits a violation if it:

> (1) presents or causes to be presented to the commission a claim that contains a statement or representation the person knows or should know to be false;

(1-b) solicits or receives [í  ] any remuneration, including kickback, bribe, or rebate [í  ] for referring an individual to a person for the furnishing of [í  ] any item or service for which payment may be made, in whole or in part, under [Medicaid];

(1-c) solicits or receives [í  ] any remuneration, including kickback, bribe, or rebate for purchasing, leasing, or ordering, or arranging for or recommending the purchasing, leasing or ordering, of any good facility, service, or item for which payment may be made by [under Medicaid];

(1-d) offers or pays [í ]any remuneration, including kickback, bribe, or rebate [í  ] to induce a person to refer an individual to another person for the furnishing of [í  ] any item or service for which payment may be made [under Medicaid];

(1-e) offers or pays [í  ] any remuneration, including kickback, bribe, or rebate [í  ] to induce a person to purchase, lease or order [í  ] any good, facility, service, or item for which payment may be made [under Medicaid];

(1-f) provides, offers, or receives an inducement [í  ] to or from a person, including a recipient, provider employee or agent of provider, third-party vendor, or public servant, for the purpose of influencing or being influenced in a decision regarding (A) selection of a provider or receipt of a good or service [Medicaid]; (B) the use of goods or services [Medicaid]; (C) the inclusion or exclusion of goods or services under [Medicaid].

§ 32.039(b).

108.    A provider who violates § 32.039(b) is liable for up to two-times the amount paid as a result of the violation plus interest and a penalty between $5,000 and $10,000 per violation. If the violation results in an injury the elderly, minors or a person with a disability, the penalty is increased to $15,000 per violation. § 32.039(c).

109.    In Texas, provider hospitals participating in the Medicaid Program file annual cost reports with the state's Medicaid agency, or its intermediary, in a protocol similar to that governing the submission of hospital cost reports for providers participating in Medicare. Indeed, not only must Medicaid providers incorporate the same type of financial data in their Medicaid hospital

cost reports as contained in their Medicare hospital cost reports, but they must also certify the accuracy of the information provided and certify compliance with Medicaid laws and regulations, including compliance with the *Stark* and Anti-kickback laws.

110.     The Texas Medicaid Program uses the Medicaid patient data included in these hospital cost reports to determine the payments due to each facility.

111.     The Hospital Defendants submitted claims to Medicaid that were based in part on their Medicaid cost reports and their false certifications of compliance with federal *Stark* and Anti-Kickback Laws. The Texas Medicaid Program relied upon such certifications as mandatory conditions of payment before paying such claims submitted by the Hospital Defendants.

**III.     Reimbursement Under Other Federal Healthcare Programs**

112.     The Civilian Health and Medical Program of the Uniformed Services, known as TRICARE Management Activity/CHAMPUS (ōTRICAREö), is a federal-funded program that provides medical benefits, including hospital services, to certain relatives of active duty, deceased, and retired service members or reservists, as well as to retirees. TRICARE sometimes provides for hospital services at non-military facilities for active duty service members as well. 10 U.S.C. §§ 1071-1110; 32 C.F.R. § 199.4(a).

113.      In addition to individual patient costs, TRICARE pays hospitals for two types of costs, both based on the Medicare cost-report: capital costs and direct medical education costs. 32 C.F.R. § 199.6.

114.     A provider seeking reimbursement from TRICARE for these costs is required to submit a TRICARE form, ōRequest for Reimbursement of CHAMPUS Capital and Direct Medical Education Costsö (ōRequest for Reimbursementö), in which the provider sets forth the number of

patient days and financial information related to these costs. These costs are derived from the provider's Medicare cost report.

115.    The Request for Reimbursement requires that the provider certify that the information contained therein is "accurate based upon the hospital's Medicare cost report."

116.    Upon receipt of a provider's Request for Reimbursement, TRICARE or its fiscal intermediary applies a formula for reimbursement wherein the provider receives a percentage of its capital and medical education costs equal to the percentage of TRICARE patients in the hospital.

117.    On information and belief, the Hospital Defendants submitted Requests for Reimbursement to TRICARE that were based on their Medicare cost reports. Whenever the Medicare cost reports for the Hospital Defendants contained false information or false certifications from which they derived their Requests for Reimbursement submitted to TRICARE, those Requests for Reimbursement were also false.

118.    On each occasion that the Hospital Defendants' Requests for Reimbursement were false due to falsity in their Medicare cost reports, the Hospital Defendants certified that the information contained in their Requests for Reimbursement were "accurate and based upon the hospital's Medicare cost report."

119.    The Hospital Defendants knew that false claims contained in their Medicare cost reports would affect TRICARE/CHAMPUS payments as well and result in damages to the federal government.

## The False Claims Act

120.    The False Claims Act establishes liability, *inter alia*, for anyone who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government' a

false or fraudulent claim for payment or approval,ö 31 U.S.C. § 3729(a)(1)(A), or öknowingly

makes, uses, or causes to be made or used, a false record or statement material[1] to a false or

fraudulent claim,ö 31 U.S.C. § 3729(a)(1)(B), or öknowingly makes, uses, or causes to be made or

used, a false record or statement material to an obligation to pay or transmit money or property to

the Government, or knowingly conceals or knowingly and improperly avoids or decreases an

obligation[2] to pay or transmit money or property to the Government.ö 31 U.S.C. § 3729(a)(1)(G).

121.    The False Claims Act defines öclaimö to include öany request or demand, whether

under a contract or otherwise, for money or property and whether or not the United States has title

to the money or property, thatí  is presented to an officer, employee or agent of the United

Statesí  or is made to a contractor, grantee or other recipient, if the money or property is to be

spent on the Governmentøs behalf or to advance a Government program, and if the United States

Governmentí  provides or has provided any portion of the money or property requested or

demandedí  or will reimburse such contractor, grantee, or other recipient for any portion of the

money or property which is requested or demanded.ö 31 U.S.C. § 3729(b)(2).

122.    Statutory liability under the False Claims Act includes a civil penalty öplus three

times the amount of damages which the Government sustains because of the act of that person.ö

31 U.S.C. § 3729(a).

123.    Under the federal False Claims Act, öknowingø and ÷knowinglyø mean that a

person, with respect to information (1) has actual knowledge of the information; (2) acts in

---

[1] öThe term ÷materialø means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.ö 31 U.S.C. § 3729(b)(4).

[2] The False Claims Act defines öobligationö as öan established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, for a fee-based or similar relationship, from stature or regulation, or from the retention of any overpayment.ö 31 U.S.C. § 3729(b)(3).

deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and require no proof of specific intent to defraud.ö 31 U.S.C. § 3729(b)(1).

124.     In considering the requisite scienter which subjects a defendant to liability under the False Claims Act, õno proof of specific intent to defraudö is required. *Id*. Under the False Claims Act, a defendant is liable for acting in õreckless disregard of the truth or falsity of the informationö or acting in õdeliberate ignorance of the truth or falsity of the information.ö *Id*.

125.     Protection of the public treasury requires that those who seek public funds do so with scrupulous regard for the requirements of law. More specifically, participants in federal Healthcare Programs have a duty to familiarize themselves with the legal requirements for payment and to ensure compliance with those requirements. A defendant who fails to inform himself of those requirements acts in reckless disregard or in deliberate ignorance of those requirements, either of which is sufficient to charge him with knowledge of the falsity of the claims in question. Likewise, a defendant who fails to verify and evaluate the accuracy of information or to investigate the accuracy of information when on notice of questions concerning the accuracy of such information, acts in reckless disregard or deliberate ignorance sufficient to charge him with knowledge of the falsity of the claims in question.

126.     On March 23, 2010, the Patient Protection and Affordability Care Act (õACAö), Pub. L. 111-148, 124 Stat. 119, was enacted and broadened both the reach of the AKS and the reach of the False Claims Act.

127.     Under the amended AKS, õa claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for the purposes of [the False Claims Act].ö 42 U.S.C. § 1320a-7b(g). According to the legislative history of the ACA, this amendment

to the AKS was intended to clarify ̃that all claims resulting from illegal kickbacks are considered false claims for the purpose of civil actions under the False Claims Act, even when the claims are not submitted directly by the wrongdoers themselves.̈ 155 CONG. REC. S10854 (daily ed. Oct. 28, 2009) (statement of Sen. Leahy).

128.    Under the amended False Claims Act, the public disclosure defense is no longer a jurisdictional bar but rather is an affirmative defense that automatically fails if opposed by the government.

129.    31 U.S.C. § 3730(4)(A), as amended in March 2010, provides as follows:

The Court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed (i) in a federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other federal report, hearing audit, or investigation; or (iii) from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, ̃original sourcë means an individual who either (i) prior to a public disclosure under subsection (e)(4)(A), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

130.    In short, even in the presence of a public disclosure as defined in the amended False Claims Act, the complaint is not subject to dismissal if the whistleblower is an ̃original source.̈

131.    Under the amended False Claims Act, ̃original sourcë has been redefined. Previously, an ̃original sourcë must have had ̃direct and independent knowledge of the information on which the allegations are based,̈ and voluntarily provided the information to the Government before filing suit based on such information. As amended, an ̃original sourcë must either: (i) prior to a public disclosure, have voluntarily disclosed to the Government the information on which allegations or transactions in the claim are based, or (ii) have knowledge

that is independent of, and that materially adds to, the publicly disclosed allegations or transactions, and have voluntarily provided the information to the Government before filing an action.

132.    In this action, there has been no public disclosure as defined by the False Claims Act. Further, Relator would satisfy the original source exception even if there was such a public disclosure.

### Texas Medicaid Fraud Prevention Act

133.    Similar to the federal FCA, the Texas Medicaid Fraud Prevention Act (õTMFPAö), Tex. Hum. Res. Code §§ 36.001 *et seq*. imposes liability on a person who:

> (1)    knowingly makes or causes to be made a false statement or misrepresentation of a material fact to receive a benefit or payment under the Medicaid program that is not authorized;
>
> (2)    knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program the is no authorized;
>
> [í  ]
>
> (4)    knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning [í  ] information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program; or
>
> [í  ]
>
> (12)    knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program.

§ 36.002.

134.     In addition to the above-mentioned acts, § 36.002(13) of TMFPA incorporates the anti-kickback provisions from § 32.039(b) of MAP, explained in greater detail in ¶ 83 above, which prohibits a person from soliciting, receiving, offering or paying "any remuneration, including any kickback, bribe, or rebate" in exchange for referrals, recommendations, or inducements for services or goods to be paid by Medicaid. § 32.039(b).

135.     Under the TMFPA, "a person actions ‗knowingly' with respect to information" if the person 1) has knowledge of the information; 2) acts with conscious indifference to the truth or falsity with respect to the information; or 3) acts in reckless disregard of the truth of the falsity of the information. § 360011. Just like the federal False Claims Act, proof of specific intent is not required. *Id.*

136.     Each element of the action must be proven by a preponderance of the evidence. § 36.1021.

137.     Statutory liability of the TMFPA includes penalties, damages, interest and attorneys' fees.   § 36.052.  A violator of the TMFPA is liable to the State of Texas for twice the amount paid by Medicaid plus interest. § 36.052(a).

138.     TMFPA imposes civil penalties of between "$5,500 or the minimum amount imposed" by the federal False Claims Act and "$11,000 or the maximum imposed" by the federal False Claims Act.  Additionally, civil penalties can increase to $15,000 "for each unlawful act" "that results in injury to an elderly person" or a "person younger than 18 years of age."   § 36.052(a)(3).

139.     Similar to the federal False Claims Act, the TMFPA has a public disclosure defense provision which requires the court to "dismiss an action or claim" "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed in a "1) Texas

or federal criminal or civil hearing where Texas is a party; 2) Texas legislative or administrative report; 3) a Texas hearing, audit or investigation; or 4) news media." § 36.113(b).

140.    However, just like the federal False Claims Act, the TMFPA public disclosure defense does not apply if the dismissal is opposed by the Texas Attorney General or if the person bringing the suit is an original source. *Id.*

141.    The TMFPA defines an original source as an individual who, prior to a public disclosure, "voluntarily disclosed to the state the information on which allegations or transactions in a claim are based" or "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions and who has voluntarily provided the information to the state before filing an action" *Id.*

142.    In this action, there has been no public disclosure as defined by the TMFPA. Further, Relator would satisfy the original source exception even if there was such a public disclosure.

## DEFENDANTS' ILLEGAL SCHEME

## I.    Defendants' Anti-Kickback Statute and Stark Act Violations

143.    The Hospital Defendants recruit wealthy international patients through the International Services Department at Baylor St. Luke's Medical Center by advertising that its "multilingual, professional team stands ready to manage all medical service and related needs 24 hours a day, 7 days a week, 365 days a year." As part of this recruitment process, the Hospital Defendants tout a long list of services provided to international patients and their families by the ISD at BSLMC, including: scheduling appointments with physicians, billing and other financial services, providing interpreters for patients who do not speak English, travel assistance, business center access, and spiritual and cultural support.

50

144.     These services are offered by the Hospital Defendants in part to attract wealthy international patients to Baylor St. Luke's Medical Center— a practice that on its own is not problematic and is duplicated in one form or another by most other major hospital systems in the U.S. with an international patient department. But, the Hospital Defendants also use these services to provide illegal kickbacks to certain medical practices and physicians, independent from the BSLMC, to induce Medicare and Medicaid patient referrals. It is this practice that violates the Anti-Kickback Statute and the *Stark* laws.

