**IN THE U.S. DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| U.S. OF AMERICA, the | ) | |
| STATE OF TEXAS, the STATE OF COLORADO, | ) | |
| the STATE OF INDIANA, the STATE OF IOWA, | ) | |
| the STATE OF MINNESOTA, the STATE OF | ) | |
| NEW MEXICO, the STATE OF TENNESSEE, | ) | |
| the STATE OF WASHINGTON, *ex rel*. HICHEM | ) | Civil Action No. 4:18-cv-00123 |
| CHIHI, | ) | |
| | ) | |
| Plaintiff-Relator, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CATHOLIC HEALTH INITIATIVES, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**THE CHI DEFENDANTS' MOTION TO DISMISS
RELATOR'S SECOND AMENDED COMPLAINT**

75373094.9

## <u>TABLE OF CONTENTS</u>

**Page**

STATEMENT OF FACTS AND SUMMARY OF ARGUMENT .................................................. 1

NATURE AND STAGE OF THE PROCEEDING.................................................................... 4

ISSUES REQUIRING RESOLUTION BY THE COURT ........................................................ 5

LEGAL STANDARDS ............................................................................................................ 5

    A.   Rule 12(b)(6)................................................................................................................ 5

    B.   Rule 9(b) ...................................................................................................................... 5

STATUTORY FRAMEWORK.................................................................................................. 6

ARGUMENT ............................................................................................................................ 7

II.      RELATOR FAILS TO STATE A CLAIM AGAINST THE CHI DEFENDANTS .............. 7

III.     RELATOR'S AKS AND STARK CLAIMS SHOULD BE DISMISSED ........................ 9

    A.   Relator Fails to Plead an AKS Violation ................................................................... 9

        1. The SAC Fails to Allege Knowing and Willful Conduct and
the Intent to Induce Referrals............................................................................... 10

            a.   International Patient Referrals ................................................................... 12

            b.   Interpreter Services ................................................................................... 18

            c.   Patient Support and Administrative Services ........................................... 21

            d.   International Travel-Related Expenses ...................................................... 24

        2. The SAC Fails to Allege the Particular Details of a False Claim or the
Specifics of a Scheme with Reliable Indicia of a False Claim. ........................... 26

            a.   The particular details of an actually submitted false claim...................... 26

            b.   The details of a scheme, paired with reliable indicia that a
false claim was submitted.......................................................................... 28

IV.     Relator Fails to State a Stark Law Violation ................................................................. 30

V.     RELATOR FAILS TO ESTABLISH A VIABLE REVERSE FALSE CLAIM.................. 33

VI.      RELATOR FAILS TO ESTABLISH A VIABLE CONSPIRACY CLAIM ................... 33

VII.     RELATOR'S TMFCPA CLAIMS (COUNTS V-IX) SHOULD BE DISMISSED ........ 34

VIII.    THE SAC SHOULD BE DISMISSED WITHOUT LEAVE TO AMMEND ................. 35

CONCLUSION ..................................................................................................................... 36

75373094.9

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...............................................................................................5, 19, 33

*U.S. ex rel. Bain v. Georgia Gulf Corp.*,
  386 F.3d 648 (5th Cir. 2004) ...............................................................................33

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..............................................................................................5

*Bodin v. Vagshenian*,
  462 F.3d 481 (5th Cir. 2006) ...............................................................................17

*U.S. ex rel. Dekort v. Integrated Coast Guard Sys.*,
  705 F. Supp. 2d 519 (N.D. Tex. 2010) ................................................................34

*Gaalla v. Citizens Med. Ctr.*,
  No. CIV.A. V-10-14, 2010 WL 5387603 (S.D. Tex. Dec. 17, 2010)..........................16, 17, 18

*U.S. ex rel. Grubbs v. Kanneganti*,
  565 F.3d 180 (5th Cir. 2009) ...............................................................5, 26, 27, 28, 34

*U.S. ex rel. Harman v. Trinity Industries, Inc.*,
  872 F.3d 645 (5th Cir. 2017) ...............................................................................6

*U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.*,
  498 F. Supp. 2d 25 (D.D.C. 2007) .......................................................................9

*Jones-McNamara v. Holzer Health Sys.*,
  630 Fed. App'x 394 (6th Cir. 2015) .....................................................................20

*U.S. ex rel. Parikh v. Citizens Med. Ctr.*,
  977 F.Supp.2d 654 (S.D. Tex. 2013) .................................................10, 27, 30, 33

*Parker & Parsley Petro. Co. v. Dresser Indus.*,
  972 F.2d 580 (5th Cir. 1992) ...............................................................................35

*U.S. ex rel. Patel v. Catholic Health Initiatives*,
  312 F. Supp. 3d 584 (S.D. Tex. 2018) ............................................................*Passim*

*U.S. ex rel. Patel v. Catholic Health Initiatives*,
  792 F. App'x 296 (5th Cir. 2019) ....................................................................10, 11

*Price v. Pinnacle Brands, Inc.*,
   138 F.3d 602 (5th Cir. 1998) ..................................................................................36

*U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*,
   355 F.3d 370 (5th Cir. 2004) ..................................................................................13

*U.S. ex rel. Ruscher v. Omnicare, Inc.*,
   No. 4:08-CV-3396, 2014 WL 2618158 (S.D. Tex. June 12, 2014)..................................20, 30

*U.S. ex rel. Shupe v. Cisco Sys., Inc.*,
   759 F.3d 379 (5th Cir. 2014) ....................................................................................6

*U.S. ex rel. Spicer v. Westbrook*,
   751 F.3d 354 (5th Cir. 2014) ..................................................................................36

*Stripling v. Jordan Prod. Co.*,
   234 F.3d 863 (5th Cir.2000) ..................................................................................36

*U.S. ex rel. Tillson v. Lockheed Martin Corp.*,
   2004 WL 2403114 (W.D. Ky. 2004) ............................................................................9

*U.S. v. Abundant Life Therapeutic Servs. Texas*,
   LLC, No. CV H-18-773, 2019 WL 1930274 (S.D. Tex. Apr. 30, 2019).........28, 29, 30, 34, 35

*U.S. v. Davis*,
   132 F.3d 1092 (5th Cir. 1998) ................................................................................10

*United States v. Bestfoods*,
   524 U.S. 51 (1968)................................................................................................8

*United States v. Rogan*,
   No. 02 C 3310, 2006 WL 8427270 (N.D. Ill. Oct. 2, 2006),
   *aff'd*, 517 F.3d 449 (7th Cir. 2008).........................................................................23

*Wady v. Provident Life and Accident Ins. Co. of Am.*,
   216 F. Supp.2d 1060 (C.D. Cal. 2002) ........................................................................8

*Waldmann v. Fulp*,
   259 F.Supp.3d 579 (S.D. Tex. 2016) (Crane, J.) ..........................................................30, 31

*U.S. ex rel. Walner v. NorthShore Univ. Healthsystem*,
   660 F. Supp. 2d 891 (N.D. Ill. 2009) ........................................................................34

*U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.*,
   336 F.3d 375 (5th Cir. 2003) ..................................................................................25

## Statutes

Americans with Disabilities Act ..........................................................................18, 19

Anti-Kickback Statute, 42 U.S.C. §§ 1320a–7b(b)(2) ......................................................*Passim*

Civil Rights Act of 1964 ...........................................................................................18, 19

False Claims Act, 31 U.S.C. § 3729, *et seq.* ...........................................................*Passim*

Patient Protection and Affordable Care Act, Pub. L. No. 111–148, 124 Stat...................11, 18, 19

Stark Law, 42 U.S. Code §§ 1395 *et seq.* .................................................................1, 30, 31, 32

Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§ 36.001 *et seq*..................*Passim*

**Rules**

Federal Rule of Civil Procedure 9(b)..................................................................*Passim*

Federal Rule of Civil Procedure 12(b)(6) ...........................................................*Passim*

Defendants Catholic Health Initiatives ("**CHI**") and CHI-St. Luke's Health ("**CHI-St. Luke's**") (collectively, the "**CHI Defendants**") hereby move to dismiss Relator Hichem Chihi's ("**Relator**") Second Amended Complaint ("**SAC**") in the above-captioned action pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). The SAC should be dismissed with prejudice under Rule 12(b)(6) because it fails to state a claim upon which relief may be granted and because it fails to plead fraud with particularity under Rule 9(b).