145.     The illegal kickback scheme works as follows: The ISD refers wealthy international patients to the Referring Physicians, and provides the Referring Physicians with complimentary interpretation, scheduling, billing, and collection services, as well as in some cases, international travel perks, to induce the referral of Medicare and Medicaid patients to BSLMC. In certain cases, the international patients themselves are used as a form of kickback to induce Medicare and Medicaid patient referrals.

146.     The Hospital Defendants have provided the international patient referrals and complimentary interpreter, billing, collection, and scheduling service kickbacks to the Referring Physicians since at least 2011, when Relator began working as an International Patient Representative.

147.     On information and belief, beginning no later than 2011 and lasting until the present time, for at least a small number of the Referring Physicians, including for Dr. Alan Hoffman, Dr. Krajcer, Dr. Cosselli, and Dr. Lamelas, Defendant CHI-St. Luke's provided lavish vacations, travel stipends, and other related gifts as a further inducement for the referral of Medicare and Medicaid patients.

148.    On information and belief, beginning no later than 2011 and lasting until approximately 2013 or 2014, Defendant CHI-St. Luke's (and formerly St. Luke's Episcopal Hospital) also provided referring physicians and practices whose offices were at the O'Quinn Medical Tower at 6624 Fannin St. in Houston with discounted rent and free building maintenance services. In approximately 2013/2014, the rental terms were changed: the rent was increased and the impacted physicians and practices had to pay for building maintenance services, such as a new fee for changing lightbulbs. Relator has knowledge of this matter because when the terms were changed, it was common knowledge and widely discussed around BSLMC that many referring physicians and practices were upset about the changes. During this time period, it was particularly important to the Hospital Defendants' scheme to placate the Referring Physicians by providing kickbacks from the ISD so that the Referring Physicians did not begin sending their referrals elsewhere, such as to Houston Methodist Hospital.  Many (though not all) of the Defendant Referring Physicians had their offices at the O'Quinn Medical Tower and were impacted by the change in terms. Those physicians who had their offices at the O'Quinn Medical Tower include the Defendant Referring Physicians identified throughout this Complaint as having received complimentary interpreters at 6624 Fannin St. in Houston.

149.    The Hospital Defendants, acting through Vice President Matar, Associate Director Sanchez, and other ISD employees, knowingly and willfully provided this remuneration—the international patient referrals, complimentary interpreter and administrative services, and international travel perks—to the Referring Physicians at least in part for an improper purpose: inducing referrals, including Medicare and Medicaid referrals, back to BSLMC.

150.    The Hospital Defendants rate and remunerate physicians based on the number of Medicare and Medicaid referrals they provide.

151.    The Referring Physicians are valued by the Hospital Defendants based on the number of Medicare and Medicaid patient referrals they make to CHI-St. Luke⊘s Health.

152.    Relator attended regular ISD staff meetings where senior ISD officials made these referral criteria absolutely clear. Relator would often attend multiple meetings in a single week where senior ISD staff, including the Vice President of the ISD Tania Matar and the Associate Director of the ISD Angelita Sanchez, instructed staff regarding which referring physicians and practices to refer international patients to, and which to avoid until such time as they increased their Medicare and Medicaid referrals back to BSLMC.

153.    On information and belief, senior ISD staff tracked the number of Medicare and Medicaid referrals to BSLMC/St. Luke⊘s Episcopal Hospital by the Referring Physicians. The ISD staff doing so included VP Matar and Associate Director Sanchez, and prior to his departure, Warren Whitehead, who served as the VP of the International Services Program when the hospital in which it was housed was named St. Luke⊘s Episcopal Hospital. Matar, Sanchez, and Whitehead had access to such information due to their roles and through their regular meetings with management personnel of BSLMC/St. Luke⊘s Episcopal Hospital, such as BSLMC President Gay Nord and St. Luke⊘s Episcopal Hospital President David Fine. Matar and Sanchez⊘s comments to Relator and other ISD staff members routinely reflected knowledge of which physicians and practices provided high or low numbers of referrals to the hospital.

154.    Doctors who refused to refer Medicare and Medicaid patients back to CHI-St. Luke⊘s Health at BSLMC, or who did not make enough referrals, risked being cut off from receiving international patient referrals. Drs. Luis Camacho, Nery Flores, and Fernando Urrutia were at one time either restricted or completely cut off from being referred international patients by ISD staff because they no longer sent enough Medicare/Medicaid referrals back to CHI-St.

Luke's Health at BSLMC – and in the cases of Dr. Flores and Dr. Urrutia, were referring many of their Medicare/Medicaid patients to Houston Methodist Hospital instead of BSLMC.  Relator and other ISD staff were instructed and reminded multiple times not to refer international patients to these physicians, including one such instruction from Associate Director Sanchez given to Relator and other ISD staff at a referral staff meeting held at the ISD at the end of 2015/beginning of 2016.

155.    At the other end of the referral spectrum, the ISD also identified those Referring Physicians that referred the most Medicare or Medicaid patients to BSLMC as "preferred" providers to whom ISD staff should refer as many international patients as possible.

156.    For example, in an ISD staff meeting in or around July 2017, ISD Associate Director Sanchez instructed Relator, as well other members of the ISD staff, including Carlos Aguilar, Suzanne Haroun, and Lorenna Jaramillo, that the ISD should refer as many patients as possible to Dr. Isaac Raijman, a private practitioner from Greater Houston Gastroenterology, because he was referring many patients to CHI-St. Luke's and the ISD needed to "keep him happy" (or words to that effect).

157.    During the regular ISD staff meetings, senior ISD staff, including VP Matar and Associate Director Sanchez, routinely instructed ISD staff to refer as many international patients to "preferred" practitioners, even going so far as attempting to thwart the referral of international patients to other doctors not on the "preferred" list regardless of the circumstances or medical necessity, using pretextual excuses.

158.    For example, on October 13, 2016, Relator received an e-mail request from Dr. Nihad Eldin, the Medical Advisor for the Consulate of the United Arab Emirates, requesting that he schedule an urgent internal medicine appointment "that same day if possible" for a patient already in the country and experiencing "cough, fever, mild dyspnea, and a family history of

54

asthma." Informed that the patient was covered by United Healthcare insurance ("UHC"), Relator made this patient a same-day appointment with Dr. Thomas Stasicha, an internist at BSLMC. When ISD VP Matar became aware of the referral to Dr. Stasicha shortly thereafter, VP Matar attempted to pressure Relator into referring the patient to Defendant Dr. Alan Hoffman instead, one of the outside "preferred" physicians referred to above. *See* Exhibit 3 (10/13/2016 e-mail from Vice President Matar).

159.    Relator was able to avoid switching the referral in this particular instance only because Dr. Hoffman did not accept UHC insurance. However, tellingly, when he informed VP Matar via e-mail that because the patient was in need of seeing a physician immediately, and because the patient was covered by UHC insurance, his only option was to refer the patient to Dr. Stasicha in BSLMC's own in-house internal medicine department, VP Matar responded that the ISD needed to find "an alternative" private practitioner who accepts UHC insurance (meaning another potential source of Medicare/Medicaid referrals). *Id*.

160.    Dr. Hoffman was "preferred" for ISD referrals because he was a consistent source of referrals of Medicare and Medicaid patients back to CHI-St. Luke's Health. Relator has attended dozens of ISD staff meetings where VP Matar and/or Associate Director Sanchez instructed ISD staff to refer as many patients as possible to Dr. Hoffman.

161.    VP Matar wanted "an alternative" private practitioner who accepted UHC insurance rather than referring ISD patients to BSLMC's internal in-house internal medicine department to further the scheme of misusing the ISD as a vehicle to induce Medicare and Medicaid referrals from independent physicians and practices.

162.     The Hospital Defendants, including Matar and Sanchez, believed that providing remuneration to high-volume referral sources and cutting off remuneration to low-volume referral sources would induce a greater volume of Medicare and Medicaid referrals to BSLMC.

163.     The ISD maintained a selective roster of physicians to facilitate referrals by ISD staff of international patients to independent physicians approved by VP Matar and Associate Director Sanchez. Matar and Sanchez placed physicians on this roster for reasons including that they believed the physicians would refer back business to the hospital. Matar and Sanchez also removed physicians from this roster if they believed the physicians would not refer business back to the hospital. The ISD's referral roster included Defendants Boccalandro, Colomer, Cherem, Dahlberg, Douglass, Elhaj, Fishman, Hoffman, Hung, Katz, Krajcer, Leachman, Livesay, Lopez, Mesa, Moses, Raijman, Santacruz, Singh, and Sista, among other physicians. In similar fashion, the ISD also maintained a file of biographies for a selective list of independent physicians slated to receive referrals of international patients from the ISD, which included many of the Defendant Referring Physicians as well.

164.     The government has long warned both hospitals and referring physicians against such practices. In 2005, the Office of Inspector General of the Department of Health and Human Services identified as a special concern "compensation arrangements" between hospitals and physicians in which "hospitals provide items or services to the physicians" including, for example, "agreements for the provision of billing . . . or other staff service" if "one purpose of the arrangements is to compensate physicians for past or future referrals." HHS-OIG Supplemental Compliance Program Guidance for Hospitals, 70 Fed. Reg. 4858-01, 2005 WL 192293, Jan. 31, 2005 (emphasis added). As the HHS-OIG warned:

> The general rule of thumb is that any remuneration flowing between hospitals and physicians should be at fair market value . . . based upon an arm's-length transaction and

56

should not take into account, directly or indirectly, the value or volume of any past or future referrals or other business generated between the parties. **Arrangements under which hospitals [] provide physicians with items or services for free [or] relieve physicians of financial obligations they would otherwise incur . . . pose significant risk**. In such circumstances, an inference arises that the remuneration may be in exchange for generating business.

*Id.* (emphasis added).

165.     Even prior to 2005, the government had identified compensation arrangements between hospitals and referring physicians as areas of special risk and concern. *See, e.g.*, 63 Fed. Reg. 8987 (February 23, 1998) (raising concerns about õ[f]inancial arrangements between hospitals and hospital-based physiciansö and õ[h]ospital incentives that violate the anti-kickback statuteö); Depøt of Health & Human Servs. Office of Inspector General Compliance Program for Individual and Small Group Physician Practices, 65 Fed. Reg. 59434 (Oct. 5, 2000) (cautioning physician practices of the risk of õimproper inducements, kickbacks, and self-referrals,ö including õarrangements with hospitalsö).

166.     As the government has made clear, õremuneration for referrals is illegal because it can distort medical decision-making, cause overutilization of services or supplies, increase costs to Federal health care programs, and result in unfair competition by shutting out competitors who are unwilling to pay for referrals,ö as well as õaffect[ing] the quality of patient care by encouraging physicians to order services . . . based on profit rather than the patientsø best medical interests.ö HHS-OIG Compliance Program for Individual and Small Group Physician Practices, 65 Fed. Reg. 59434, 59440 (Oct. 5, 2000); OIG Special Fraud Alert, 65 Fed. Reg. 9274, 9275 (Feb. 24, 2000).

167.     These actionsô the referral of international patients, the provision of free scheduling, billing, and interpretation services, and the provision of lavish travel-related giftsô when provided by the ISD to the Defendant Referring Physicians, violate the AKS and Stark Act.



**III.    Defendants' False Claims Act Violations.**

175.    Although the Hospital Defendants were violating the requirements of the AKS, federal *Stark* laws, and other relevant regulations, they nonetheless submitted claims to Medicare and Medicaid, which made up a large proportion of their business (58%, in the case of Defendant CHI).

176.     The Hospital Defendants violated the False Claims Act by, among other actions/misconduct:

a.   Certifying compliance with the AKS, federal *Stark* laws, and other relevant regulations as a condition of participation in Medicare and Medicaid (Forms HCFA-1561 and CMS-1500);

b.   Certifying compliance with the AKS, federal *Stark* laws, and other relevant regulations as a condition of payment under the Medicare and Medicaid programs (Forms 855A and CMS-1500);

c.   Falsely certifying compliance with the AKS, the Stark laws, and other relevant regulations in their claims for interim reimbursement (Form UB-92);

d.   Falsely certifying compliance with the AKS, the *Stark* laws, and other relevant regulations in their hospital cost reports (Form CMS-2552):

e.   Falsely certifying that none of the services billed to Medicare or Medicaid were õprovided or procured through the payment directly or indirectly of a kickbackö or other illegal remuneration.

177.     The Hospital Defendants also violated the TMFPA by 1) falsely certifying compliance with the AKS, Federal *Stark* laws, and other relevant regulations in the Provider Agreement; 2) falsely certifying compliance with the AKS, federal *Stark* laws, and other relevant regulations as a condition of payment under the Medicaid programs; and 3) knowingly violating § 36.002(13) and § 32.039(b) by accepting or paying for kickbacks.

178.     These certifications by the Hospital Defendants for the purposes of enrollment in, payment by, and continued participation in Medicare and Medicaid were knowingly false as agents, employees, and representatives of the Hospital Defendants, including Vice President Matar

and Associate Director Sanchez, knew that the Hospital Defendants were routinely violating the AKS, Stark laws, and relevant regulations by misusing the ISD to provide illegal remuneration to induce referrals.

179.     In many cases, the Hospital Defendants' claims to Medicare and Medicaid were the product of referrals from the Referring Physicians, including the Defendant Referring Physicians, to which the Hospital Defendants had provided illegal remuneration through the ISD in order to induce referrals, in violation of the AKS and the *Stark* laws.

180.     In many cases, the Hospital Defendants' claims to Medicare and Medicaid were the product of referrals from Referring Physicians, including the Defendant Referring Physicians, that had and expected to continue to receive illegal remuneration through the ISD in violation of the AKS and the *Stark* laws.

181.     The Hospital Defendants submitted thousands of claims to Medicare and Medicaid in which the claims were the product of referrals from the Referring Physicians, including the Defendant Referring Physicians, who were receiving kickbacks in violation of the AKS, *Stark* laws, and § 36.002(13) and § 32.039(b).