## STATEMENT OF FACTS AND SUMMARY OF ARGUMENT

Relator worked as a patient representative in the International Services Department ("ISD") at Baylor St. Luke's Medical Center ("BSLMC") for roughly eight years, where he and a group of multilingual professionals managed and coordinated the medical services and related needs for international patients. In an effort to collect an undue bounty, Relator has filed the current lawsuit, falsely alleging that the Defendants devised a scheme to use international patients and related support services as remuneration to induce Medicare referrals from various group practices and individual physicians (the "Defendant Physicians") throughout the Houston area. Relator alleges that this scheme violated the Anti-Kickback Statute ("AKS") the Stark Law and – by extension – the False Claim Act ("FCA") and the Texas Medicaid Fraud Prevention Act ("TMFPA"). As set forth below, the alleged scheme – premised on a dangerous combination of conjecture, innuendo, and imprecision – crumbles under the weight of Rules 12(b)(6) and 9(b).

As an initial matter, Relator obfuscates the distinct roles played by CHI St. Luke's, CHI, and BSLMC in the alleged scheme. Though Relator alleges the scheme was perpetrated at BSLMC to induce referrals back to BSLMC, BSLMC is not named as a

defendant in this case. Instead, Relator endeavors to impute liability to BSLMC's part owner, CHI St. Luke's, and its corporate parent, CHI. However, the SAC lacks the type of allegations that are necessary to hold the CHI Defendants accountable for the acts of a partly-owned subsidiary that allegedly occurred at BSLMC, and they should be dismissed for this reason alone.

Relator's inability to allege a plausible kickback scheme also extends to the physicians who were on the receiving end of the purported remuneration. The list of Defendant Physicians, like the SAC's allegations, has been a moving target and since Relator's action was initially filed, the forty-four defendants named in the original complaint has wandered down to a field of thirty-six. This is based on Relator quietly dismissing eight defendants who either never referred patients to BLSMC or were not even in a position to refer in the first place.

Relator also fails to state a claim under the AKS because the SAC does not establish that the CHI Defendants "knowingly and willfully" provided illicit remuneration with the intent to induce referrals. To the contrary, the SAC reveals that the ISD's referral decisions and patient support apparatus were entirely consistent with lawful behavior and furthered the ISD's mission to provide exceptional patient services to its international clientele. Relator's AKS claims also fail to satisfy Rule 9(b), as the SAC does not provide the particular details of an actual false claim, or outline the specifics of an unlawful kickback scheme by tying the purported remuneration to the inducement of referrals.

Relator's Stark-based claims fail for similar reasons, and because the SAC does not establish even the most basic elements of a violation, including that the CHI Defendants

had an actual financial relationship with a specific physician, or that any physicians made referrals for Designated Health Services ("DHS") to the CHI Defendants. Finally, Relator's remaining allegations regarding a reverse false claim, an FCA conspiracy, and various TMFPA violations should be dismissed because they are entirely derivative of his failed AKS and Stark-based claims and premised on a mechanical recitation of their applicable elements rather than well-pled factual allegations.

This is now Relator's third attempt to present a cognizable FCA claim, but rather than using his multiple amendments to cure the complaint's pervasive pleading deficiencies, he has merely reorganized his allegations, summarized the same exhibits that were attached to the original pleading – many of which relate to defendants who have been dismissed from this action – and even removed several allegations that contradict his assertions of fraud. Relator's failure to state a claim with particularity this late in the game, after the defendants have expended extraordinary time and resources defending against this action, is simply inexcusable. Relator previously induced nearly forty defendants to file thirteen motions to dismiss the prior iteration of his complaint, only to use the briefs to (unsuccessfully) address his many pleading deficiencies.  Even with a detailed roadmap identifying his action's shortcomings, Relator's SAC still fails to pass muster under Rules 12(b)(6) and 9(b).

This is not a situation where the SAC's defects can be cured by further amendment or additional discovery. In fact, after the Court ordered limited discovery with respect to just seven paragraphs from the SAC – which should never have been included to begin with – Relator voluntarily withdrew the allegations from his pleading. The limited

3

discovery process, while costly and time-consuming, provides a snapshot of what future litigation would look like in this matter, and the CHI Defendants are confident that the SAC's remaining allegations would suffer the same fate as the withdrawn paragraphs. For these reasons, and those expressed in greater detail below, the CHI Defendants respectfully request that this Court dismiss the SAC *with prejudice.*

## NATURE AND STAGE OF THE PROCEEDING

On January 12, 2018, Relator filed this action on behalf of the United States and eight states, including Texas. Dkt. 1. After investigating Relator's claims, the government declined to intervene in this case, leaving Relator to pursue it on his own. Dkt. 3. After filing his First Amended Complaint on October 9, 2019, Relator filed the SAC on December 4, 2019, dropping his unjust enrichment claim and all state law claims except those brought under the TMFPA. The SAC once again alleges that "the Hospital Defendants [provided] illegal kickbacks to the Referring Physicians to induce Medicare and Medicaid referrals" in violation of the AKS and Stark Law. *See e.g.*, Dkt. 273 ¶ 307. Relator further alleges that by violating the AKS and Stark Law, the CHI Defendants also violated the FCA by: (i) knowingly presenting or causing to be presented false claims for payment (Count I, ¶¶ 303–308), (ii) making or causing to be made false records or statements material to false claims (Count II, ¶¶ 309–313), (iii) making or causing to be made false records or statements material to an obligation to pay money to the government and knowingly concealing or avoiding that obligation (Count III, ¶¶ 314–320), and (iv) conspiring to violate the FCA (Count IV, ¶¶ 321–324). Relator also brings five counts under the TMFPA (Counts V-IX, ¶¶ 325-348) which are based upon the same conduct as

4

the FCA claims. The CHI Defendants now move to dismiss the SAC pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).

## ISSUES REQUIRING RESOLUTION BY THE COURT

(1)     Whether Relator's FCA claims (Counts I-IV) should be dismissed with prejudice for failure to state a claim under Rule 12(b)(6) or to plead fraud with particularity as required by Rule 9(b).

(2)     Whether Relator's TMFPA claims (Counts V-IX) should be dismissed.

(3)     Whether the Court should decline to exercise supplemental jurisdiction over Relator's TMFPA claims in the event it dismisses Relator's FCA claim.

## LEGAL STANDARDS

### A.     Rule 12(b)(6)

To survive a Rule 12(b)(6) challenge, Relator must plead enough facts to state a claim for relief that is plausible on its face. Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plausibility standard demands more than "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Relator's allegations must demonstrate more than a sheer possibility that Defendants acted unlawfully and contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

### B.     Rule 9(b)

The SAC must also meet the heightened pleading standard of Rule 9(b). *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 n.8 (5th Cir. 2009). Rule 9(b) states that "a party

75373094.9

must state with particularity the circumstances constituting fraud" and "requires, at a minimum, that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud." *U.S. ex rel. Shupe v. Cisco Sys., Inc.*, 759 F.3d 379, 382 (5th Cir. 2014).

## STATUTORY FRAMEWORK

The FCA authorizes actions by the United States or by a relator in a *qui tam* capacity on the Government's behalf. 31 U.S.C. § 3730 *et seq.* (2012). The FCA imposes civil penalties and damages on any person who (i) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the Government"; (ii) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"; (iii) "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay . . . or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government"; and (iv) "conspires to commit a violation of [the FCA]." *Id.* §§ 3729(a)(1)(A)–(C), (G).

The Fifth Circuit has summarized the FCA inquiry as follows: "(1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *U.S. ex rel. Harman v. Trinity Industries, Inc.*, 872 F.3d 645, 653–54 (5th Cir. 2017).