182.     Defendant Bone and Joint Clinic of Houston, for example, was a major beneficiary of illegal remuneration from the ISD. For example, eight of the ten orthopedic physicians on the ISD's referral roster were agents and representatives of Bone and Joint Clinic of Houston during relevant time periods (Dr. William Granberry; Dr. Thomas Greider; Dr. Marc Labbe; Dr. Walter Sassard; Dr. Roy Smith; Dr. Sherwin Siff; Dr. Todd Siff; and Dr. William Watters). Bone and Joint Clinic received the vast majority of the ISD's referrals of international patients for orthopedic services, along with complimentary services such as free interpreters, billing and collection services.

183.     Defendant Bone and Joint Clinic of Houston referred Medicare and Medicaid patients to the Hospital Defendants for care at BSLMC while receiving and expecting to receive illegal remuneration from the ISD to induce referrals. One such referral by the Bone and Joint Clinic of Houston (through physician Dr. William Watters) was Medicare patient W.P., referred by Dr. Watters to Defendant CHI-St. Luke's Health for pre-surgical testing on October 17, 2015, and an orthopedic surgery on October 24, 2015 at BSLMC. The testing and surgery were both carried out on those dates, and because of patient W.P.'s status as a Medicare beneficiary, Relator has good reason to believe that the Hospital Defendants billed the testing and surgery to the government through the Medicare program and received payment from the government.

## FORMS OF ILLEGAL REMUNERATION

184.     The Hospital Defendants provided four categories of illegal remuneration to the Defendant Referring Physicians that serve as the basis for Relator's claims: (1) lucrative international patient referrals; (2) complimentary interpreters; (3) free administrative assistance in the form of scheduling, billing, and collection services; and (4) international travel perks. Each are discussed in detail below.

## I.     Lucrative International Patient Referrals

185.     As indicated above, Baylor St. Luke's Medical Center is an 850-bed super hospital.

186.     BSLMC is staffed by nearly 1800 medical professionals across all specialties, including physicians, with approximately one hundred thousand patient admissions and emergency visits every year. BSLMC provides comprehensive care in both the inpatient and outpatient settings for most major medical specialties.

187.     BSLMC has a primary care department staffed by physicians hired by CHI-St. Luke's.

188.     CHI-St. Luke's Health also has specialty care departments at BSLMC and other facilities in the Greater Houston area, including the following departments: Respiratory & Lung Care (Pulmonology); Oncology; Family Bariatric Surgery; Cardiovascular Care; Diabetes Care; Ear, Nose & Throat (ENT); Emergency Care; Endocrinology; Executive Health; Eye Care (Ophthalmology); Gastroenterology & Digestive Health; Imaging & Diagnostic Procedures; Infectious Diseases; Infusion Centers; Laboratory Services; Liver Care; Nephrology; Neurology & Neurosurgery; Occupational Health; Orthopedics & Sports Medicine; Pain Management; Pediatrics; Plastic & Reconstructive Surgery; Rehabilitation Services; Rheumatology; Sleep Medicine; Spine Care; Stroke Care; Surgical Services; Transplants; Urgent Care; Urology; Women's Health & Maternity; and Wound Care.

189.     BSLMC houses the International Services Department of the Hospital Defendants. The Hospital Defendants spend millions of dollars each year to operate the ISD precisely because the patient flow generated by international medical tourism is lucrative. Nearly all of the international patients served by the ISD are paying patients. Indeed, many international patients are pre-approved for services by their respective embassies which guarantee payment by a Letter of Guarantee. *See* Exhibit 1 (International Services Billing/Collection Process for Embassy Patients).

190.     The ISD could refer nearly all of the international patients that contact the ISD to physicians working in CHI-St. Luke's own primary or specialty care departments.

191.     Tellingly, the Hospital Defendants do the opposite in practice – they refer the vast majority of international patients recruited by the ISD to *independent* medical practices and practitioners in the Greater Houston area, such as the Defendant Referring Physicians.

192.    When the Hospital Defendants refer these international patients to the Defendant Referring Physicians, they plainly provide the Defendant Referring Physicians with something of value: patients seeking medical services with the ability to pay for medical care at full cost. *See generally*, HHS-OIG, *Supplemental Compliance Program Guidance for Hospitals*, 70 Fed. Reg. 4858 (indicating that under the AKS, any time any form of remuneration is exchanged between referral sources (i.e., the Defendant Referring Physicians) and a provider of health care services to a federal health care program (i.e., the Hospital Defendants), the arrangement must be highly scrutinized because private physicians are the primary source of referrals of patients to hospitals.

193.    When the ISD refers international patients to the Referring Physicians, they generate significant revenue for those Referring Physicians. *See, e.g.*, Exhibit 2 (reflecting billings/collection of payments to the Referring Physicians for services provided to international patients); Exh. 9 (35 pages of scheduling documents reflecting hundreds of appointments by Dr. Hoffman with international patients referred to him by the ISD); Paragraph 250, below (reflecting an instance of MedCare receiving payment of $138,320.99 in April 2016 for services provided to nine international patients referred by the ISD).

194.    The Hospital Defendants knowingly and willfully refer these valuable international patients to the Referring Physicians rather than to their own hired in-house physicians to induce the Referring Physicians to refer Medicare and Medicaid patients to BSLMC.

195.    The scheme makes economic sense to the Hospital Defendants for two reasons. First, the volume of Medicare and Medicaid patients being referred to the Hospital Defendants for medical care at BSLMC is so great (Defendant CHI, for example, derives 58% of its gross revenue from Medicare and Medicaid patients) that it more than compensates for the lost revenues on the much fewer number of private patients referred out in exchange.

196.    Second, under the arrangement as agreed with the Referring Physicians, the Hospital Defendants receive a referral to BSLMC for any follow-up care the private patients required. Indeed, ISD staff received a daily e-mail from Carlos Aguilar that attached a list of the international patient appointments with outside private practitioners, for that particular day, and instructing them to õplease contact the physiciansøoffices to ensure any testing, etc. be returned to BSLMC.ö *See* Exhibit 6 (Examples of daily e-mails from Carlos Aguilar regarding making sure follow-up care occurred at BSLMC).

197.    The scheme makes economic sense for the Referring Physicians, because they receive valuable referrals of wealthy, full-paying international patients (along with other related kickbacks such as free interpreters, administrative services, and for a subset of the Referring Physicians, international travel perks), and in response need only reciprocate by referring their patients, including their Medicare and Medicaid patients to BSLMC instead of other area hospitals such as Houston Methodist Hospital.

198.    For example, through the ISD, the Hospital Defendants routinely referred international patients for pulmonary care to Defendant Santacruz of Pulmonary Critical Care & Sleep Medicine Consultants. *See, e.g.*, Exh. 7, at 4 (reflecting ISD referral of international patient from Saudi Arabia to Dr. Santacruz for evaluation on 5/20/14 at 2:30pm, at 6560 Fannin Street, Suite 1760); Exh. 7, at 12 (reflecting ISD referral of international patient from Qatar to Dr. Santacruz for evaluation on 2/17/15 at 1:30pm, at OøQuinn Medical Tower, Suite 1730); Exh. 6, pp. 6-7 (reflecting ISD referral of international patient from Venezuela to Dr. Santacruz for an appointment on 9/27/16 at 10:30am). The Hospital Defendants could have instead referred the same international patients to CHI-St. Lukeøs own in-house physician, Dr. Robert Solis, a Yale graduate with decades of experience, who could have provided them with excellent pulmonary

care. One reason the Hospital Defendants instead referred the international patients to independent practitioners such as Dr. Santacruz and Pulmonary Critical Care & Sleep Medicine Consultants was to induce the Referring Physicians to refer their patients, including their Medicare and Medicaid patients, back to BSLMC instead of other hospitals.

199.    In return for lucrative international services patient referrals (and the free interpreters and administrative services described in more detail throughout this Complaint that the ISD provided with them), the Referring Physicians referred back patients, including Medicare and Medicaid patients, to the Hospital Defendants for treatment at BSLMC.

200.    For example, pursuant to this arrangement, the ISD provided Bone and Joint Clinic of Houston with illegal remuneration in the form of lucrative international patient referrals, free interpreters, and free administrative assistance (see, e.g., Paragraph 27). In return, Bone and Joint Clinic referred Medicare patients back to the Hospital Defendants at BSLMC. For example, Bone and Joint Clinic of Houston referred to the Hospital Defendants Medicare patient W.P., referred by Dr. William Watters to Defendant CHI-St. Luke's Health for pre-surgical testing on October 17, 2015, and an orthopedic surgery on October 24, 2015 at BSLMC. The testing and surgery were both carried out on those dates, and because of patient W.P.'s status as a Medicare participant, Relator has good reason to believe that the testing and surgery were both billed to the government through the Medicare program.

201.    Each of the Defendant Referring Physicians has received referrals of international patients from the ISD intended to induce Medicare and Medicaid referrals back to the BSLMC. See, e.g., Paragraphs 23-39, above; Exh. 6 (appointment information for international patients referred by the ISD to Defendants Hoffman, Mesa, Cherem, Lopez, Santacruz, Livesay, Jogi, and Douglas); Exhs. 2 & 11 (detailing payments for services provided to international patients referred

by the ISD to the Defendant Referring Physicians); Exh. 12, 13 (detailing charges for certain international patients referred by the ISD to the Defendant Referring Physicians); Exh. 7 (detailing interpretation services provided to international patients referred by the ISD to the Defendant Referring Physicians).

202.    The illegal referrals of international patients made by the Hospital Defendants to the Referring Physicians to induce Medicare and Medicaid referrals back to BSLMC were occurring in 2011, when Relator first began working at the ISD, and have continued through the present day.

## II.    Complimentary Interpreters

203.    For each international patient ISD referred to the Defendant Referring Physicians, the ISD provided a complimentary language interpreter to accompany the patients to their appointments. Each time the Hospital Defendants provided this complimentary interpreter through the ISD, they knowingly and willfully provided an illegal kickback to ingratiate themselves with the Referring Physicians and induce Medicare/Medicaid referrals in return.

204.    ISD staff members were instructed to schedule an interpreter for every single international patient referred to one of the Referring Physicians regardless of the circumstances. *See e.g.*, Exh. 4 (8/26/2016 Email from ISD Associate Director Sanchez to ISD staff instructing the ISD to send Arabic-speaking interpreters for international patients referred to referring physician even if the physician or one of his staff members speak Arabic).

205.    The free interpreters had significant value to the Referring Physicians because they facilitated to their business of providing medical care, enabled them to receive payment for that care, and minimized their liability.

206.    To treat the international patients, the Referring Physicians and their nursing and administrative staff had to be able to communicate with the patients. The free interpreters gifted to the Referring Physicians by the ISD allowed the Referring Physicians and their staff to communicate effectively and efficiently with their international patients, enabling the provision of medical services, and ultimately, the receipt of payment for those services.

207.    Moreover, all health care providers face potential civil liability when they treat patients with limited English proficiency without providing language services such as interpreters. A communication gap with patients with limited English proficiency exposes physicians and medical practices to liability for failure to obtain the patient's informed consent for treatment; for breach of the physician's duty to warn the patient of medical risks from a course of treatment, such as from a medication or procedure; and for misdiagnosis or the prescription of an improper course of medical treatment that results from the inability of a patient to communicate with medical professionals. Such claims are often categorized as civil rights claims and not covered by medical malpractice insurance. The use of a third-party professional interpreter, in particular, decreases liability to the Referring Physicians.

208.    Third, Title VI of the Civil Rights Act of 1964, the Americans with Disabilities Act, and Section 1557 of the Patient Protection and Affordable Care Act require that providers who receive federal funds, including from the Medicare and Medicaid programs, must provide oral interpreters to patients with limited English proficiency. By law, the costs for the interpreters cannot be passed on to patients. Each of the Defendant Referring Physicians received federal funds for treating Medicare and Medicaid patients, and therefore was required by law to comply with this requirement or face liability.

209.     Finally, the free interpreters helped the Defendant Referring Physicians avoid a risk of costly negative outcomes such as poor medical outcomes that could damage a physician's reputation or bill payment refusal that arises when communication gaps cause misdiagnosis or mistreatment or limit a patient's ability to understand and consent to a course of treatment or payment of the cost of such treatment.

210.     Had the ISD not provided such interpreters, the Referring Physicians would have had to pay for an interpreter themselves and could not pass that cost on to the patient.

211.     The ISD provided free interpreters to Referring Physicians on at least a thousand occasions between 2011 and 2016.

212.     The complimentary interpreters provided by the ISD were required to complete and send an Update Report to the ISD after every international patient appointment with a Referring Physician.

213.     The mandatory Update Report was a form e-mail sent from "info@umsac.com" by the interpreter to "St. Luke's International" that included the name of the patient, the name of the interpreter, the date of the appointment, location of appointment, and the name of the doctor with whom the appointment was made. *See* Exh. 5 (Examples of Update Reports). The Update Report also included three boxes where interpreters were required to indicate whether the appointment resulted in a "Change in Medication," as well as whether a "Follow-up [was] Required." *Id*. Finally, the Update Report included a section entitled "Outcome of Appointment" where the interpreter was to indicate what occurred at the appointment and whether any and what follow-up care was required. *Id*.

214.     For example, an Update Report from October 17, 2016 indicates that the ISD provided a complimentary interpretation to Dr. Krajcer by interpreter Hossalmeldin Salem. The

international patient at issue had an echocardiogram performed by Dr. Krajcer; follow-up treatment was required in the form of the fitting of a heart holter monitor and a second appointment with Dr. Krajcer. *Id.*, at 5; *see also* Exh. 7, at 81.