In the healthcare context, two laws that often serve as FCA predicates are the AKS and Stark. The AKS provides criminal penalties for:

> [K]nowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person ... to refer an individual to a person for the furnishing ... of any item or service for which payment may be made in whole or in part under a federal health care program.

42 U.S.C. §§ 1320a–7b(b)(2) (2012). Stark prohibits physicians from referring Medicare patients to an entity for certain "designated health services" if the referring physician has a nonexempt "financial relationship" with such entity. 42 U.S.C. §§ 1395nn(a)(1), (h)(6).

## ARGUMENT

## II.   RELATOR FAILS TO STATE A CLAIM AGAINST THE CHI DEFENDANTS

After more than two years and several failed attempts, Relator still fails to allege a kickback scheme that was intended to induce referrals from the Defendant Physicians to BSLMC. CHI St. Luke's is a non-profit Catholic health system in Texas, comprised of sixteen hospitals, eight emergency centers, medical group locations, and numerous other facilities. Dkt. 5 ¶ 19; Dkt. 273 ¶ 17. CHI St. Luke's is a subsidiary of CHI, a national health system comprised of more than 100 hospitals and 3,900 providers across seventeen states. *Id.* ¶ 15. In light of the sprawling nature of these systems, it is perplexing that Relator continues to lump them together as the "Hospital Defendants," as neither institution is a hospital.

The *only* hospital at issue in this matter is BSLMC, which houses the ISD and was the alleged recipient of wrongfully-induced referrals. However, BSLMC – which is a distinct legal entity from CHI St. Luke's and was not named as a defendant – is not alleged to be a part of CHI. Instead, the SAC makes clear that BSLMC is jointly owned by Baylor

College of Medicine ("BCM") and CHI St. Luke's. *Id.* ¶ 39. Although the purported scheme was allegedly perpetrated by the ISD at BSLMC – and not any other hospital – Relator still tries to pin liability on BSLMC's partial owner and its corporate parent.

The SAC does not supply the type of allegations that are necessary to pierce the corporate veil and hold the CHI Defendants liable for the alleged scheme, however. At most, Relator alleges that the ISD and its managers, Tania Matar ("Matar") and Angie Sanchez ("Sanchez"), wrote emails and issued checks, employee evaluation forms, and various policies and/or other documents using the CHI Defendants' logos and letterhead. *Id.* ¶ 20. Relator also alleges that CHI St. Luke's website promotes the ISD and that Matar, Sanchez and another former ISD manager met regularly with the president of BSLMC (but not officers or directors from either of the CHI Defendants) to discuss various matters. *Id.* ¶¶ 20, 153.

Relator's allegations – which ostensibly "[provide] the basis for liability against each of the Hospital Defendants" (Dkt. 191 at 12) – are insufficient to hold BSLMC's partial owner and its corporate parent liable for the conduct alleged in the SAC. *United States v. Bestfoods,* 524 U.S. 51, 61 (1968) ("absent an independent basis to impose liability, a parent corporation is generally not liable for the acts of [even] its wholly owned subsidiary."). Relator has not established an independent basis to hold the CHI Defendants accountable for the ISD's purported conduct at BSLMC, and they should therefore be dismissed from this case pursuant to Rule 12(b)(6). *See Wady v. Provident Life and Accident Ins. Co. of Am.,* 216 F. Supp.2d 1060, 1068 (C.D. Cal. 2002) (the use of the parent corporation's letterhead by the subsidiary a does not establish an alter ego

relationship); *U.S. ex rel. Tillson v. Lockheed Martin Corp.,* 2004 WL 2403114, *33 at *107 (W.D. Ky. 2004) (merely "[b]eing a parent corporation of a subsidiary that commits a FCA violation, without some degree of participation by the parent in the claims process, is not enough to support a claim against the parent for the subsidiary's FCA violation."); *U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.,* 498 F. Supp. 2d 25, 59–60 (D.D.C. 2007) (a relator must demonstrate either that [defendant] is liable under a veil piercing or alter ego theory, or that it is directly liable for its own role in the submission of false claims).

## III.   RELATOR'S AKS AND STARK CLAIMS SHOULD BE DISMISSED

Each of Relator's claims in the SAC is premised on alleged violations of the AKS and Stark. Because the SAC fails to sufficiently: (1) plead a violation of the AKS, (2) plead a violation of Stark, (3) allege the submission of a false claim or provide reliable indicia that a false claim was submitted, (4) allege facts in support of a FCA conspiracy claim, or (5) adequately allege a reverse false claims theory, Counts I through IV should be dismissed.

### A.   Relator Fails to Plead an AKS Violation

To assert a viable AKS claim, Relator must plausibly allege that the CHI Defendants "knowingly and willfully offer[ed] or pa[id] any remuneration . . . to any person to induce such person to refer an individual to a person for the furnishing . . . of any item or service" paid by a federal health care program. 42 U.S.C. § 1320a–7b(b)(2).

Relator's AKS claims fail for two reasons: first, the SAC fails to plausibly allege that the CHI Defendants paid prohibited remuneration "willfully" with the intent to induce referrals. Second, Relator fails to plausibly allege the particular details of an actually

9

submitted false claim or the specifics of the purported kickback scheme paired with reliable indicia that a false claim was submitted as required to satisfy Rule 9(b)'s heightened pleading requirements.

        1.    <u>The SAC Fails to Allege Knowing and Willful Conduct and the Intent to Induce Referrals.</u>

Relator's AKS-based claims are plagued by insurmountable pleading deficiencies, including the failure to plausibly allege that the CHI Defendants knowingly and willfully used international patient referrals, interpreters, and patient support services as forms of prohibited remuneration to induce referrals from the Physician Defendants. *See U.S. v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998) ("willfully" means "that the act was committed voluntarily and purposely with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law."); *see also, U.S. ex rel. Parikh v. Citizens Med. Ctr.*, 977 F.Supp.2d 654, 665 (S.D. Tex. 2013) ("the AKS inducement element [is] an intent requirement").

As the Court noted on December 4, 2019, a recent decision in the Southern District of Texas – *U.S. ex rel. Patel v. Catholic Health Initiatives*, 312 F. Supp. 3d 584, 599 (S.D. Tex. 2018), aff'd sub nom. *U.S. ex rel. Patel v. Catholic Health Initiatives*, 792 F. App'x 296 (5th Cir. 2019) – bears on this case, particularly as it relates to the Court's analysis of whether Relator has plausibly alleged that the CHI Defendants acted "willfully" with the intent to induce referrals. Dkt. 300 at 33, lines 20-23.

In *Patel*, two physicians who held partnership interests in the St. Luke's Sugarland Hospital ("Sugarland"), sued CHI St. Luke's – which controlled Sugarland – and others

under the FCA based on alleged violations of the AKS and the Stark Law. *Patel,* 312 F. Supp. 3d 584. Sugarland was originally structured with individual doctors, including the relators, as partners. *Id.* When a provision of the Patient Protection and Affordable Care Act ("PPACA") prevented Sugarland from expanding while preserving physician ownership, CHI St. Luke's made offers to rescind the relators' (and other physicians') partnership interests pursuant to the Texas Securities Act ("TSA").

The relators alleged that the defendants' use of the TSA to rescind the physicians' ownership interest in Sugarland was pre-textual and that the true purpose of the rescission payments to the physician investors (which relators claimed were in excess of fair market value for the physicians' ownership shares and therefore were kickbacks) was not to compensate them for their underperforming ownership interests and ward off potential litigation, but to induce referrals in violation of the AKS, Stark Law, and FCA. *Id.*

In a well-reasoned opinion that the Fifth Circuit called "lengthy and thorough," the District Court dismissed the relators' claims with prejudice. *U.S. ex rel. Patel v. Catholic Health Initiatives*, 792 F. App'x 296, 297 (5th Cir. 2019). The rationale offered by the Court in *Patel* to support dismissal of relators' AKS claims is applicable here, particularly concerning the Court's holding that the defendants did not act "willfully" with the intent to induce referrals because their conduct was "at least as consistent with law-abiding behavior as it [was] with intentional scheming to skirt the law." *Patel*, 312 F. Supp. 3d at 596. Like the rescission payments at issue in *Patel*, the CHI Defendants' conduct was consistent with law-abiding intent and an alternative narrative that is buttressed by logic, common sense, and Relator's own allegations and exhibits.