215.    The mandatory Update Reports that the ISD required interpreters to complete for each international patient visit with one of the Referring Physicians document that the Hospital Defendants were providing interpreters to the Referring Physicians, and include the name of the physicians to whom interpretation services were being provided for free as well as the name of the interpreter provided to said physician.

216.    ISD staff also received a daily e-mail from Carlos Aguilar that attached a list of the international patient appointments with outside private practitioners, each of which corresponded with ISD's provision of a complimentary interpreter for the appointment. *See* Exh. 6 (lists reflecting the details of international patient referral appointments, with corresponding complimentary interpretation services, provided to Drs. Hoffman, Mesa, Cherem, Lopez, Santacruz, Livesay, Jogi, and Douglas). Mr. Aguilar's daily e-mail also reminded ISD staff to provide appointment reminders to the international patients to keep the ISD from scheduling and paying for interpreters "unnecessarily." *Id.*

217.    As one example, the ISD provided Defendant Moses of The Center for ENT with a complimentary interpreter on April 21, 2017, for an 11:00am appointment with international patient M.K. from Qatar, regarding the Epley maneuver.

218.    Relator has attached to this Complaint more than 100 pages of "Interpreter Logs" comprising thousands of examples of the ISD scheduling and providing interpreters at no cost to the Referring Physicians. *See* Exh. 7 (Interpreter Logs).

219.     For example, as reflected in these logs:

a.     The ISD provided a complimentary interpreter to Defendant Boccalandro on 7/8/14 at 10:00 am for an international patient from Qatar referred by the ISD to Dr. Boccalandro for an evaluation. Exh. 7 at 4.

b.     The ISD provided complimentary interpreters to Defendant Boccalandro on 8/8/14 at 8:00 am and at 2:00 pm for international patients from Saudi Arabia and Oman respectively, referred by the ISD to Dr. Boccalandro for evaluations. Exh. 7 at 9-10.

c.     The ISD provided a complimentary interpreter to Defendant Boccalandro on 3/4/15 at 2:30 pm for an international patient from Kuwait referred by the ISD to Dr. Boccalandro for an evaluation. Exh. 7 at 13.

d.     The ISD provided a complimentary interpreter to Defendant Boccalandro on 3/29/16 at 3:00 pm at 6624 Fannin St., Suite 2380 in Houston, TX for an international patient from Saudi Arabia referred by the ISD to Dr. Boccalandro for an evaluation. Exh. 7 at 56.

e.     The ISD provided a complimentary interpreter to Defendant Boccalandro on 6/9/16 at 3:25 pm at 6624 Fannin St., Suite 2380 in Houston, TX for an international patient from Kuwait referred by the ISD to Dr. Boccalandro for an evaluation. Exh. 7 at 67.

f.     The ISD provided a complimentary interpreter from Universal Medical Services to Defendant Boccalandro on 8/15/16 at 1:00 pm at OQMT, 6624 Fannin St., Suite 140 in Houston, TX for an international patient from Kuwait referred by the ISD to Dr. Boccalandro for diabetes education. Exh. 7 at 71.

g.     The ISD provided a complimentary interpreter Defendant Boccalandro on 10/26/16 at 1:00 pm at 6624 Fannin St., Suite 2380 in Houston, TX for an international patient from Kuwait referred by the ISD to Dr. Boccalandro for an evaluation. Exh. 7 at 85.

   h.  The ISD provided additional complimentary interpreters to Defendant Boccalandro from Language Line Co. for evaluations of international patients referred to Dr. Boccalandro by the ISD. Exh. 7 at 34-35, 37, 39-40.

  220. The following is just a small sample of these Interpreter Logs:

      [Space Intentionally Left Blank ó Images Begin on Next Page]

## INTERPRETATIONS LOG – 03/08/2016

| DATE | TIME | LENGTH | COUNTRY | LANGUAGE | NAME | ADDRESS/PHONE | SERVICE | INTERPRETER | WORK ORDER No. |
|---|---|---|---|---|---|---|---|---|---|
| 03/08/16 | 7:30AM | 2Hrs | Saudi Arabia | Arabic | | O'Quinn Medical Towers 6624 Fannin Street 9th floor Houston, TX 77030 (832) 355-3350 | Surgery with Dr. Azita Madjidi | Patient Care International | Ali Alghafilee |
| 03/08/16 | 9:00AM | Please update time | UAE | Arabic | | O'Quinn Medical Towers 6624 Fannin Street Suite 2105 Houston, TX 77030 (713) 791-9494 | Evaluation with ophthalmology Dr. Mary Green | Kate | |
| 03/08/16 | 10:00AM | Please update time | Kuwait | Arabic | | St. Luke's Hospital 6720 Bertner Avenue, Purple Elevator - B1 Houston, TX 77030 (832) 355-3350 | X-Ray | Alexandra | |
| 03/08/16 | 10:30AM | Please update time | Kuwait | Arabic | | St. Luke's Hospital 6720 Bertner Avenue, THI Clinic Houston, TX 77030 (832) 355-3350 | Evaluation with Doctor Amit Parulekar | Alexandra | |
| 03/08/16 | 10:30AM | 2 Hrs | U.S.A. | Hindi | | BCM, 6620 Main St, Suite 1450 Houston, TX 77030 (832) 355-6162 | Transplant Evaluation Follow Up | Language Line Co. | 229846 |
| 03/08/16 | 11:00AM / 11:15AM | 2 Hrs | Bolivia / Mexico | Spanish | | 2491 S. Braeswood Blvd. Houston, TX 77030 (832) 355-7118 | Evaluation with Dr. Larry Steven Carpenter | Language Line Co. (Per patient's request please assign interpreter Anibal Mauricio Hernandez if possible) | 229847 |
| 03/08/16 | 11:30AM | 2Hrs | UAE | Arabic | | St. Luke's Kirby Glen 2491 S. Braeswood Blvd, Houston TX 77030 (832) 355-7118 | Radiation Therapy with Dr. Carpenter | Patient Care International | Aala Ibrahim |
| 03/08/16 | 1:00PM | 2Hrs | UAE | Arabic | | Scurlock Tower 6560 Fannin St, Suite 1224 Houston, TX (713) 796-1200 | Evaluation with Oncologist Dr. Luis Camacho | Patient Care International | Aala Ibrahim |

# INTERPRETATIONS LOG – 03/09/2016

| DATE | TIME | LENGTH | COUNTRY | LANGUAGE | NAME | ADDRESS/PHONE | SERVICE | INTERPRETER | WORK ORDER No. |
|---|---|---|---|---|---|---|---|---|---|
| 03/09/16 | 9:00AM | 4Hrs | USA | Spanish | | St. Luke's Hospital 6720 Bertner Avenue, Heart & Lung Clinic Purple Elevator - 3rd Floor Houston, TX 77030 (832) 355-2285 | Lung Transplant Evaluation | Language Line Co. | 230061 |
| 03/09/16 | 9:30AM | 2Hrs | USA | Mandarin | | BCM Baylor Clinic 6620 Main St. Suite 1450 Houston, TX 77030 832-355-1471 | Evaluation Hepatology | Language Line Co. | 230062 |
| 03/09/16 | 11:00AM | Please update time | UAE | Arabic | | BCM 6620 Main St. Suite 1350 Houston, TX 77030 (713) 798-3750 | Evaluation with oncology Dr. Gustavo Rivero | Alexandra | |

# INTERPRETATIONS LOG – 03/10/2016

| DATE | TIME | LENGTH | COUNTRY | LANGUAGE | NAME | ADDRESS/PHONE | SERVICE | INTERPRETER | WORK ORDER No. |
|------|------|--------|---------|----------|------|---------------|---------|-------------|----------------|
| 03/10/16 | 8:00AM | 2 Hrs | Kuwait | Arabic | ███████ | St. Luke's Hospital 6720 Bertner Avenue, Purple Elevator - 4th floor Houston, TX 77030 (832) 355-3350 | Bronchoscopy | Patient Care International | Ali Atta |
| 03/10/16 | 9:00AM | 2 Hrs | U.S.A. | Korean | ███████ | BCM, 6620 Main St., Suite 1450 Houston, TX 77030 (832) 355-5422 | Transplant Evaluation Follow Up | MasterWord | 508213 |
| 03/10/16 | 10:00AM | Please update time | UAE | Arabic | ███████ | O'Quinn Medical Towers 6624 Fannin Street 12th floor Houston, TX 77030 (832) 355-3350 | Labs | Nathale | |
| 03/10/16 | 2:30PM | 2Hrs | Saudi Arabia | Arabic | ███████ | O'Quinn Medical Towers 6624 Fannin Street Suite 2160 Houston, TX 77030 (713) 795-0055 | Evaluation with neurology Dr. Vincenzo Virgadamo | Patient Care International | Ali Alghafilee |
| 03/10/16 | 3:45PM | 2Hrs | UAE | Arabic | ███████ | 1977 Butler Blvd. 2nd Floor Houston, TX 77030 (713) 798-6100 | Evaluation with Dr. Alice Matoba | Patient Care International | Aaia Ibrahim |

## INTERPRETATIONS LOG – 03/10/2016

| DATE | TIME | LENGTH | COUNTRY | LANGUAGE | NAME | ADDRESS/PHONE | SERVICE | INTERPRETER | WORK ORDER No. |
|---|---|---|---|---|---|---|---|---|---|
| 03/10/16 | 8:00AM | 2 Hrs | Kuwait | Arabic |  | St. Luke's Hospital 6720 Bertner Avenue, Purple Elevator – 4th floor Houston, TX 77030 (832) 355-3350 | Bronchoscopy | Patient Care International | Ali Atta |
| 03/10/16 | 9:00AM | 2 Hrs | U.S.A. | Korean |  | BCM, 6620 Main St., Suite 1450 Houston, TX 77030 (832) 355-5422 | Transplant Evaluation Follow Up | MasterWord | 608213 |
| 03/10/16 | 10:00AM | Please update time | UAE | Arabic |  | O'Quinn Medical Towers 6624 Fannin Street 12th floor Houston, TX 77030 (832) 355-3350 | Labs | Nathale |  |
| 03/10/16 | 2:30PM | 2Hrs | Saudi Arabia | Arabic |  | O'Quinn Medical Towers 6624 Fannin Street Suite 2160 Houston, TX 77030 (713) 795-0055 | Evaluation with neurology Dr. Vincenzo Virgadamo | Patient Care International | Ali Alghafilee |
| 03/10/16 | 3:45PM | 2Hrs | UAE | Arabic |  | 1977 Butler Blvd. 2nd Floor Houston, TX 77030 (713) 798-6100 | Evaluation with Dr. Alice Matoba | Patient Care International | Aala Ibrahim |

## INTERPRETATIONS LOG – 03/16/2016

| DATE | TIME | LENGTH | COUNTRY | LANGUAGE | NAME | ADDRESS/PHONE | SERVICE | INTERPRETER | WORK ORDER No. |
|---|---|---|---|---|---|---|---|---|---|
| 03/16/16 | 8:30AM | Please update time | Mexico | Spanish | ███████ | O'Quinn Medical Towers 6624 Fannin Street 10th floor International Services Houston, TX 77030 (832) 355-3350 | US Breast BX | Raquel | |
| 03/16/16 | 10:00 | 20 min | USA | Spanish | ███████ | Baylor St. Luke's Medical Center 6720 Bertner Ave. Room 1227 Houston, TX 77030 832 355 9314 | Discharge | Veronica | |
| 03/16/16 | 11:20AM | 2 Hrs | UAE | Arabic | ███████ | BCM 6620 Main St. Suite 1350 Houston, TX 77030 (713) 798-3750 | Evaluation with oncology Dr. Gustavo Rivero | Patient Care International | Ali Alghafilee |
| 03/16/16 | 2:00PM | 2 Hrs | Qatar | Arabic | ███████ | BCM 6620 Main St., Suite 1350 Houston, Texas 77030 713-798-3750 | Evaluation with Oncologist Dr. Anita Sabichi | Patient Care International | Ali Atta |

## INTERPRETATIONS LOG - 03/29/2016

| DATE | TIME | LENGTH | COUNTRY | LANGUAGE | NAME | ADDRESS/PHONE | SERVICE | INTERPRETER | WORK ORDER No. |
|------|------|--------|---------|----------|------|---------------|---------|-------------|----------------|
| 03/29/16 | 8:00AM | 2Hrs | Honduras | Spanish | | O'Quinn Medical Towers 6624 Fannin Street International Services Houston, TX 77030 (832) 355-3350 | Health check | Language Line Co. | 233633 |
| 03/29/16 | 9:00AM | Please update time | Qatar | Arabic | | Scurlock Tower 6560 Fannin St., Suite 1224 Houston, TX (713) 796-1200 | Chemotherapy | Alexandra | |
| 03/29/16 | 11:00AM | 2Hrs | Mexico | Spanish | | 2491 S. Braeswood Blvd. Houston, TX 77030 (832) 355-7118 | Evaluation with Dr. Larry Steven Carpenter | Language Line Co. (Per patient's request please assign interpreter Anibal Mauricio Hernandez if possible) | 2336:34 |
| 03/29/16 | 11:00AM | Please update time | Saudi Arabia | Arabic | | O'Quinn Medical Towers 6624 Fannin Street 1st floor International Services Houston, TX 77030 (832) 355-3350 | MRI Spine | Alexandra | |
| 03/29/16 | 12:30PM | Please update time | UAE | Arabic | | O'Quinn Medical Towers 6624 Fannin Street Suite 2260 Houston, TX 77030 (713) 800-6212 | Evaluation with endocrinologist Dr. Medhavi Jogi | Alexandra | |
| 03/29/16 | 1:00PM | 2Hrs | UAE | Arabic | | BCM 6620 Main St., Suite 1320 Houston, TX 77030 (713) 756-8555 | Evaluation with Dr. Elizabeth Bonefas | Patient Care International | |
| 03/29/16 | 3:00PM | Please update time | Saudi Arabia | Arabic | | O'Quinn Medical Towers 6624 Fannin Street Suite 2380 Houston, TX 77030 Phone: (832) 355-3350 | Evaluation with endocrinologist Dr. Oxana Boccalandro | Alexandra | |