11

Below, the CHI Defendants address Relator's failure to plausibly allege a kickback scheme where the CHI Defendants acted willfully with the intent to induce referrals by analyzing each form of remuneration at issue in this case, including: "[1] referrals of full-paying international patients; [2] complimentary interpreter services; [3] complimentary administrative assistance in the form of scheduling, billing, and collection services; and [4] free international travel-related perks" and demonstrating why they do not support Relator's theory of AKS liability. Dkt. 273, ¶ 3.

a.    *International Patient Referrals*

Relator alleges that the CHI Defendants "recruit wealthy international patients through the [ISD] at Baylor St. Luke's Medical Center . . . [and] in many cases, the international patients themselves are used as a form of kickbacks to induce Medicare and Medicaid patient referrals." *Id.* ¶¶ 143, 145. This allegation relies on an inference that the ISD made referral decisions that were colored by an intent to curry favor with the Defendant Physicians and induce referrals to BSLMC. But this critical inference is implausible because the SAC reveals a far more plausible explanation that is *entirely* consistent with law-abiding intent – namely, that referral decisions were informed by a variety of factors that had nothing to do with an intent to induce referrals to BSLMC, including the patient's insurance, the physician's availability and track record for accommodating international patients, and patient satisfaction.

An email attached to the SAC as Exhibit 3 perfectly illustrates the lawful, business-minded considerations that fueled referral decisions in the ISD.    Relator points to the exhibit as an example of a situation where "senior ISD staff, including [Matar] and

12

[Sanchez] . . . instructed ISD staff to refer as many international patients to 'preferred' practitioners, even going so far as attempting to thwart the referral of international patients to other doctors not on the 'preferred' list regardless of the circumstances or medical necessity." Dkt. 273, ¶ 157. However, Relator's allegations, which grossly mischaracterize Exhibit 3, are directly contradicted by the contemporaneous communications in the exhibit itself and should be disregarded by the Court as it considers the current motion.  *See U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.,* 355 F.3d 370, 377 (5th Cir. 2004) (when "an allegation is contradicted by the contents of an exhibit attached to the pleading, then indeed the exhibit and not the allegation controls."). Given the importance of Exhibit 3, the CHI Defendants provide the full content below, followed by an accurate analysis of its meaning.

On October 13, 2016 at 9:58 a.m., Dr. Eldin Nihad, Medical Advisor from the Consulate of the United Arab Emirates, emailed Relator saying:

> *Dear Hicham,*
>
> *Kindly schedule* ███████████ *for urgent IM appointment (Today if possible) for cough, fever mild dyspnea and family history of Asthma.*
>
> *She is covered by United heath care international*
>
> *D.O.B: 11/20/1980*
>
> *Regards,*
>
> *Nihad Eldin, MD*

On October 13, 2016 at 10:14 a.m., Relator responds to Dr. Nihad, copying Sanchez, Matar and others as follows:

> *Hello Dr. Nihad,*

13

*I am working on it. I will let you know as soon as confirmed.*

*Regards,*

*Hesham Chihi*

Shortly thereafter, at 10:23 am, Relator sends the following update to Dr. Nihad, once again copying Sanchez, Matar and others:

*12:30pm today at 6624 Fannin, suite 1240. The patient has been scheduled to see Dr. Stasicha. Please provide us with the UHC information.*

*Regards,*

*Hesham Chihi*

A few minutes later, Matar sends the following directly to Relator:

*Hichem*

*We have experienced many problems with this office (cancelling, changing last minute etc..) and they don't seem to accommodate our patients. Unless things have changed, I would like to use Dr Hoffman who pamper the international patients and is willing to go the extra mile for them.*

*Tania*

Relator responds to Matar at 10:56 am as follows:

*Tania,*

*We always reach out to Dr. Hoffman for these requests, in this case the patient has UHC insurance, unfortunately Dr. Hoffman doesn't accept it. My only available option to accommodate he, the same day, was our IM department.*

*Regards,*

*Hesham Chihi*

14

Just six minutes later, Matar concludes the exchange with the following remarks:

> *Hichem*
>
> *Thank you for the clarification. Let me know if the patient was satisfied with the visit. If we continue having problem with them we might need to find an alternative who accept UHC.*
>
> *Tania*

*See* Dkt. 273, Exh. 3.

Exhibit 3 reveals that when Relator notified Matar he had scheduled an appointment with Dr. Stasicha, Matar did not attempt to "pressure Relator into referring the patient to Hoffman" (Dkt. 273, ¶ 158), but instead raised legitimate points regarding Dr. Stasicha's history of failing to accommodate ISD patients, including canceling or changing appointments at the last minute – which would be particularly problematic for foreign patients in the country for only a short time – and failing to go the extra mile for patients. *See id.,* Exh. 3. The email exchange does not support Relator's allegation that Matar or others made referral decisions "regardless of the circumstances or medical necessity." Dkt. 273, ¶ 157. To the contrary, the email establishes that Matar was acutely attuned to the circumstances, including the need to ensure patient satisfaction. *Id.,* Exh. 3.

Finally, rather than "attempt[ing] to thwart the referral of international patients to other doctors," the email reveals that Matar was deferential to Relator and willing to consider whether he believed "things [had] changed" with respect to Dr. Stasicha's history of failing to accommodate ISD patients. *Id.* Notably, Relator did not disagree with Matar's concerns regarding Dr. Stasicha or respond to her request to let her know if "things [had]

changed." *Id.* Instead, Relator informed Matar that Dr. Hoffman did not accept the patient's insurance. Tellingly, Matar did not pull another name out of the alleged "preferred provider" hat and instead thanked Relator for his clarification regarding the insurance issue, asked Relator to inform her if the patient was satisfied, and stated that ISD "might need to find an alternative who accept[s] [the patient's insurance]," but only if ISD "continue[d] having problem[s] with [Stasicha]." *Id.,* Exh. 3.

None of what Exhibit 3 actually says, or that could be reasonably inferred from its contents, shows that the CHI Defendants considered or sought to induce Medicare referrals to BSLMC when deciding which physicians should care for international patients.

Relator also attempts to plead into existence an illusory difference between "independent medical practices" and "physicians hired by CHI St. Luke's," alleging that the CHI Defendants "knowingly and willfully refer these valuable international patients to the Referring Physicians rather than their own hired in-house physicians to induce the referring physicians to refer their Medicare and Medicaid patients to BSLMC." Dkt. 273, ¶ 194. Not only is this allegation implausible, it is completely detached from reality. To be clear, Relator has not (and cannot) articulate an actual distinction between "independent" physicians (who apparently should not have received ISD referrals) and BSLMC's "own hired in-house physicians" (who apparently should have received referrals) because neither CHI St. Luke's nor BSLMC can employ physicians in Texas.

As the Fifth Circuit has explained, "[i]n Texas . . .physicians are not employees of hospitals or similar facilities because the corporate practice of medicine is prohibited, with limited exceptions." *Gaalla v. Citizens Med. Ctr.,* No. CIV.A. V-10-14, 2010 WL 5387603,

16

at *3 (S.D. Tex. Dec. 17, 2010) (citing *Bodin v. Vagshenian*, 462 F.3d 481, 495 (5th Cir. 2006)). Rather, "[p]hysicians attend patients as independent contractors or obtain privileges to practice at a hospital." *Id.* Relator's central thesis, that the CHI Defendants violated the AKS by referring patients to private physicians instead of employed physicians as an unlawful inducement, is completely false and fails as a matter of law.

Relator attempts to point to several examples of the false distinction between "independent" and "in-house" physicians, saying that referrals to Dr. Hoffman should have gone to Dr. Stasicha, and referrals to Dr. Santacruz should have gone to Dr. Solis. Dkt. 273, ¶¶ 158, 198. But Relator does not articulate an actual difference between Hoffman and Stasicha, or Santacruz and Solis with respect to their affiliation (or lack thereof) with BSLMC. In fact, all four physicians are on the hospital's medical staff and have admitting privileges at BSLMC.