## INTERPRETATIONS LOG – 04/14/2016

| DATE | TIME | LENGTH | COUNTRY | LANGUAGE | NAME | ADDRESS/PHONE | SERVICE | INTERPRETER | WORK ORDER No. |
|------|------|--------|---------|----------|------|---------------|---------|-------------|----------------|
| 04/14/16 | 10:00AM | Please update time | Kuwait | Arabic | | St. Luke's Hospital 6720 Bertner Avenue, Purple Elevator – 4th Floor Houston, TX 77030 (832) 355-3350 | Broncoscopy | Ihab | |
| 04/14/16 | 10:45AM | Please update time | Saudi Arabia | Arabic | | BCM 6620 Main St., Suite 1450 Houston, Texas 77030 (832) 355-1400 | Evaluation with Dr. Saira Khaderi | Alexandra | |
| 04/14/16 | 1:15PM | Please update time | UAE | Arabic | | O'Quinn Medical Towers 6624 Fannin Street Suite 1240 Houston, TX 77030 | Evaluation with Dr. Bindu J. Abraham | Alexandra | |
| 04/14/16 | 3:00PM | Please update time | Saudi Arabia | Arabic | | O'Quinn Medical Towers 6624 Fannin Street Suite 2180 Houston, TX 77030 (713) 790-1800 | Evaluation with Dr. Irving Fishman | Alexandra | |

## INTERPRETATIONS LOG – 04/20/2016

| DATE | TIME | LENGTH | COUNTRY | LANGUAGE | NAME | ADDRESS/PHONE | SERVICE | INTERPRETER | WORK ORDER No. |
|------|------|--------|---------|----------|------|---------------|---------|-------------|----------------|
| 04/20/16 | 8:30AM | Please update time | USA | Spanish | ■■■■■■ | St. Luke's Hospital 6720 Bertner Avenue, Heart & Lung Clinic Purple Elevator – 3rd Floor Houston, TX 77030 (832) 355-9346 | LVAD Evaluation | Veronica | |
| 04/20/16 | 10:30AM | 2 Hrs. | Qatar | Arabic | ■■■■■■ | O'Quinn Medical Towers 6624 Fannin Street Suite 1720 Houston, TX 77030 (713) 797-0200 | Evaluation with cardiologist Dr. Sayed F. Feghali | Patient Care International | Lira Moghrabi |
| 04/20/16 | 12:00PM | 2Hrs | U.S.A. | Burmese | ■■■■■■ | St. Luke's Hospital 6720 Bertner Avenue, Purple Elevator 7th floor 7s1- bed 7 Houston TX 77030 832-355-6710 | Family meeting with physicians | Language Line Co. | 237697 |
| 04/20/16 | 3:30PM | 2 Hrs. | Qatar | Arabic | ■■■■■■ | BCM 6620 Main St., Suite 1350 Houston, Texas 77030 713-798-3750 | Evaluation with Oncologist Dr. Anita Sabichi | Patient Care International | Aala Ibrahim |

# INTERPRETATIONS FOR - 05/02/2016

| DATE | TIME | LENGTH | LANGUAGE | NAME | ADDRESS/PHONE | SERVICE | INTERPRETER | Interpreter Feedback |
|------|------|--------|----------|------|---------------|---------|-------------|---------------------|
| 05/02 | 9:30AM | 2Hrs | Spanish | ████████ | BCM, 6620 Main St., Suite 1450 Houston, TX 77030 (832) 355-5422 | New Hepatology Evaluation | Universal pharmaceuticals LLC Confirmed By Walaa A. Moussa | Not required |
| 05/02 | 10:00AM | 2Hrs | Arabic | ████████ | OQMT 6624 Fannin St., Suite 1720 Houston, Texas 77030 (832) 355-3350 | CRD Evaluation | Ihab | Staff |
| 05/02 | 10:30AM | 2Hrs | Spanish | ████████ | BCM, 6620 Main St., Suite 1450 Houston, TX 77030 (832) 355-5422 | New Hepatology Evaluation | Universal pharmaceuticals LLC Confirmed By Walaa A. Moussa | Not required |

## INTERPRETATIONS LOG - 05/17/2016

| DATE | TIME | LENGTH | COUNTRY | LANGUAGE | NAME | ADDRESS/PHONE | SERVICE | INTERPRETER | INTERPRETER FEEDBACK |
|------|------|--------|---------|----------|------|---------------|---------|-------------|----------------------|
| 05/17/16 | 8:15AM | 2 Hrs. | Qatar | Arabic | | O'Quinn Medical Towers 6624 Fannin Street International Patient Center Houston, TX 77030 (832) 355-3350 | US Abdomen and Labs | Mohamed Al Amin | Yes, please submit one after the appt. |
| 05/17/16 | 10:00AM | 2Hrs. | USA | Spanish | | St. Luke's Hospital 6720 Bertner Avenue, 14th floor yellow elevators, room 1414 Houston TX 77030 832-355-9008 | Heart Transplant evaluation | Claudia | Not required |
| 05/17/16 | 10:45AM | Please update time | Kuwait | Arabic | | O'Quinn Medical Towers 6624 Fannin Street Suite 1710 Houston, TX 77030 (713) 796-1115 | Evaluation with Dr. Maher Nasser | Ihab | |
| 05/17/16 | 11:00AM | 2Hrs | Qatar | Arabic | | O'Quinn Medical Towers 6624 Fannin Street Suite 2260 Houston, TX 77030 (713) 800-6212 | Evaluation with endocrinologist Dr. Medhavi Jogi | Nadeen | Yes, please submit one after the appt. |
| 05/17/16 | 11:00AM | 2Hrs | Saudi Arabia | Arabic | | 7200 Cambridge St. 10th floor Houston, TX 77030 (713) 798-4001 | Evaluation with Dr. Catherine Polisch | Omer | Yes, please submit one after the appt. |
| 05/17/16 | 11:00AM | 2Hrs | UAE | Arabic | | BCM 6620 Main St., Suite 1350 Houston, Texas 77030 713-798-3750 | Chemo | Zaynab | Yes, please submit one after the appt. |
| 05/17/16 | 11:00AM | 1Hr | USA | Spanish | | St. Luke's Hospital 6720 Bertner Avenue, 17th floor yellow elevators, room 1754 Houston TX 77030 832-355-6281 | Speech Therapy | Ernesto | Not required |
| 05/17/16 | 1:00PM | 2Hrs | UAE | Arabic | | St Luke's Kirby Glen 2491 S. Braeswood Blvd. Houston TX 77030 (832) 355-7118 | Radiation Therapy | Zaynab | Yes, please submit one after the appt. |
| 05/17/16 | 1:45PM | 2Hrs | Kuwait | Arabic | | O'Quinn Medical Towers 6624 Fannin Street Suite 2380 Houston, TX 77030 713 790-1790 | Evaluation with Dr. Alan Hoffman | Noor Hadi | Yes, please submit one after the appt. |
| 05/17/16 | 3:00PM | 2 Hrs | Saudi Arabia | Arabic | | 7200 Cambridge St. 10th floor, Suite 10B Housotn, TX 77030 (713) 986-5790 | Biopsy | Hossam | Yes, please submit one after the appt. |
| 05/17/16 | 3:45PM | 2 Hrs. | Qatar | Arabic | | O'Quinn Medical Towers 6624 Fannin Street Suite 2260 Houston, TX 77030 (713) 800-6212 | Evaluation with endocrinologist Dr. Fareed Elhaj | Ahmed Fadel | Yes, please submit one after the appt. |

# INTERPRETATIONS LOG – 05/26/2016

| DATE | TIME | LENGTH | COUNTRY | LANGUAGE | NAME | ADDRESS/PHONE | SERVICE | INTERPRETER | INTERPRETER FEEDBACK |
|---|---|---|---|---|---|---|---|---|---|
| 05/26/16 | 8:30AM | 2 Hrs | Saudi Arabia | Arabic | | 7200 Cambridge St. 10th floor, Suite 10B Housotn, TX 77030 (713) 986-5790 | Evaluation with Dr. Seth Lerner | Ahmad Ayad | Yes, please submit one after the appt. |
| 05/26/16 | 10:00AM | 2Hrs | Kuwait | Arabic | | St. Luke's Hospital 6720 Bertner Avenue, THI Clinic Houston, TX 77030 (832) 355-3350 | Evaluation with Dr. Charles Hallman | Nadeen | Yes, please submit one after the appt. |
| 05/26/16 | 10:30AM | 2 Hrs | U.S.A. | Spanish | | BCM, 6620 Main St, Suite 1450 Houston, TX 77030 (832) 355-4696 | Evaluation Hepatology | Ernesto | Not required |
| 05/26/16 | 11:00AM | 2 Hrs | Qatar | Arabic | | BCM, 6620 Main St, Suite 1350 Houston, TX 77030 (713) 798-7348 | Evaluation with Dr. Lisa Haubert | Hossam | Yes, please submit one after the appt. |
| 05/26/16 | 1:00PM | 2Hrs | UAE | Arabic | | St Luke's Kirby Glen 2491 S. Braeswood Blvd, Houston TX 77030 (832) 355-7118 | Radiation Therapy | Zaynab | Yes, please submit one after the appt. |
| 05/26/16 | 3:30PM | 2Hrs | UAE | Arabic | | 7200 Cambridge St. 1st floor Houston, TX 77030 (713) 798-7246 | MRI | Noor | Yes, please submit one after the appt. |

221.   Because a complimentary interpreter was sent as a matter of policy for every medical appointment between 2011 and 2016 for which the ISD referred an international patient to a Referring Physician, each appointment associated with the complimentary scheduling, collection, or billing services provided to the Referring Physicians that is detailed in this Complaint (and its accompanying exhibits) during that timeframe also involved a complimentary interpreter provided by the ISD.

222.   The vast majority of interpreters scheduled by the ISD were scheduled to provide their services at the offices of independent physicians and practices, such as those of the Defendant Referring Physicians. *See* Exhibit 8 (CHI-St. Luke's internal statistics regarding interpreter services).

223.   The improper remuneration in the form of free interpreters described in this section was being provided to the Referring Physicians in 2011, when Relator first began working at the ISD, and continued through the end of 2016. After that time, free interpreters were provided on a limited basis.

224.   Starting in or around December 2016 or January 2017, CHI-St. Luke's replaced the interpreter Update Report with New Patient Forms, completed by ISD staff.

225.   On information and belief, and as is discussed in more detail above, this change occurred because Relator informed Defendant CHI-St. Luke's compliance department that CHI-St. Luke's was improperly providing free interpreter and other services to Defendant Referring Physicians, and had been doing so for a number of years.

**III.   Complimentary Administrative Assistance**

226.   In addition to the unnecessary referral of international patients to the Referring Physicians and the provision of free interpreter services, the Hospital Defendants gifted the

Referring Physicians with administrative assistance in the form of scheduling services, billing, and collection servicesô all provided on a complimentary basis by ISD staff.

227.    After the ISD referred an international patient to one of the Defendant Referring Physicians, the ISD would then, using its own staff, schedule an appointment with the chosen physician, call the patient with appointment reminders in advance of the appointment, schedule follow-up appointments for the patient, bill the patient directly on the physician/practiceøs behalf for the appointment, and collect any outstanding balances owed on behalf of the physician/practice.

228.    These administrative services were provided at the Hospital Defendantsø own expense and should have been performed by the Referring Physiciansø own staff members (and paid for by Referring Physicians). Instead, ISD staff worked virtually full-time providing these services for the Referring Physicians.

229.    Had the ISD staff not performed these administrative services, the Referring Physicians would had had to provide them through administrative staff, resulting in significant expense.

230.    In addition, had the ISD staff not performed these administrative services, the Referring Physicians would had to provide these administrative services while also facilitating language access at their own expense. As set forth above, Title VI of the Civil Rights Act of 1964, the Americans with Disabilities Act, and Section 1557 of the Patient Protection and Affordable Care Act require that all providers who receive federal funds, including from the Medicare and Medicaid programs, provide meaningful language access to all patients with limited English proficiency and do not permit providers to refuse care to such patients because of any difficulty or expense associated with providing language services. The Defendant Referring Physicians all

received federal funds treating Medicare and Medicaid patients and therefore were required to comply with these directives.

231.    The Hospital Defendants provided these scheduling, billing, and collection services to the Referring Physicians knowingly and willfully to induce Medicare and Medicaid referrals.

       **a.**      **Free Scheduling Assistance**

232.    For every international patient referred by the ISD to the Referring Physicians, ISD staff provided free scheduling services that should have been performed by the administrative staff of the Referring Physicians.

233.    If the ISD referred a patient to one of the Referring Physicians, that physician's own staff should have scheduled the initial appointment with the referred international patient and provided appointment reminders.

234.    However, to curry favor and induce Medicare and Medicaid referrals back to the BSLMC, the ISD took on these scheduling tasks on a complimentary basis for the Referring Physicians, providing a valuable and costly administrative function that should have been performed by the physician or practice's own staff.