The Court need not look any further than Relator's ill-fated attempt to cast BCM as an "independent" or unaffiliated Referring Physician to understand the illusory and implausible nature of his allegations. Relator contends that "BCM is also part owner of [BSLMC]." Dkt. 273. ¶ 39. Yet, in the same pleading, he inexplicably casts BCM among the "independent medical practices" to which ISD should not have referred. *Id.*, ¶ 191. The CHI Defendants cannot imagine a group of physicians who could be any *less* "independent" or "unaffiliated" than those practicing in an entity like BCM, which owns a part of BSLMC and relies on BSLMC as the primary practice site for its residency and fellowship programs. The absurdity of Relator's logic should be clear on its face, and his

decision to draw a line between "independent medical practices" and characterize BCM as an outside Referring Physician reveals the falsity of his allegations.

For these reasons, ISD's referral decisions are legitimate, and Relator's allegations regarding international patient referrals fail to plausibly establish that the CHI Defendants provided prohibited remuneration "willfully" to induce referrals.

b.    *Interpreter Services*

Relator also alleges that "[e]ach time the [CHI Defendants] provided [a] complimentary interpreter through the ISD, they knowingly and willfully provided an illegal kickback to ingratiate themselves with the Referring Physicians and induce Medicare/Medicaid referrals in return. Dkt. 273, ¶ 203. Relator alleges that the interpreters were remunerative and provided something of value because they allowed physicians to: (1) render and seek reimbursement for medical care (*Id.* ¶ 206); (2) provide patients with appropriate informed consent (*Id.* ¶ 207); (3) make proper diagnoses and treatment decisions (*Id.*); (4) comply with Federal laws purportedly requiring physicians to provide interpreters (*Id.* ¶ 208); and (5) avoid damage to their reputation and bill payment refusal (*Id.* ¶ 209). Relator presents these allegations only in general and theoretical terms and does not provide specific examples of cases where a Referring Physician was able to avoid liability or non-compliance with a legal obligation by using a "complimentary interpreter" furnished directly by the CHI Defendants.

Relator also takes liberties with respect to his characterization of certain Federal statutes, positing that Title VI of the Civil Rights Act of 1964 ("CRA"), the Americans with Disabilities Act ("ADA"), and Section 1557 of PPACA "require that providers who

18

receive federal funds, including from the Medicare and Medicaid programs, must provide oral interpreters to patients with limited English proficiency." Dkt. 273 ¶ 208. Relator fails to provide a single detail or even cite specific statutory language to support this claim.

It is difficult to comprehend how Relator can allege that the ADA – which, by its name, applies to Americans and not wealthy international patients – would require physicians in the U.S. to provide oral interpreters to foreign nationals. To be clear, the ADA does not include Limited English Proficiency ("LEP") within its definition of "disability."  42 U.S.C.A. § 12102.

Relator also provides absolutely no support for his contention that the CRA and PPACA would require U.S. physicians and medical practices to pay out of pocket to supply language interpreters to wealthy, non-U.S. citizen patients who come to the country for a short time to avail themselves of the American health care system. This proposition goes beyond what the statutes or their legislative histories contemplate and would effectively mean that U.S. physicians must provide free services to wealthy foreign nationals merely because they happen to treat unrelated Medicare beneficiaries. This defies conventional wisdom and need not be accepted as true by the Court. *Iqbal*, 556 U.S. at 578 (the Court "is not bound to accept as true [naked assertions or] legal conclusions couched as factual allegations.").

Relator's own representative examples regarding the CHI Defendants' alleged provision of interpreters further undermine the services' purported value to the Defendant Physicians. For example, Relator alleges that ISD staff was instructed to schedule interpreters for international patients even when the physician or her staff spoke the same

language as the patient. Dkt. 273 ¶ 204 (alleging that ISD sent "Arabic-speaking interpreters for international patients referred to referring physician even if the physician or one of his staff members speak Arabic"). It is not clear, nor does Relator allege, what benefit an Arabic-speaking interpreter would be to physician if she or her staff already speaks Arabic and can communicate with the patient. *See e.g., Jones-McNamara v. Holzer Health Sys.*, 630 Fed. App'x 394, 401 (6th Cir. 2015) (holding that items of little or no value to the referral source cannot reasonably constitute remuneration under the AKS); *U.S. ex rel. Ruscher v. Omnicare, Inc.,* No. 4:08-CV-3396, 2014 WL 2618158, at *10 (S.D. Tex. June 12, 2014) (holding that to satisfy the first element of the AKS, a plaintiff "must sketch out [among other things] . . . how Defendant benefitted from the remuneration.").

Even assuming complimentary interpreters had value and were required by law, Relator's allegations fail because the SAC does not plausibly establish that interpreters were provided by the ISD "willfully" to induce referrals. To the contrary, the SAC makes clear that the ISD marketed "a long list of services provided to *international patients and their families* by ISD at BSLMC, including . . . providing interpreters *for patients*." Dkt. 273 ¶ 143 (emphasis added). These services were "part of [ISD's] recruitment process," which the SAC seems to acknowledge was geared toward the patients and not physicians.

In other words, Relator conflates the intrinsic value of the interpreter services with the party to whom that value is being offered or provided. Aside from Relator's conjecture regarding the ISD's purportedly pre-textual motives, the SAC lacks well-pled allegations negating the more plausible explanation that ISD provided interpretation services for the

benefit of the patients as part of their efforts to recruit them to the U.S. and ensure a positive experience once they arrive.

Notably too, Relator offers no allegations that the Defendant Physicians asked for or demanded these services, which would have signaled the physicians' knowledge of an obligation to provide them to ISD patients or their view that the interpreters were in fact seen as an item of value by the Defendant Physicians.  This is a theme that pervades the entire SAC; Relator fails to establish that the interpreters – or any of the other purported remuneration – were actually viewed by the Defendant Physicians as something of value capable of inducing Medicare or Medicaid referrals.

Finally, Relator clearly alleges that interpreters were provided for *all ISD patients* when they obtained care outside of BSLMC, regardless of whether the ISD patients saw doctors on the purported "preferred physician" list or not.   Dkt. 273 ¶ 204; Exhibit 4.  The CHI Defendants' consistency concerning the provision of interpreters erodes Relator's theory that they were targeted to a select group of physicians and bolsters the CHI Defendants' alternative explanation for this business practice.  *See Patel,* 312 F. Supp. 3d at 596 ("the use of rescission negates the inference that payments were meant to induce referrals, because . . . all physicians were compensated at the same rate regardless of their referral volume.").

For these reasons, Relator fails to allege that the CHI Defendants provided interpreters "willfully" with the intent to induce referrals.

c. *Patient Support and Administrative Services*

Relator also alleges that the CHI Defendants violated the AKS by providing physicians with free "administrative assistance in the form of scheduling services, billing, and collection services." Dkt. 273 ¶ 226. Relator alleges that the administrative services provided Defendant Physicians with significant value because they allowed the doctors to avoid "compensate[ing] their own administrative staff to provide the services, which were costly and time-consuming to provide." *Id.* ¶ 239.

Relator provides no factual support for these conclusory assertions and there are no allegations, for example, regarding the actual cost and time that Defendant Physicians were spared. A review of Relator's exhibits and allegations divulge the implausibility of these assertions. In Exhibit 6, Relator includes a handful of emails sent to ISD staff from Carlos Aguilar attaching lists of international patient appointments and reminding ISD staff to provide appointment reminders to the patients. Relator asserts that by providing these reminders to the ISD patients, physicians did not have to compensate their own administrative staff. However, even for one of ISD's "preferred providers," Dr. Alan Hoffman, the maximum number of appointment reminders provided on any one day was only six. The printouts for the remaining seven days included as examples in Exhibit 6 reveal zero additional appointments for Dr. Hoffman, implying that the ISD did not provide appointment reminders on those days. Based on Relator's own allegations and exhibits, it is unreasonable and implausible to suggest that Dr. Hoffman or other physicians could forego employing or compensating their own administrative staffs simply because ISD made a handful of phone calls to a few international patients.