235.    The ISD also took on additional scheduling duties for the Referring Physicians to curry favor with them and induce Medicare and Medicaid referrals to BSLMC. Specifically, if a Referring Physician referred an international patient for follow-up care at the BSLMC with staff paid for by the Hospital Defendants, the Referring Physician's own administrative staff should have contacted BSLMC Central Scheduling so that Central Scheduling could schedule the referred follow-up care. Instead, the ISD took on this form of scheduling assistance for the Referring Physician, free of charge, in order to induce Medicare/Medicaid referrals.

236.    The scheduling services were provided as a matter of ISD policy.

237.    The daily e-mail sent to ISD staff from Carlos Aguilar attaching a list of international patient appointments specifically reminded ISD staff to provide appointment reminders to the international patients for each appointment the ISD scheduled on their behalf with the Referring Physicians. Exhibit 6.

238.    The cover sheet provided with the New Patient Form also made clear that the ISD was providing Referring Physicians with free scheduling services.

239.    These complimentary administrative services had value to the Referring Physicians, because they did not have to compensate their own administrative staff to provide the services, which were time-consuming and costly to provide. Indeed, such services facilitated and were necessary to the Referring Physicians' business of providing medical care and receiving payment for that care. The Referring Physicians would not have been able to receive payment for services provided to international payments had their initial and follow-up appointments not been scheduled (or would have had to compensate their own staff to provide those functions) and would have incurred opportunity cost and wasted expense due to missed appointments had the ISD staff not provided appointment reminders to the international patients prior to their appointments with the Referring Physicians.

240.    In fact, the Referring Physicians often requested that the ISD fulfill their scheduling requests. For example, on August 18, 2017, Katie Spence, a representative of Houston Thyroid & Endocrine Specialists, emailed ISD staff to convey Dr. Jogi's request that the ISD staff schedule international patient P.M. from Mexico for blood tests on Dr. Jogi's behalf, and the ISD complied.

241.    Relator has attached to this Complaint thirty-five pages of records reflecting the dates, times, and medical service associated with hundreds of appointments scheduled by the ISD on a complimentary basis for Dr. Hoffman alone, with international patients referred to Dr.

Hoffman by the ISD.  *See* Exh. 9 (ISD scheduling documents related to Dr. Hoffman); *see also* Exh. 6 at 3 (ISD provided complimentary appointment reminders to international patients from the United Arab Emirates and Honduras referred by the ISD to Dr. Hoffman for appointments on 8/23/16); Exh. 6 at 3 (ISD provided complimentary appointment reminders to international patients from the United Arab Emirates and Honduras referred by the ISD to Dr. Hoffman for appointments on 8/23/16); Exh. 6 at 11 (ISD provided complimentary appointment reminders to international patient from the United Arab Emirates to Dr. Hoffman for an appointment on 11/15/16).

242.    Similar documents exist for all of the other Defendant Referring Physicians.

243.    Around November 2015, there was a leadership change at BSLMC Central Scheduling whereby it was emphasized that all appointments with BSLMC staff should be scheduled by BSLMC Central Scheduling. Worried that the ISD would lose out on one important inducement for Medicare/Medicaid referrals, ISD Associate Director Sanchez sent a letter to the office staff of the Defendant Referring Physicians reassuring them that despite the change in ôCentral Scheduling leadership,ö the ISD will continue to ô(1) contact patient[s] for their date/time availability; (2) secure financial clearance for [any tests]; and (3) schedule the test[s] with Central Scheduling. *See* Exhibit 10 (11/10/2015 Letter from Sanchez with attached fax cover sheet). Attached to this letter was a fax cover sheet to be used by the Referring Physicians to expedite their scheduling requests to ISD. *Id.* Thus, even after that time, the ISD continued to provide free administrative scheduling services in order to ingratiate itself with the Referring Physicians and induce Medicare and Medicare referrals back to the BSLMC.

244.    The improper remuneration in the form of free scheduling services described in this section was being provided to the Referring Physicians in 2011, when Relator first began working

at the ISD, continued unabated until late 2016, and continues on a more limited basis to the present day.

>   **b.**    **Free Billing and Collection Services**

245.    Defendant CHI-St. Luke's Health also provided complimentary billing and collection services to the Referring Physicians in part to induce Medicare and Medicaid referrals.

246.    The ISD's own internal policy and procedure documents indicate that ISD staff were to provide billing and collection services for international patients referred to independent physicians and practices such as the Defendant Referring Physicians. *See* Exhibit 1 (International Services Billing/Collection Process for Embassy Patients).

247.    These administrative services were provided at the Hospital Defendants' own expense and should have been performed by the Referring Physicians' own staff members (and paid for by Referring Physicians). Instead, ISD staff worked virtually full-time providing these services for the Referring Physicians.

248.    These complimentary billing and collections services had value to the Referring Physicians, because they did not have to compensate their own administrative staff to provide the services, which were time-consuming and costly to provide. The services facilitated and were necessary to the Referring Physicians' business of receiving payment for medical care. The Referring Physicians would not have been able to receive payment for services provided to international payments had their bills not been sent out and collected and would have incurred significant administrative costs to pay their own staff to provide those services.

249.    Some physicians, including Dr. Urrutia, declined these complimentary services and properly insisted on billing the patients directly.

250.     For example, through ISD staff, CHI-St. Luke's billed nine international patients, S.A.K., N.A.M, S.A.N., B.A.S., K.A.S., F.A., N.A., A.A.M., and A.A, for fourteen charged services totaling $138,320.99, on behalf of MedCare, and collected payment. The ISD then prepared documentation of the collection and disbursement on April 6, 2016, and provided a check for payment issued by CHI on April 12, 2016 to MedCare. The ISD provided these services for free to MedCare, whose administrative staff did not themselves need to collect the $138,320.99 from the nine patients.

251.     Likewise, through ISD staff, CHI-St. Luke's billed international patient S.A.K. $2,094 on behalf of Defendant Apnix for two charged services, collected payment, prepared documentation of the disbursement on April 12, 2016 for Apnix, and provided a check for payment issued by CHI on 4/19/16 to Apnix. The ISD provided these services for free to Apnix.

252.     Relator has attached to this Complaint nearly 100 pages of billing documents, including checks, which demonstrate that ISD staff were not only billing international patients on behalf of the Defendant Referring Physicians, but also collecting and disbursing payment for them. *See* Exh. 11 (Documents indicating extent of billing/collections conducted by ISD on behalf of the Defendant Referring Physicians).

253.     As reflected in Exhibit 11, for example:

a.     The ISD collected on a complimentary basis a bill for six international patients referred by the ISD to Dr. Hoffman, for six charges totaling $4,992 that were disbursed by the ISD to Dr. Hoffman on 2/25/16. Exh. 11 at 17-18.

b.     The ISD collected on a complimentary basis bills for one international patient referred by ISD to Dr. Hoffman, for a charge totaling $1,300 that was disbursed by the ISD to Dr. Hoffman on 4/6/16. Exh. 11 at 19-20.

c.      The ISD collected on a complimentary basis a bill for two international patients referred by the ISD to Houston Thyroid & Endocrine Specialists, for three charges totaling $1,894.72, that were disbursed by the ISD to Houston Thyroid & Endocrine Specialists on 4/12/16. Exh. 11, pp. 35-36.

d.      The ISD collected on a complimentary basis a bill for four international patients referred by the ISD to Leachman Cardiology Associates, for four charges totaling $2,488.00, that were disbursed by the ISD to Leachman Cardiology Associates on 2/25/16. Exh. 11, pp. 21-24.

254.    The following is just a small sample of these checks:

[Space Intentionally Left Blank ó Images Begin on Next Page]



SO-5018816 - 14ZF VG

Catholic Health Initiatives — DO REMOVE DOCUMENT ALONG THIS PERFORATION — Check No. 601182097

60-160/433

THE FACE OF THIS DOCUMENT CONTAINS A COLORED BACKGROUND, A VOID PANTOGRAPH AND MICROPRINTING IN THE BORDER. THE REVERSE SIDE CONTAINS AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW

✝ CATHOLIC HEALTH
INITIATIVES
PO Box 636000
Littleton, CO 80163-6000

Bank of New York-Mellon, N.A.
Pittsburgh, PA

| Date | Check No. |
|------|-----------|
| 04/12/2016 | 601182097 |

Amount
$ *****29,579.00

PAY  Twenty Nine Thousand Five Hundred Seventy Nine and 00/100 Dollars

TO THE
ORDER
OF

MH RADIATION ONCOLOGY
PO BOX 2486
HOUSTON TX 77252-2486

Kevin E. Lofton

⑆601182097⑆ ⑈043301601⑈ 008⑈6756⑈

SEE REVERSE SIDE FOR OPENING INSTRUCTIONS

✝ CATHOLIC HEALTH
INITIATIVES
PO Box 636000
Littleton, CO 80163-6000

#601182097

MH RADIATION ONCOLOGY
PO BOX 2486
HOUSTON TX 77252-2486



April 6, 2016

MH, Radiation Oncology
3801 Kirby Dr. Suite #430
Houston, Texas 77098

Ladies/Gentlemen:

Attached you will find a check payable for the following
patient(s):

| | | | | | | |
|---|---|---|---|---|---|---|
| | 10050712128 | $ | 3,383.00 | | 10050712127 | $ | 7,953.00 |
| | 10050696406 | $ | 6,829.00 | | 10050699515 | $ | 1,075.00 |
| | 10050693146 | $ | 10,339.00 | | | | |
| | | $ | 20,551.00 | | | $ | 9,028.00 |

|  |  |
|---|---|
| $ | 29,579.00 |

Sincerely,

Angelita Sanchez
Manager - International Services
St. Luke's Episcopal Hospital
(832) 355-6475



Catholic Health Initiatives    DO REMOVE DOCUMENT ALONG THIS PERFORATION

THE FACE OF THIS DOCUMENT CONTAINS A COLORED BACKGROUND, A VOID PANTOGRAPH AND MICROPRINTING IN THE BORDER. THE REVERSE SIDE CONTAINS AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW

60-160433

✝ CATHOLIC HEALTH
  INITIATIVES
  PO Box 636000
  Littleton, CO 80163-6000

Bank of New York-Mellon, N.A.
Pittsburgh, PA

| Date | Check No. |
|------|-----------|
| 03/01/2016 | 601159811 |

Amount
$ ****21,738.20

PAY  Twenty One Thousand Seven Hundred Thirty Eight and 20/100 Dollars

TO THE
ORDER
OF

SINGLETON ASSOCIATES
P O BOX 4346   DEPT 808
HOUSTON   TX    77210

Kevin E. Loften

⑈601159811⑈ ⑆043301601⑆ 008⑈6756⑈

SEE REVERSE SIDE FOR OPENING INSTRUCTIONS

✝ CATHOLIC HEALTH
  INITIATIVES
  PO Box 636000
  Littleton, CO 80163-6000

#601159811

SINGLETON ASSOCIATES
P O BOX 4346   DEPT 808
HOUSTON TX   77210



Catholic Health Initiatives

DO REMOVE VOID DOCUMENT ACROSS THIS PERFORATION

Check No. 601182099

60-160/433

THE FACE OF THIS DOCUMENT CONTAINS A COLORED BACKGROUND, A VOID PANTOGRAPH AND MICROPRINTING IN THE BORDER. THE REVERSE SIDE CONTAINS AN ARTIFICIAL WATERMARK. HOLD AT AN ANGLE TO VIEW.

† CATHOLIC HEALTH
INITIATIVES
PO Box 636000
Littleton, CO 80163-6000

Bank of New York-Mellon, N.A.
Pittsburgh, PA

| Date | Check No. |
|------|-----------|
| 04/12/2016 | 601182099 |

Amount
$ ****29,110.00

PAY  *Twenty Nine Thousand One Hundred Ten and 00/100 Dollars*

TO THE
ORDER
OF

KIDNEY AND HYPERTENSION CONSU
PO BOX 272747
HOUSTON TX   77217

Kevin E. Lofton

⑈601182099⑈ ⑆043301601⑆ 008⑈6756⑈

SEE REVERSE SIDE FOR OPENING INSTRUCTIONS

SO-501R818 • 14ZF-VG

† CATHOLIC HEALTH
INITIATIVES
PO Box 636000
Littleton, CO 80163-6000

#601182099

KIDNEY AND HYPERTENSTION CONSU
PO BOX 272747
HOUSTON TX   77277

MAILED
4/15/2016



April 6, 2016

Kidney and Hypertenstion Consultants
Po Box 272747
Houston, Texas 77277-2747

Ladies/Gentlemen:

Attached you will find a check payable for the following
patient(s):

| | 10050656330 | $ | 29,110.00 | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | $ | 29,110.00 | | | | $ | |

$ 29,110.00

Sincerely,

Angelita Sanchez
Manager - International Services
St. Luke's Episcopal Hospital
(832) 355-6475



60-160433

SO-5018516 • 14ZF-VG

**CATHOLIC HEALTH INITIATIVES**
PO Box 636000
Littleton, CO 80163-6000

Bank of New York-Mellon, N.A.
Pittsburgh, PA

| Date | Check No. |
|------|-----------|
| 03/01/2016 | 601159790 |

| Amount |
|--------|
| $ *****4,928.00 |

PAY Four Thousand Nine Hundred Twenty Eight and 00/100 Dollars

Kevin E. Lofton

TO THE
ORDER
OF

ANDRES MESA MD
888 NORMANDY ST
HOUSTON TX 77015

⑈601159790⑈ ⑆043301601⑆ 008⑈6756⑈

SEE REVERSE SIDE FOR OPENING INSTRUCTIONS

**CATHOLIC HEALTH INITIATIVES**
PO Box 636000
Littleton, CO 80163-6000

#601159790

ANDRES MESA MD
888 NORMANDY ST
HOUSTON TX 77015

MAILED 3/4/2016



February 25, 2016

ANDRES MESA MD
888 NORMANDY ST
HOUSTON, TX 77015

Ladies/Gentlemen:

Attached you will find a refund check payable for the following
patient(s):

| | | | | | |
|---|---|---|---|---|---|
| | 10050602475 | $ | 670.00 | | |
| | 10050595933 | $ | 4,258.00 | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | $ | 4,928.00 | $ | . |

| $ | 4,928.00 |
|---|---|

Sincerely,

Angelita Sanchez
Director - International Services
St. Luke's Episcopal Hospital
(832) 355-6475



60-160/433

THE FACE OF THIS DOCUMENT CONTAINS A COLORED BACKGROUND, A VOID PANTOGRAPH AND MICROPRINTING IN THE BORDER. THE REVERSE SIDE CONTAINS AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW.