Additional exhibits to the SAC further undermine the plausibility of Relator's allegations regarding the ISD's provision of free billing and collection services. Exhibit 2 and 11 purportedly show that the CHI Defendants provided billing and collection services on behalf of numerous physicians and practices, many of which are not defendants in this case, including Singleton Associates, Greater Houston Anesthesiology, MH Radiation Oncology, Medical Center ER Physicians, Apnix, and Dr. Cesar Gregorio. These physicians and practices are not (or are no longer) included as Referring Physicians presumably because they either did not make any referrals to BSLMC or are not the types of practices that refer patients at all. Greater Houston Anesthesiology, for example, includes anesthesiologists who generally *do not* refer patients to other providers. *See, e.g, United States v. Rogan,* No. 02 C 3310, 2006 WL 8427270, at *5 (N.D. Ill. Oct. 2, 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008) ("Anesthesiologists do not usually refer patients to hospitals.").

Exhibits 2 and 11 therefore establish that the ISD provided collection services for the benefit of the international patients and their embassies, regardless of whether the treating physician or practice was a Defendant Physician or even capable of referring patients to BSLMC. This renders implausible Relator's allegation that the CHI Defendants offered complimentary billing and collection services "willfully" to induce referrals. *Patel,* 312 F. Supp. 3d at 596.

Finally, as with the alleged free interpreters, the CHI Defendants' provision of complimentary billing and collection services are completely consistent with an alternate narrative of law-abiding behavior. As Exhibit 1 makes clear, there was a written policy

23

acknowledging agreements with certain Embassies requiring the submission of consolidated bills for the hospital and physicians. Dkt. 273, Exhibit 1. Similarly, some of the Embassies paid for all care with a consolidated check thereby *requiring* the ISD to collect the amounts owed to the physicians and remit payment. *Id.* Relator fails to explain why compliance with the process put in place by Embassies leads to the provision of illegal remuneration to the Defendant Physicians.   Rather than being a calculated decision made by the CHI Defendants to provide remuneration to physicians, BSLMC's management of the billing process for international patients shows no more than a desire to comply with the Embassies' specifications and to get paid for the services it provided.   Relator therefore fails to plausibly allege that the CHI Defendants provided administrative services to international patients "willfully" to induce referrals.

   d. *International Travel-Related Expenses*

Realtor also alleges without particularly that the CHI Defendants "provided all-expense paid international trips organized by the ISD to those referring physicians responsible for the largest number of Medicare and Medicaid referrals to BSLMC . . . [including] stays at expensive 5-star hotels, as well as tickets to local events or shows." Dkt. 273 ¶¶ 259, 261. Relator alleges that the CHI Defendants "provided this illegal remuneration through the ISD knowingly and willfully . . . and at least in part to induce Medicare and Medicaid referrals. *Id.* ¶ 264.

Relator's conclusory allegations lack basic information necessary to state a plausible claim for relief under Rule 12(b)(6), much less the heightened particularity required under Rule 9(b). Even Relator's representative examples lack any level of detail

and plausibility. Relator alleges, for example, that Dr. Joseph Lamelas traveled to Lima, Peru in 2017 on a "lavish trip," but Relator does not allege anything about the trip itself, such as hotel where Dr. Lamelas stayed, the names of individuals who accompanied him, the purpose of the trip, or the events in which he partook. Dkt. 273 ¶ 263. Relator also alleges that the ISD paid for trips for Drs. Hoffman, Krajcer, and Coselli, but does not allege where they went, when the trip occurred, where they stayed, or what events they enjoyed. *Id.* ¶ 262.

Relator's allegations, which are pled "on information and belief" are once again explained by a more plausible narrative, namely that the ISD relied on physicians on staff at BSLMC – like those listed in Paragraph 262 of the SAC – to help recruit international patients abroad. Surely, physicians like Dr. Lamelas – who was born in Cuba, studied medicine in the Dominican Republic, and speaks fluent Spanish – would be a good candidate to recruit patients in Peru and extoll the virtues of BSLMC, where he performed cardiothoracic surgeries. *U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 385 (5th Cir. 2003) ("[W]here allegations are based on information and belief, the complaint must set forth a factual basis for such belief.").

In the absence of any detail regarding the purported international travel perks doled out to "preferred physicians," it is more plausible to conclude that physicians like Dr. Lamelas were asked by BSLMC to help recruit patients to BSLMC because they have impressive credentials, can speak intelligently about the hospital, and, in many cases, speak foreign languages.

Relator also fails to consider that the trips described in the SAC were performed for the benefit of BLSMC so it could educate foreign nationals and attract business to the ISD. That BLSMC covered the expenses associated with physicians accompanying ISD staff on trips abroad – as opposed to making the unreasonable and illogical request for the physicians to pay their own travel costs –  is wholly unremarkable because the trips were designed to promote BSLMC.

For these reasons, Relator's assertions that the CHI Defendants "knowingly and willfully" paid kickbacks for the improper purpose of inducing referrals are implausible. Relator therefore fails to state a viable AKS-based FCA claim.

2.    The SAC Fails to Allege the Particular Details of a False Claim or the Specifics of a Scheme with Reliable Indicia of a False Claim.

To state an AKS-based claim with particularity under Rule 9(b), Relator must allege either the particular details of an actually submitted false claim *or* the specifics of a kickback scheme paired with reliable indicia that a tainted claim was submitted. *Grubbs*, 565 F.3d at 190. As set forth below, Relator fails to satisfy either prong of the *Grubbs* standard.

a.    *The particular details of an actually submitted false claim*

Relator does not allege the details of a single false claim that was actually submitted to a Federal health care program. Relator merely attempts to create the illusion of specificity by providing the following "representative example" of a Medicare referral from just one of nearly forty defendants in this case:

> Defendant Bone and Joint Clinic of Houston referred Medicare and Medicaid patients to the Hospital Defendants for care at BSLMC while receiving and

26

expecting to receive illegal remuneration from the ISD to induce referrals. One such referral by the Bone and Joint Clinic of Houston (through physician Dr. William Watters) was Medicare patient W.P., referred by Dr. Watters to Defendant CHI-St. Luke's Health for pre-surgical testing on October 17, 2015, and an orthopedic surgery on October 24, 2015 at BSLMC. The testing and surgery were both carried out on those dates, and because of patient W.P.'s status as a Medicare beneficiary, Relator has good reason to believe that the Hospital Defendants billed the testing and surgery to the government through the Medicare program and received payment from the government.

Dkt. 273 ¶ 183. This representative example fails under Rule 9(b) because it does not provide "the particular details of an actually submitted false claim" and stands in stark contrast to the types allegations that have been held to pass muster by this Court and the Fifth Circuit. *Grubbs*, 565 F.3d at 190.

In *Parikh,* for example, the relator's AKS-based FCA complaint — "[i]n exacting detail comprising eleven pages"—included "28 examples of specific Medicare or Medicaid patients that the [emergency room] physicians referred for treatment at the Chest Pain Center." *Parikh*, 977 F. Supp. 2d at 667. The type of "exacting detail" provided by Relator in that case – including details about the specific care that was provided to each patient and information about the submission of actual claims – is sorely lacking here, where Relator merely alleges that a physician from Bone and Joint Clinic of Houston referred a patient to CHI St. Luke's (which, again, is a large health system and not a specific provider or hospital) for pre-surgical testing of some sort, and then to BSLMC for "an orthopedic surgery." Dkt. 273 ¶ 183. Relator states that "he has good reason to believe" that CHI or CHI St. Luke's Health billed the testing and the surgery to a Government payor, which is perplexing as BSLMC is a jointly-owned hospital with its own National Provider Identifier that submits its own claims to Medicare. In any case, paragraph 183 clearly does not

provide the "particular details of an actually submitted false claim," which is necessary to satisfy the first prong of the *Grubbs* standard.