Catholic Health Initiatives — REMOVE DOCUMENT ALONG THIS PERFORATION

✝ CATHOLIC HEALTH
  INITIATIVES
PO Box 636000
Littleton, CO 80163-6000

Bank of New York-Mellon, N.A.
Pittsburgh, PA

| Date | Check No. |
|------|-----------|
| 03/01/2016 | 601159812 |

Amount
$ ****24,213.60

PAY *Twenty Four Thousand Two Hundred Thirteen and 60/100 Dollars*

Kevin E. Lofton

TO THE
ORDER
OF

GREATER HOUSTON ANESTHESIOLOGY
2411 FOUNTAIN VIEW DR #200
HOUSTON TX 77057

⑈601159812⑈ ⑉043301601⑈ 008⑈6756⑈

SEE REVERSE SIDE FOR OPENING INSTRUCTIONS

✝ CATHOLIC HEALTH
  INITIATIVES
PO Box 636000
Littleton, CO 80163-6000

#601159812

GREATER HOUSTON ANESTHESIOLOGY
2411 FOUNTAIN VIEW DR #200
HOUSTON TX 77057





February 25, 2016

GREATER HOUSTON ANESTHESIOLOGY
2411 FOUNTAIN VIEW DR#200
HOUSTON, TX 77057

Ladies/Gentlemen:

Attached you will find a refund check payable for the following
patient(s):

| | | | | | | |
|---|---|---|---|---|---|---|
| | 10050704927 | $ | 2,872.60 | | | |
| | 10050624109 | $ | 5,130.00 | | | |
| | 10050742506 | $ | 2,257.20 | | | |
| | 10050641399 | $ | 2,462.40 | | | |
| | 10050587356 | $ | 1,641.60 | | | |
| | 10050633743 | $ | 1,641.60 | | | |
| | 10050619920 | $ | 1,846.80 | | | |
| | 10050630861 | $ | 1,846.80 | | | |
| | 10050668040 | $ | 4,514.40 | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | $ | 24,213.60 | | $ | - |

$ 24,213.60

Sincerely,

Angelita Sanchez
Director - International Services
St. Luke's Episcopal Hospital
(832) 355-6475

Catholic Health Initiatives — PO Box 636000 — THIS IS AN ACTUAL DOCUMENT ACCOUNT — THIS PERFORATION

THE FACE OF THIS DOCUMENT CONTAINS A COLORED BACKGROUND, A VOID PANTOGRAPH AND MICROPRINTING IN THE BORDER. THE REVERSE SIDE CONTAINS AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW

60-150/433

✝ CATHOLIC HEALTH
INITIATIVES
PO Box 636000
Littleton, CO 80163-6000

Bank of New York-Mellon, N.A.
Pittsburgh, PA

| Date | Check No. |
|------|-----------|
| 04/12/2016 | 6011B2101 |

| Amount |
|--------|
| $ ****23,392.80 |

PAY Twenty Three Thousand Three Hundred Ninety Two and 80/100 Dollars

TO THE
ORDER
OF

GREATER HOUSTON ANESTHESIOLOGY
2411 FOUNTAIN VIEW DR #200
HOUSTON TX  77057

Kevin E. Lofton

⑆6011B2101⑆ ⑆043301601⑆ 008⑈6756⑈

SEE REVERSE SIDE FOR OPENING INSTRUCTIONS

SO-5018810 • 14ZF-VG

✝ CATHOLIC HEALTH
INITIATIVES
PO Box 636000
Littleton, CO 80163-6000

#601182101

GREATER HOUSTON ANESTHESIOLOGY
2411 FOUNTAIN VIEW DR #200
HOUSTON TX  77057

MAILED 4/15/2016



April 6, 2016

Greater Houston Anesthesiology
2411 Fountain View Dr # 200
Houston, Texas 77057

Ladies/Gentlemen:
Account# 10050831418
Attached you will find a check for the following
patient(s):

| | | | | | | |
|---|---|---|---|---|---|---|
| | 10050710645 | $ | 10,670.40 | | 10050712127 | $ | 2,667.60 |
| | 10050656330 | $ | 7,387.20 | | 10050582946 | $ | 2,667.60 |
| | | $ | 18,057.60 | | | $ | 5,335.20 |

$ 23,392.80

Catholic Health Initiatives    DO NOT COPY    Check No. 601182096

60-160/433

THE FACE OF THIS DOCUMENT CONTAINS A COLORED BACKGROUND - A VOID PANTOGRAPH AND MICROPRINTING IN THE BORDER - THE REVERSE SIDE CONTAINS AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW

✝ CATHOLIC HEALTH
INITIATIVES
PO Box 636000
Littleton, CO 80163-6000

Bank of New York-Mellon, N.A.
Pittsburgh, PA

| Date | Check No. |
|---|---|
| 04/12/2016 | 601182096 |

Amount
$ ****15,170.00

PAY Fifteen Thousand One Hundred Seventy and 00/100 Dollars

TO THE
ORDER
OF

SINGLETON ASSOCIATES
P O BOX 4346   DEPT 808
HOUSTON TX   77210

Kevin E. Lofton

⑈601182096⑈ ⑆043306601⑆ 008⑈6756⑈

SEE REVERSE SIDE FOR OPENING INSTRUCTIONS

SD-5018818 • 14ZF-VG

✝ CATHOLIC HEALTH
INITIATIVES
PO Box 636000
Littleton, CO 80163-6000

#601182096

SINGLETON ASSOCIATES
P O BOX 4346   DEPT 808
HOUSTON TX   77210

MAILED
4/15/2016

255.    In line with this practice, billing documents sent to the various embassies that deal with the ISD include the following language:

> Please make check payable to CHI St. Luke's Health Baylor and mail to address noted below. Checks can also be prepared separately (hospital/physicians) and mailed to St. Luke's International Center, where they will personally be hand delivered [in order to] expedite [the] process. If you have already paid the Physicians' bills please disregard [the] above notice.

*See* Exhibit 12 (Billing Document to UAE).

256.    These billing documents, which are sent by Defendant CHI-St. Luke's Health on CHI-St. Luke's Health letterhead (and were earlier sent by St. Luke's Episcopal Hospital on its letterhead), routinely list one or more private practices and/or practitioners for whom collection is sought, as well as the charges related to the services provided by those private practices/practitioners. *See e.g.*, Exhibit 12 (Billing Document to UAE whereby CHI-St. Luke's Health seeks collection on behalf of Defendant Dr. Alan Hoffman); *see also*, Exhibit 11 (Documents indicating extent of billing/collections conducted by ISD on behalf of the Defendant Referring Physicians); Exhibit 13 (CHI-St. Luke's billing documents to various embassies seeking collection on behalf of all of the Defendant Referring Physicians).

257.    As with the complimentary interpreters and scheduling services, this practice was longstanding and predated CHI-St. Luke's purchase of St. Luke's Episcopal Hospital. For example, St. Luke's Episcopal Hospital billed international patient J.O.O. for charges incurred to multiple Referring Physicians for dates of service 6/7/10 to 6/24/10. The billing services were provided on a complimentary basis to Referring Physicians including Pulmonary Critical Care & Sleep Medicine Consultants ($3,353.60 billed for services of Dr. Dahlberg, Dr. Manion, and Dr. Connolly, reflecting a discount offered by these physicians that St. Luke's Episcopal Hospital incorporated into the bill) and Defendant Douglas ($100 billed for gastroenterology services), and

then St. Luke's Episcopal Hospital went on to collect payment from patient J.O.O. and disburse it to the Referring Physicians.

258.     The improper remuneration in the form of free billing and collection services described in this section was being provided to the Referring Physicians in 2011, when Relator first began working at the ISD, continued unabated until late 2016, and continues on a more limited basis to the present day.

**4.     Complimentary International Travel Perks**

259.     In addition to the illegal remuneration described above, the Hospital Defendants also provided all-expense paid international trips organized by the ISD to those referring physicians responsible for the largest number of Medicare and Medicaid referrals to BSLMC.

260.     These trips were referenced and discussed in ISD staff meetings that Relator attended.

261.     The lavish trips were put on by the ISD Marketing Department and included stays at expensive 5-star hotels, as well as tickets to local events or shows, providing value to the recipient physicians.

262.     The Referring Physicians who were provided with these trips included Dr. Hoffman, Dr. Krajcer, Dr. Cosselli, and Dr. Lamelas,.

263.     For example, the ISD Marketing Department paid for Dr. Lamelas to travel to Lima, Peru in early August 2017 on such a lavish trip.

264.     The Hospital Defendants provided this illegal remuneration through the ISD knowingly and willfully to ingratiate themselves with the Referring Physicians and at least in part to induce Medicare and Medicaid referrals.

265.     On information and belief, international travel perks were provided to those Referring Physicians who referred the most Medicare and Medicaid patients to Defendant CHI-St. Luke's as a further inducement for Medicare and Medicaid referrals.

266.     Dr. Hoffman, for example, was gifted with lavish complimentary international travel perks because he was considered a "preferred" provider by ISD staff including VP Matar and Associate Sanchez due to his being a consistent source of referrals of Medicare and Medicaid patients back to BSLMC.

267.     The patients recruited on these international trips would be referred to the Referring Physicians by the ISD. The Hospital Defendants expected these same physicians to continue to refer their Medicare and Medicaid patients to BSLMC in return for the trips and the referrals.

## LIABILITY OF THE DEFENDANT REFERRING PHYSICIANS

268.     Each of the Defendant Referring Physicians, including APNIX, Bone and Joint Clinic of Houston, Greater Houston Gastroenterology, Houston Thyroid & Endocrine Specialists, Kidney Associates, Kidney and Hypertension Consultants, Leachman Cardiology Associates, Pulmonary Critical Care & Sleep Medicine Consultants, Surgical Associates of Texas, Texas Endocrinology Group, The Center for ENT, Baylor College of Medicine, MedCare, and Drs. Boccalandro, Colomer, Cherem, Dahlberg, Douglass, Elhaj, Fishman, Hoffman, Hung, Jogi, Katz, Krajcer, Leachman, Livesay, Lopez, Mesa, Moses, Raijman, Santacruz, Singh, and Sista treated Medicare and/or Medicaid patients received payments from the government through the Medicare and/or Medicaid programs.

269.     Each of these Defendant Referring Physicians also referred their Medicare and/or Medicaid patients out for services they could not provide, including to hospitals.

270.     The Hospital Defendants knowingly and willfully offered and/or paid remuneration to the Referring Physicians to induce them to refer their Medicare and Medicaid patients to BSLMC.

271.     The Defendant Referring Physicians knowingly and willfully received and accepted renumeration from the Hospital Defendants that they understood was provided to induce referrals of their Medicare and Medicaid patients to BSLMC.

272.     The Defendant Referring Physicians knowingly and willfully made referrals of Medicare and Medicaid patients to the Hospital Defendants while they had an improper financial relationship with the Hospital Defendants pursuant to which they received the improper remuneration described herein.

273.     The Defendant Referring Physicians knowingly and willfully made referrals of Medicare and Medicaid patients to the Hospital Defendants even know they knew that doing so violated the Stark Act.

274.     The Defendant Referring Physicians knowingly and willfully made referrals of Medicare and Medicaid patients to the Hospital Defendants even know they knew that doing so violated the Anti-Kickback Statute.

275.     When the Defendant Referring Physicians referred Medicare and Medicaid patients to the Hospital Defendants for services, they knew that the Hospital Defendants would bill the government for those services.

276.     When the Defendant Referring Physicians referred Medicare and Medicaid patients to the Hospital Defendants for services, the Defendant Referring Physicians knew that the resulting claims and statements made by the Hospital Defendants to obtain payment from the government would be false or fraudulent because of AKS and Stark Act violations, or in the alternative, acted

with deliberate ignorance of the truth or falsity of the information provided to the government or reckless disregard of the truth or falsity of the information provided to the government.

277.    The Defendant Referring Physicians knowingly, purposefully, and willfully assisted in causing the government to pay Medicare and Medicaid claims submitted by the Hospital Defendants that were grounded in fraud due to the illegal kickback scheme described herein.

278.    The Defendant Referring Physicians knew the requirements of the AKS and Stark Act.

279.    The Defendant Referring Physicians (themselves or through their agents) had all billed the government for services provided to federal health care program beneficiaries for their own Medicare and/or Medicaid clients, and had thus made the certifications described above, including that they had familiarized themselves with the applicable laws such as the AKS and Stark law.

280.    The Defendant Referring Physicians were also on notice from the government that they were to avoid receiving illegal remuneration from hospitals intended at least in part to induce referrals, having been warned of the risk of "improper inducements, kickbacks, and self-referrals," including "arrangements with hospitals." Dep't of Health & Human Servs. Office of Inspector General Compliance Program for Individual and Small Group Physician Practices, 65 Fed. Reg. 59434 (Oct. 5, 2000). They knew that hospitals had incentives to provide them remuneration to curry favor and induce referrals, since physicians are the primary source of Medicare and Medicaid referrals to hospitals.