> ### b. *The details of a scheme, paired with reliable indicia that a false claim was submitted*

The Fifth Circuit has said that "a relator's complaint, if it cannot allege the details of an actually submitted false claim – as is the case here – may nevertheless survive by alleging the details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Patel,* 312 F. Supp. 3d at 598, citing *Grubbs*, 565 F.3d at 190.

It is firmly established in this district that to allege the particular details of a kickback scheme, the relator must clearly assert facts linking the purported remuneration to the actual inducement of referrals. *U.S. v. Abundant Life Therapeutic Servs. Texas*, LLC, No. CV H-18-773, 2019 WL 1930274, at *6 (S.D. Tex. Apr. 30, 2019) ("to allege 'particular details of [the] scheme,' [the relator] must assert facts linking the kickbacks to the inducement of referrals."); *see also, Patel,* 312 F. Supp. At 599 ("the improper remuneration [must] clearly relate to the inducement of referrals."). As the Court previously explained, the holdings in *Patel* and *Abundant Life* are relevant to this case, as they inform facts that are necessary to allege the particular details of a scheme.

In *Abundant Life*, the relator alleged that his former employer, Abundant Life Therapeutic Services Texas, LLC ("Abundant Life"), and its manager, Jon Ford ("Ford"), violated the FCA, AKS, and TMFPA by paying kickbacks to officials at various educational institutions to induce Medicaid referrals to Abundant Life. The relator alleged

75373094.9

that Ford directed an independent contractor working with Abundant Life to provide "free skills building services" to students at two elementary schools in the Houston area, Blackshear Elementary and Rhodes Charter, and to refer the students to Abundant Life for mental health services and assessments. The relator also alleged that Ford "gave $7,200 in free items to Blackshear Elementary principle" and donated $20,000 worth of computers to the principal at Rhodes Charter in order to induce referrals from the schools. Abundant Life also allegedly entered into contracts with two school systems, Houston Independent School District and Harmony Schools, that "included an offer [for Abundant Life] to provide free skills building services . . . in exchange for Abundant Life billing Medicaid for mental health services."

In *Abundant Life,* the Court held that while the relator had alleged a fair amount about the purported kickback scheme, he did not "allege the *details* of the scheme with particularity." *Abundant Life*, 2019 WL 1930274, at *7 (emphasis added). The Court found that a number of critical details were absent from the complaint. For instance, the Court held that the complaint never alleged that that the Blackshear Elementary principal, the person who purportedly received the donations, caused the school to refer students to Abundant Life. *Id.* Even assuming Ford directed the donations to the principal of the school, the Court said that "the second amended complaint fail[ed] to allege that [she] did anything except receive the free items." *Id.* at *8. The Court also held that the complaint failed under Rule 9(b) because it did not provide "particularized allegations as to why Ford thought the donations and the [free building services] would induce Blackshear Elementary officials to refer students to Abundant Life." *Id*. The Court held that the presentment claims

29

as to Rhodes Charter also failed because the complaint did not allege that a donation of computers or the free skilled building services ever "induced Rhodes Charter to refer students to Abundant Life." *Id.*

Here, the SAC is similarly plagued by a lack of particularized detail linking the purported remuneration to the inducement of referrals. First, the SAC does not allege with particularity that the Defendant Physicians, the individuals and entities that allegedly received the remuneration, referred patients or services to BSLMC. With the exception of the ill-pled "representative example" of a referral from the Bone and Joint Clinic of Houston, Relator does not allege with specificity that the Defendant Physicians ever referred or caused patients to be referred to BSLMC. The SAC also fails to explain "how and why [ISD] believed that remuneration would induce new business." *Abundant Life*, 2019 WL 1930274 at *8, citing *Ruscher*, 2014 WL 2618158 at *10. For the reasons expressed above, each form of purported remuneration alleged in the complaint is better explained by a more plausible narrative of law-abiding, patient-focused intent.

Similar to the Court's holding in *Abundant Life,* the *Patel* court held that the relators failed to tie the offer of rescission payments to the physician investors to the inducement of referrals, noting that in cases that have been found to satisfy Rule 9(b), "the improper remuneration clearly relate[d] to the inducement of referrals, making it plausible that the defendants specifically intended to do something the law forbids." *Patel,* 312 F. Supp. 3d at 599, citing *Waldmann v. Fulp*, 259 F.Supp.3d 579 (S.D. Tex. 2016) (Crane, J.); *Ruscher,* 2014 WL 2618158 at *10; and *Parikh*, 977 F.Supp.2d 654.

## IV.    Relator Fails to State a Stark Law Violation

The SAC's Stark-based claims are also deficient under Rules 9(b) and 12(b) because the SAC reveals that: (1) neither of the CHI Defendants are "entities" of the type regulated under the Stark Law; (2) even if the CHI Defendants were "entities" for purposes of Stark, there was not a prohibited direct or indirect "financial relationship" between the CHI Defendants and specific individual physicians; and (3) no physician named as a defendant in this case referred a patient to the CHI Defendants, much less a patient who received "designated health services" that would be covered by Medicare.

To demonstrate a Stark Law violation, Relator must show that a physician had a "financial relationship" with an "entity" that provides and bills for "designated health services" and that such physician made a "referral" to the entity for DHS covered in whole or part by Medicare. *Waldmann*, 259 F. Supp. 3d 579 at 614 (citing 42 U.S.C. § 1395nn). "The Stark law includes in its definition of a 'financial relationship' a 'compensation arrangement,' which is, in turn, defined as 'any arrangement involving any remuneration' between the physician and the entity. Stark defines 'remuneration' as any kind of payment 'directly or indirectly, overtly or covertly, in cash or in kind.'" *Id.* (citing 42 U.S.C. §§ 1395nn(a)(2); 1395nn(h)(1)(A); 1395nn(h)(1)(B).) An "indirect" compensation relationship only exists when the physician receives aggregate compensation that takes into account or varies with the volume or value of referrals or other business generated for a regulated "entity" and the entity knows of such compensation. 42 C.F.R. 411.354(c)(2)(ii) - (iii). A financial relationship between a physician and an "entity" is prohibited only if the entity: (i) has performed services referred by the physician that are billed as DHS; or (ii) has presented a claim to Medicare for the DHS referred by the physician. 42 C.F.R. § 411.351.

31

As an initial matter, the SAC does not allege that either of the CHI Defendants qualifies as an "entity," as defined by Stark, because the Physician Defendants are alleged only to have referred patients to BSLMC. Dkt. 273 at 42. CHI is a parent corporate entity that neither provides healthcare services to patients nor bills for such services, while CHI St. Luke's is a health system comprised of several distinct hospitals, each of which is a separate legal entity independently enrolled in Medicare. Relator has not (and cannot) allege that CHI or CHI St. Luke's performed or presented a claim to Medicare for any DHS, let alone services referred by the Defendant Physicians and, therefore, neither CHI Defendant can possibly constitute the kind of "entity" regulated under Stark. 42 C.F.R. § 411.351. Stark does not apply to relationships between physicians and entities other than "DHS entities" regulated under the law.

Even if the CHI Defendants were DHS entities (they are not), Relator fails to allege any compensation arrangement (direct or indirect) between either CHI or CHI St. Luke's and a specific physician. *See* 42 C.F.R. § 411.354 (defining "direct" and "indirect" compensation arrangements). The SAC fails to grasp a fundamental concept intrinsic to the Stark Law; namely, that the prohibition against self-referrals generally applies to physicians, not physician practices. 42 U.S.C. § 1395nn(a)(1). Relator fails to allege any "direct" compensation arrangement with a physician or any indirect relationship flowing through a practice that employs the referring physician.

Finally, Relator does not identify a single physician who made a referral to the CHI Defendants, much less a Stark–defined "referral" for any DHS. This is a fatal flaw in the SAC, as the Stark Law "bars entities from submitting claims to federal health care programs

if the services forming the basis of the claims were furnished pursuant to referrals from physicians with which the entities had a financial relationship." *Parikh*, 977 F. Supp. 2d at 663 (citing 42 U.S.C. § 1395nn(a)(1)). Relator's Stark claim lacks virtually every element required under the statute, and therefore it cannot serve as a predicate to the SAC's alleged FCA violations.