281.    The improper remuneration received by the Defendant Referring Physicians in the form of international patient referrals, free interpreters, and free administrative services was provided with high frequency to each of the Defendant Referring Physicians over a period of years.

It had significant financial value to them. For those Defendant Referring Physicians who received luxurious international travel at the Hospital Defendants' expense, the financial value was even greater.

282.    This extensive volume, high frequency, and significant value of remuneration coming from the ISD made it obvious and apparent that the Hospital Defendants were using the ISD as a means to curry favor with the Referring Physicians and induce the Hospital Defendants to send their patients—including Medicare and Medicaid beneficiaries—to BSLMC rather than other hospitals.

283.    Moreover, as set forth above, the Hospital Defendants made evident their unlawful intent to solicit and induce referrals to the Referring Physicians through the ISD by increasing and decreasing the flow of international patient referrals to the Referring Physicians based on the volume of referrals received back to BLSMC.

284.    On information and belief, the Hospital Defendants, including Matar and Sanchez, also communicated their unlawful intent to induce referrals to the Defendant Referring Physicians directly or through their staff. Relator has good cause for this belief because VP Matar and Associate Director Sanchez were vocal about their scheme and did not shy away from indicating to ISD employees such as Relator that they were rewarding high levels of referrals and punishing low levels of referrals from Referring Physicians.

285.    The illegal remuneration described in this Complaint was not universally accepted by physician and provider referral sources.  Some physicians, such as Dr. Urrutia, refused certain complimentary services and declined to provide a high volume of referrals to BSLMC, and as a result, were punished with reduced referrals of lucrative international patients by the ISD.

86

## MATERIALITY

286.    The Government would not have paid bills submitted by the Hospital Defendants for medical services had it known that the billed services were solicited and referred illegally by the Referring Physicians through AKS and Stark Act violations.

287.    Submission of claims for services that were solicited and referred illegally through AKS and Stark Act violations goes to the very essence of the bargain between the Hospital Defendants and the Government for reasons including that the Government agrees to pay for beneficiary care only upon the condition that neutral physicians— not physicians receiving illegal remuneration who stand to profit directly from the billing— have identified beneficiaries as needing care and referred those beneficiaries to the billing entity without any compromised relationship.

288.    The AKS and Stark Act are meant to ensure that the government pays for only conflict-free medical care provided in the best interests of the patient; kickbacks, in turn, taint medical decisions with financial interests and raise numerous concerns for the integrity of Medicare and Medicaid programs, including corruption of medical judgment, overutilization, increased costs, and unfair competition.

289.    Under the amended AKS, "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g).

290.    The AKS provides a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization of federal healthcare services or to poor quality of care, reflecting the materiality of kickbacks to the government's decision to pay for care.

291.    Congress strengthened the AKS in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade the statute's reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93. As such, "[i]f any one purpose of remuneration is to induce or reward referrals of federal healthcare program business, the [Anti-Kickback] statute is violated." 66 Fed. Reg. 919 (citing *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68 (3rd Cir. 1985)).

292.    Likewise, pursuant to the *Stark* Act, if a physician has a financial relationship with a hospital or entity, then:

> (A) The physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

> (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under sub paragraph (A).

42 U.S.C. § 1395nn(a)(1).

293.    Federal healthcare programs are statutorily *prohibited* from paying for designated health services furnished pursuant to a prohibited referral. 42 U.S.C. § 1395nn(g)(1) ("No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section.").

294.    The AKS and Stark Act are critical provisions of the Medicare and Medicaid statutes, and thus compliance with both is material to the government's treatment of claims for reimbursement.

295. The AKS and Stark Act impose criminal penalties and civil penalties upon violatorsô they are do not amount to mere *de minimis* technical requirements.

296. The Government routinely criminally prosecutes and imposes civil penalties upon health care providers who violate the AKS and Stark Act.

297. The Government also routinely prosecutes False Claims Act cases against health care providers who submit false or fraudulent claims or statements associated with AKS and Stark Act violations.

298. Claims for payment for services to federal healthcare programs are materially false when the patient was referred under a kickback scheme, as alleged above, because the kickback is material information that renders the claim ineligible for payment.

299. Certifications of compliance with the AKS and Stark Act are prerequisites for payment and thus are material to government reimbursement under Medicare and Medicaid.

300. The government has expressly conditioned payment of Medicare and Medicaid claims upon the claimantœs certification of compliance with the AKS and Stark Act.

301. The government has repeatedly warned hospitals and referring physicians against engaging in illegal remuneration schemes such as the one alleged here. *See, e.g.*, Paragraphs 164-166.

302. The government did not know about the violations alleged here at the time of payment.

## CLAIMS

## Count I – False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

303. Relator incorporates and re-alleges each paragraph of this Complaint as if fully set forth herein.

304.    Relator hereby incorporates by reference the documents and exhibits attached, recited, or referenced herein.

305.    As described above, Defendants knowingly presented, or caused to be presented, to an officer or employee of the government, false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

306.    As described above, Defendants knowingly presented, or caused to be presented, to an officer or employee of the government, false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

307.    As described above, the Hospital Defendantsø illegal kickbacks to the Referring Physicians to induce Medicare and Medicaid referrals violated the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2) and the *Stark* laws. As a result, claims for payment by Defendants to the federal health care programs were false and fraudulent because they were tainted by kickbacks, making them ineligible for payment. Accordingly, Defendants knowingly caused to be presented false or fraudulent claims for payment or approval in violation of the False Claims Act, 31 U.S.S. § 3729(a)(1)(A).

308.    As a result of these false or fraudulent claims, the government sustained substantial damages to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

## Count II – False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

309.     Relator incorporates and re-alleges each paragraph of this Complaint as if fully set forth herein.

310.    Relator hereby incorporates by reference the documents and exhibits attached, recited, or referenced herein.

311.    As described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim for payment or approval by the government, in violation of 31 U.S.C. § 3729(a)(1)(B).

312.    As described above, the Hospital Defendants' illegal kickbacks to the Defendant Referring Physicians to induce Medicare and Medicaid referrals violated the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2) and the *Stark* laws. As a result, Defendants made or caused to be made false records or statements that were material to false or fraudulent claims for payment submitted to federal health care programs. The false records or statements included false certifications and representations of full compliance with all federal and state laws and regulations prohibiting false or fraudulent reporting, including, but not limited to, the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2) and the *Stark* laws.

313.    As a result of these false or fraudulent records or statements, the government sustained substantial damages to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

## Count III – False Claims Act, 31 U.S.C. § 3729(a)(1)(G)

314.    Relator incorporates and re-alleges each paragraph of this Complaint as if fully set forth herein.

315.    Relator hereby incorporates by reference the documents and exhibits attached, recited, or referenced herein.

316.    The regulations implementing the Stark Law require that "[a]n entity that collects payment for a designated health service that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis, as defined at § 1003.101 of this title." 42 C.F.R. § 411.353(d).

317.     As described above, Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government, in violation of 31 U.S.C. § 3729(a)(1)(G).

318.     As described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, in violation of 31 U.S.C. § 3729(a)(1)(G).

319.     As described above, by violating their record-keeping obligations and undertakings such that the government would not discover Defendants' violations, Defendants concealed from the government the fact that the government was entitled to refunds and/or accommodations from Defendants.

320.     As a result of their acts or omissions, the government sustained substantial damages to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

## Count IV – False Claims Act, 31 U.S.C. § 3729(a)(1)(C)

321.     Relator incorporates and re-alleges each paragraph of this Complaint as if fully set forth herein.

322.     Relator hereby incorporates by reference the documents and exhibits attached, recited, or referenced herein.

323.     As described above, the Defendants conspired to defraud the Government by getting false or fraudulent claims allowed or paid, and/or conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(A), (B) or (G), in violation of 31 U.S.C. § 3729(a)(1)(C).

324.     As a result of their acts or omissions, the government sustained substantial damages to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

**Count V – Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code § 36.002(1)**

325.     Relator incorporates and re-alleges each paragraph of this Complaint as if fully set forth herein.

326.     Relator hereby incorporates by reference the documents and exhibits attached, recited, or referenced herein.

327.     As described above, Defendants knowingly made or caused to be made a false statement or misrepresentations of a material fact to permit the Defendants to receive a payment under the Medicaid program that is not authorized, in violation of Tex. Hum. Res. Code §§ 36.002(1).

328.     As described above, the Hospital Defendantsø illegal kickbacks to the Defendant Referring Physicians to induce Medicaid referrals violated the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2), the *Stark* laws, and the Texas anti-kickback provision in Tex. Hum. Res. Code § 32.039(b). As a result, claims for payment by the Defendants to the federal health care programs were false and fraudulent because they were tainted by kickbacks, making them ineligible for payment. Accordingly, Defendants knowingly caused to be presented false or fraudulent claims for payment or approval in violation of the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§ 36.002(1).

329.     As a result of these false or fraudulent claims, the State of Texas sustained substantial damages to be determined at trial, and is entitled to double damages plus a civil penalty for each violation.

**Count VI – Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code § 36.002(2)**

330.     Relator incorporates and re-alleges each paragraph of this Complaint as if fully set forth herein.

331.    Relator hereby incorporates by reference the documents and exhibits attached, recited, or referenced herein.

332.    As described above, Defendants knowingly concealed or failed to disclose information that permitted Defendants to receive a payment under the Medicaid program that was not authorized in violation of Tex. Hum. Res. Code §§ 36.002(2).

333.    As described above, the Hospital Defendantsø illegal kickbacks to the Defendant Referring Physicians to induce Medicaid referrals violated the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2), the *Stark* laws, and the Texas anti-kickback provision in Tex. Hum. Res. Code § 32.039(b). As a result, claims for payment by the Defendants to the federal health care programs were false and fraudulent because they were tainted by kickbacks, making them ineligible for payment. Accordingly, Defendants knowingly concealed or failed to disclose information that permitted Defendants to receive payment under the Medicaid program in violation of the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§ 36.002(2).

334.    As a result of these false or fraudulent claims, the State of Texas sustained substantial damages to be determined at trial, and is entitled to double damages plus a civil penalty for each violation.

## Count VII – Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code § 36.002(4)

335.    Relator incorporates and re-alleges each paragraph of this Complaint as if fully set forth herein.

336.    Relator hereby incorporates by reference the documents and exhibits attached, recited, or referenced herein.

337.     As described above, Defendants made false statements or misrepresentations of material facts concerning information required to be provided by federal or state law, rule, regulation, or provider agreement in violation of Tex. Hum. Res. Code §§ 36.002(4).

338.     As described above, Defendants were required to submit an enrollment application at least every five years certifying compliance with all Medicaid regulations.  Further, Defendants certified their understanding that Medicaid payments were conditioned on compliance with the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2) and the *Stark* laws.  As a result, Defendants made false statements or misrepresentations of material facts when they certified they would abide by all Medicaid regulations, including Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2) and the *Stark* laws.

339.     As a result of these false or fraudulent claims, the State of Texas sustained substantial damages to be determined at trial, and is entitled to double damages plus a civil penalty for each violation.

## Count VIII – Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code § 36.002(12)

340.     Relator incorporates and re-alleges each paragraph of this Complaint as if fully set forth herein.

341.     Relator hereby incorporates by reference the documents and exhibits attached, recited, or referenced herein.

342.     As described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the state of Texas under the Medicaid program, and knowingly concealed or knowingly and improperly avoided or deceased an obligation to pay or transmit money or property to the state of Texas in violation of Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§ 36.002(12).

343.     As described above, by violating their record-keeping obligations and undertakings such that the State of Texas would not discover Defendantsø violations, Defendants concealed from the state of Texas the fact that the government was entitled to refunds and/or accommodations from the Hospital Defendants.

344.     As a result of their acts or omissions, the State of Texas sustained substantial damages to be determined at trial, and is entitled to double damages plus a civil penalty for each violation.

<b><u>Count IX – Texas Medicaid Fraud Prevention Act,<br>Tex. Hum. Res. Code §§ 36.002(13)</u></b>

345.     Relator incorporates and re-alleges each paragraph of this Complaint as if fully set forth herein.

346.     Relator hereby incorporates by reference the documents and exhibits attached, recited, or referenced herein.

347.     As described above, the Hospital Defendantsø illegal kickbacks to the Defendant Referring Physicians to induce Medicaid referrals violated the Texas anti-kickback provision in Tex. Hum. Res. Code § 32.039(b).  As a result, claims for payment to Defendants through the Medicaid program were false and fraudulent because they were tainted by kickbacks, making them ineligible for payment in violation of Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code § 36.002(13).

348.     As a result of the Defendantsø kickback scheme, the State of Texas sustained substantial damages to be determined at trial, and is entitled to double damages plus a civil penalty for each violation.

## Jury Trial Demanded

The United States of America, on the relation of Hichem Chihi, hereby demands trial by jury on all issues so triable.

## Relief Requested

WHEREFORE, Hichem Chihi respectfully requests that this Court enter judgment in his favor and in favor of the United States of America against Defendants, awarding: treble damages and penalties for violations of 31 U.S.C. § 3729; other damages to the extent allowed by law; all costs associated with litigating this civil action, including attorney's fees; an award to relator Chihi of thirty percent of the government's recovery; interest; and all other relief this Court deems just and proper.

Respectfully Submitted,

/s/ Ruth Brown

**Correro & Leisure, P.C.**

Mark A. Correro
Lance Leisure
2909 Hillcroft Avenue, Suite 350
Houston, Texas 77057
888.508.1292 (Telephone)
888.508.1293 (Facsimile)

**Loevy & Loevy**

Michael Kanovitz
Ruth Brown
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
312.243.5900 (Telephone)
312.243.5902 (Facsimile)