## V. RELATOR FAILS TO ESTABLISH A VIABLE REVERSE FALSE CLAIM

To plead a reverse false claim, Relator must sufficiently allege that Defendants had an obligation to repay the government at the time the false record was made or used; a potential obligation to the government does not cross the threshold of a reverse false claims violation. 31 U.S.C. § 3729(a)(1)(G); *U.S. ex rel. Bain v. Georgia Gulf Corp*., 386 F.3d 648, 657 (5th Cir. 2004). Relator does not support his derivative reverse false claim allegations and instead merely parrots the statutory language of Section 3729(a)(1)(G). The SAC therefore fails to state a claim for relief. Dkt. 273 ¶¶ 314–320; *see Iqbal*, 556 U.S. at 678.

Relator also alleges that "by violating their record-keeping obligations and undertakings such that the government would not discover Defendants' violations, [all] Defendants concealed from the government the fact that the government was entitled to refunds and/or accommodations from Defendants." Dkt. 273 ¶ 319. Relator does not explain how Defendants violated amorphous and undefined "record-keeping obligations and undertakings" and this bizarre assertion also does nothing to state a claim for relief under Section 3729(a)(1)(G).

## VI. RELATOR FAILS TO ESTABLISH A VIABLE CONSPIRACY CLAIM

To state a conspiracy claim, Relator must allege that Defendants had an agreement, combination, or conspiracy to defraud the government by getting a false claim allowed or paid, and that they did so for the purpose of obtaining payment from the government. *Grubbs*, 565 F.3d at 193. Relator fails to plead the facts to support a claim for conspiracy and again offers a mechanical recitation of the elements of Section 3729(a)(1)(C). Without more, Relator fails to state a viable conspiracy claim under Rule 12(b)(6). *U.S. ex rel. Dekort v. Integrated Coast Guard Sys.*, 705 F. Supp. 2d 519, 548 (N.D. Tex. 2010).

To satisfy Rule 9(b), Relator must plead "who agreed with whom, how they agreed, how they decided to file a false claim, who made the alleged misrepresentation, who filed the allegedly false claim, the method by which it was filed, and how much the payment was for." *U.S. ex rel. Walner v. NorthShore Univ. Healthsystem*, 660 F. Supp. 2d 891, 895–96 (N.D. Ill. 2009). Relator does not attempt to answer of these key questions. The SAC's conspiracy allegations also "fail on the independent ground that [it] cannot plead a conspiracy to commit [a False Claims Act] violation without successfully alleging [a False Claims Act] violation." *Abundant Life*, 2019 WL 1930274, at *10 (internal citations omitted).

## VII.   RELATOR'S TMFCPA CLAIMS (COUNTS V-IX) SHOULD BE DISMISSED

The FAC includes five counts based on alleged violations of the TMFPA. Counts V-IX, ¶¶ 303-348. The TMFPA is modeled after and interpreted in similar fashion to the FCA and, as such, Relator's failure to state a claim under the FCA also constitutes a failure to state a claim under the TMFPA. This argument holds true despite the Statement of Interest ("SOI") filed by the State of Texas. Dkt. 204. The CHI Defendants previously filed

a response in opposition to Texas' SOI and incorporate those arguments by reference here. Dkt. 211.

Relator's FCA and TMFPA claims are both premised on alleged violations of the AKS and Stark and, thus, Relator's failure to sufficiently allege his AKS and Stark-based claims are equally fatal to his TMFPA allegations for many of the same reasons discussed above. Dkt. 211 at 4. In particular, Relator's failure to sufficiently allege that the CHI Defendants provided remuneration to the Defendant Physicians in exchange for federal healthcare program referrals (with the required scienter) subjects *all five* TMFPA counts to dismissal. *Id.* Relator's failure to allege a predicate act violation of the AKS apply to his TMFPA claims, and those too should be dismissed. Should the Court dismiss Relator's FCA claims for any reason, it should dismiss the pendent state-law claims and decline to exercise supplemental jurisdiction. *See Abundant Life*, 2019 WL 1930274, at *10, citing *Parker & Parsley Petro. Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992) ("Generally, when all federal claims have been dismissed at an early stage, a district court should dismiss any pendent state-law claims.").

## VIII.   THE SAC SHOULD BE DISMISSED WITHOUT LEAVE TO AMMEND

Relator has repeatedly failed to cure the SAC's defects, despite having had "regular access to scheduling, billing, and collection documents," a blueprint outlining the defects in the prior iterations of his complaint, and several years to gather facts to support his allegations.  Because of these repeated failures, the Court should exercise its discretion in denying Relator's Motion. *See Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 608 (5th Cir. 1998); *U.S. ex rel. Spicer v. Westbrook*, 751 F.3d 354, 367–68 (5th Cir. 2014).

Relator's continued failure to fix the SAC's deficiencies demonstrates that any further amendment would be futile and unduly prejudicial. *Stripling v. Jordan Prod. Co.*, 234 F.3d 863, 873 (5th Cir.2000). Nor should Relator be granted additional time or discovery to cure his pleading defects, which would violate Rule 9(b)'s and the Court's gatekeeping function. The Court was afforded a test-case to assess the merits of moving forward to discovery when it ordered the parties to engage in limited discovery regarding seven contested passages in the SAC. At the conclusion of the limited-discovery process, Relator voluntarily withdrew his claims. The Court should not expect that the remaining allegations would fare any better if this case were permitted to move forward, and the SAC should be dismissed once and for all, with prejudice.

## CONCLUSION

Based on the foregoing reasons, the CHI Defendants respectfully request that this Honorable Court dismiss with prejudice Relator's SAC, as Relator has not (and cannot) satisfy Federal Rules of Civil Procedure 9(b) and 12(b)(6).

Dated:  November 16, 2020                    Respectfully submitted,

**POLSINELLI PC**

By:  */s/ Brian F. McEvoy*
       Brian F. McEvoy
       Attorney-In-Charge
       Georgia State Bar No. 490845
       (Admitted *Pro Hac Vice*)
       1201 West Peachtree Street
       Atlanta, GA 30309
       (404) 253-6021 (Direct)
       (404) 253-6060 (Facsimile)

75373094.9

bmcevoy@polsinelli.com

Asher D. Funk
Illinois State Bar No. 6295022
Federal ID No. 3138175
150 N. Riverside Plaza, Suite 3000
Chicago, IL 60606
(312) 873-3635 (Direct)
(312) 819-1910 (Facsimile)
afunk@polsinelli.com

Kevin M. Coffey
Illinois State Bar No. 6303073
(Admitted *Pro Hac Vice*)
150 N. Riverside Plaza, Suite 3000
Chicago, IL 60606
(312) 873-2986 (Direct)
(312) 819-1910 (Facsimile)
kcoffey@polsinelli.com

75373094.9

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements set forth in Hon. Charles R. Eskridge III's Court Procedures.  This motion contains 9,816 words, excluding the case caption, table of contents, table of authorities, signature block, and certificates, and was prepared in 13-point Times New Roman font.

*/s/ Brian F. McEvoy*
**Attorney for CHI Defendants**

## CERTIFICATE OF CONFERENCE

I hereby certify that counsel for Defendants has conferred in good faith with Ruth Brown, counsel for Relator, regarding the subject matter of this motion. Counsel for Relator and counsel for CHI Defendants were unable to reach an agreement on whether the Second Amended Complaint satisfies Federal Rules of Civil Procedure 12(b)(6) and 9(b), warranting the foregoing Motion to Dismiss.

*/s/ Brian F. McEvoy*
**Attorney for CHI Defendants**

38

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 16th day of November, 2020, a true and correct copy of the foregoing was electronically served on counsel for all parties properly registered to receive notice via the Court's CM/ECF system.

 */s/ Brian F. McEvoy*
**Attorney for CHI Defendants**