United States District Court
Southern District of Texas
**ENTERED**
April 01, 2022
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| EX REL. HICHEM CHIHI, | § | |
| | § | |
| **Plaintiff-Relator,** | § | |
| | § | |
| v. | § | **CIVIL ACTION NO. 4:18-CV-123** |
| | § | |
| CATHOLIC HEALTH INITIATIVES, | § | |
| *et al.*, | § | |
| | § | |
| **Defendants.** | § | |

### MEMORANDUM AND RECOMMENDATION

This is a *qui tam* action brought by Relator on behalf of the United States under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and the Texas Medicaid Fraud Prevention Act, TEX. HUM. RES. CODE § 36.001 *et seq.*, alleging generally that Defendants—who are various medical organizations and healthcare providers in Houston, Texas—engaged in a scheme to defraud the United States Government by submitting Medicare and Medicaid claims for reimbursement that resulted from illegal kickbacks. (Dkt. No. 273.) Pending before the Court[1] are two motions to dismiss under Rules 9(b) and 12(b)(6) filed by two groups of Defendants. (Dkt. Nos. 302–03.) Based on a thorough review of the motions, arguments, and relevant law, the Court **RECOMMENDS** both motions be **GRANTED IN PART** and **DENIED IN PART**.

### I.    BACKGROUND

Relator Hichem Chihi ("Relator") has worked since 2011 in the International Services Department at Baylor St. Luke's Medical Center and performed administrative tasks associated

---

[1] On July 27, 2020, this case was referred to the Undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Federal Rule of Civil Procedure 72. (Dkt. No. 276.)

with international patients, such as making referrals and scheduling interpreters. (Dkt. No. 273 ¶¶ 13–14.) According to Relator, Baylor St. Luke's Medical Center is a super hospital jointly owned by CHI-St. Luke's Health and Baylor College of Medicine. (*Id.* ¶¶ 17, 39.) Relator alleges that CHI-St. Luke's Health is part of Catholic Health Initiatives ("CHI"), a national health system operating in seventeen states, and that he and other employees in the International Services Department at Baylor St. Luke's Medical Center are supervised and managed by CHI and CHI-St. Luke's Health. (*Id.* ¶¶ 15–17, 20.)[2] Relator sued CHI and CHI-St. Luke's Health (collectively, "CHI Defendants") but did not sue Baylor St. Luke's Medical Center.

Relator alleges that, during his employment, he discovered a scheme between CHI Defendants and various physicians and practice groups in the Houston area (collectively, "Provider Defendants"). (Dkt. No. 273 ¶¶ 3–4.) According to Relator, CHI Defendants provided illegal kickbacks to Provider Defendants—in the form of international patient referrals, complimentary interpreters, free administrative assistance, and international travel perks—in exchange for referrals of Medicare/Medicaid patients to Baylor St. Luke's Medical Center. (*Id.*) Relator alleges that CHI Defendants maintained a roster of physicians that provided the most Medicare/Medicaid referrals and directed employees to refer international patients to those physicians. (*Id.* ¶¶ 150–56, 163.) One such physician was Defendant Alan Hoffman, M.D. ("Dr. Hoffman"). (*Id.* ¶ 25.) Relator alleges that CHI Defendants communicated with Provider Defendants about the scheme and that the volume, frequency, and value of the kickbacks from CHI Defendants to Provider Defendants made it obvious that the kickbacks were intended to induce referrals. (*Id.* ¶¶ 282–84.)

---

[2] As discussed below, the parties dispute the relationship between employees in the International Services Department and CHI Defendants.

According to Relator, this scheme violated the Anti-Kickback Statute ("AKS") and Stark Law which are intended to "ensure that the government pays for only conflict-free medical care provided in the best interests of the patient." (Dkt. No. 273 ¶¶ 5–6, 288.)[3] Relator alleges Defendants in turn violated the False Claims Act ("FCA") and the Texas Medicaid Fraud Prevention Act ("TMFPA") each time they submitted federal healthcare claims for reimbursement because those claims were tainted by underlying AKS and Stark Law violations. (*Id.* ¶¶ 6, 176–77.) Relator brings four claims under the FCA—for submitting false claims (Count I), making material false statements (Count II), concealing an obligation to pay the Government (Count III), and conspiracy (Count IV)—and five related claims under the TMFPA (Counts V to IX). (*Id.* ¶¶ 303–48.) Relator does not bring any stand-alone claims under the AKS or Stark Law.

Relator originally filed this lawsuit on January 12, 2018. (Dkt. No. 1.) The United States Government ("Government") declined to intervene but remains a real party in interest in the case. (Dkt. No. 3.) Relator filed his First Amended Complaint on January 9, 2019 before Defendants had been served. (Dkt. No. 5.) After Defendants were served and filed various motions to dismiss (Dkt. Nos. 163–64, 167–71, 174, 176–77, 179–81), Relator moved for leave to file a Second Amended Complaint (Dkt. No. 191). The District Judge held a status conference on December 4, 2019 during which he granted Relator leave to amend, making the Second Amended Complaint the operative pleading in the case, and denied the various motions to dismiss as moot. (Minute Entry Order dated Dec. 4, 2019; Dkt. No. 273.) The District Judge also warned Relator that he

---

[3] According to Relator, remuneration in exchange for Medicare/Medicaid referrals is illegal because it can, for example, "cause overutilization of services or supplies, . . . shut[] out competitors who are unwilling to pay for referrals, [and] encourag[e] physicians to order services based on profit rather than the patient's best medical interests." (Dkt. No. 273 ¶ 166.)

would not be permitted to amend the complaint for a third time before the Court ruled on any renewed motions to dismiss. (Dkt. No. 300 at 42:12–43:23.)

On November 16, 2020, the two groups of Defendants—CHI Defendants and Provider Defendants—separately moved to dismiss the Second Amended Complaint under Rules 12(b)(6) and 9(b). (Dkt. Nos. 302–03.) Both groups of Defendants argue that Relator's FCA claims should be dismissed because he fails to sufficiently allege they knowingly and willfully participated in a scheme, actually submitted false claims to the Government, or did anything other than act with legitimate business purposes. (Dkt. No. 302 at 9–34; Dkt. No. 303 at 16–40.) Both groups of Defendants also argue that Relator's TMFPA claims should be dismissed for the same reasons and that Relator should not be given leave to amend the complaint. (Dkt. No. 302 at 34–36; Dkt. No. 303 at 48–50.) CHI Defendants separately argue that Relator fails to allege they were directly involved in the scheme and that they cannot be liable for the actions of Baylor St. Luke's Medical Center as its partial owner and corporate parent. (Dkt. No. 302 at 7–9.) Provider Defendants separately argue that Relator has, at most, pleaded a unilateral plan by CHI Defendants without any link between the remuneration and return referrals. (Dkt. No. 303 at 31–34.)

Relator responds that he has sufficiently pleaded Defendants violated both the FCA and TMFPA by providing particularized details of the alleged kickback scheme paired with reliable indicia that false claims were submitted to the Government. (Dkt. No. 309.) Relator argues that any alternative, legal explanation for Defendants' conduct cannot excuse their actions because the AKS prohibits the remuneration scheme alleged even if only one purpose is improper. (*Id.* at 18–21, 52–53.) Relator also argues his TMFPA claims should survive because Defendants' arguments for dismissal depend on the contention that Relator failed to plead FCA claims, ignoring important differences between the two statutes. (*Id.* at 123–25.) Finally, Relator argues any dismissal should

be without prejudice and he should be given the opportunity to amend his complaint based on guidance from the Court. (*Id.* at 125–29.)

On January 21 and 31, 2022, the Court held hearings on the motions to dismiss and the parties presented their respective arguments. (Dkt. Nos. 324–25.) After consideration of the arguments, briefs, and relevant law, the Court makes the following findings:

(1)  Relator has sufficiently stated a claim against CHI Defendants and Dr. Hoffman only for submitting false claims and making false statements under § 3729(a)(1)(A) and (B) of the FCA (Counts I and II) to the extent the claims are predicated on the AKS only;

(2) Relator has not sufficiently stated a claim against any Defendants for concealing an obligation to pay the Government under § 3729(a)(1)(G) of the FCA (Count III);

(3) Relator has not sufficiently stated a claim against any Defendants for conspiracy under § 3729(a)(1)(C) of the FCA (Count IV);

(4) Relator has sufficiently stated a claim against CHI Defendants and Dr. Hoffman only under § 36.002(1), (2), (4), and (13) of the TMFPA (Counts V, VI, VII, IX); and

(5) Relator has not sufficiently stated a claim against any Defendants under § 36.002(12) of the TMFPA (Count VIII).

In sum, only Relator's claims against CHI Defendants and Dr. Hoffman under the FCA § 3729(a)(1)(A) and (B) and analogous Texas law should remain in this case. Further, Relator should not be given a third opportunity to amend his complaint and all insufficiently pleaded claims should be dismissed with prejudice.[4]

---

[4] Provider Defendants make several arguments—including that the claims against Defendant Baylor College of Medicine must be dismissed based on sovereign immunity—that the Court need not address given it recommends dismissal on other grounds.

## II.     LEGAL STANDARDS

Rule 12(b)(6) allows a defendant to move to dismiss a complaint based on failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although a complaint need not contain detailed factual allegations, it "must provide the plaintiff's grounds for entitlement to relief—including factual allegations that . . . raise a right to relief above the speculative level." *Wilson v. Houston Cmty. Coll. Sys.*, 955 F.3d 490, 500 (5th Cir. 2020) (quotations omitted). A court must accept "all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009) (quotations omitted). However, a court is not bound to accept legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

Rule 9(b) requires that, in alleging fraud or mistake, "a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). This generally requires a plaintiff to "set forth the who, what, when, where, and how of the alleged fraud." *United States ex rel. Shupe v. Cisco Sys., Inc.*, 759 F.3d 379, 382 (5th Cir. 2014) (quotations omitted). Rule 9(b)'s heightened pleading standard applies to *qui tam* suits brought under the FCA. *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009). However, in the context of these suits, "the time, place, contents, and identity standard is not a straitjacket for Rule 9(b)" and must remain flexible in order "to achieve the remedial purpose of the False Claims Act." *United States ex rel. Colquitt v. Abbott Lab'ys*, 858 F.3d 365, 372 (5th Cir. 2017) (quotations and alterations omitted).

An FCA complaint can survive by alleging either "the details of an actually submitted false claim" or the "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Grubbs*, 565 F.3d at 190. Under Rule 9(b), intent, knowledge, and state of mind can be alleged generally. FED. R. CIV. P. 9(b).

### III.    THE FALSE CLAIMS ACT

The FCA imposes liability on any person who knowingly submits or causes to be submitted a false claim for payment of Government funds, knowingly makes or causes to be made a false record or statement material to a false claim, or conspires to commit any such violation. 31 U.S.C. § 3729(a)(1)(A)–(C). The FCA also imposes liability on any person who knowingly makes or causes to be made a false record or statement material to an obligation to transmit money to the Government or knowingly conceals an obligation to transmit money to the Government. *Id.* § 3729(a)(1)(G). To determine liability under the FCA, courts must ask: "(1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 467 (5th Cir. 2009) (quotations omitted). "The FCA may be enforced not just through litigation brought by the Government itself, but also through civil *qui tam* actions that are filed by private parties, called relators, in the name of the Government." *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 575 U.S. 650, 653 (2015) (quotations omitted).

FCA violations can be predicated on violations of other statutes, often the AKS and the Stark Law in the healthcare context. *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997); *United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 662 (S.D. Tex. 2013), *aff'd*, 587 F. App'x 123 (5th Cir. 2014). The AKS prohibits

any person or entity from knowingly and willfully offering, paying, soliciting, or receiving remuneration for referring an individual for federally-funded medical services. 42 U.S.C. § 1320a-7b(b). The Stark Law prohibits a physician from making a referral to an entity he or she has a financial relationship with for federally-funded medical services and, in turn, prohibits the entity from seeking reimbursement arising from such a referral. *Id.* § 1395nn(a)(1). Claims for Medicare and Medicaid services rendered in violation of the AKS or Stark Law are false under the FCA when compliance is a condition of payment and, indeed, claims for such services rendered in violation of the AKS are false as a matter of law under the FCA. *See* 42 U.S.C. § 1320a-7b(g); *United States ex rel. Wheeler v. Union Treatment Ctrs., LLC*, No. 13-CV-4, 2019 WL 571349, at *5 (W.D. Tex. Feb. 12, 2019).

## IV.   PRELIMINARY ISSUES

The Court first addresses two preliminary issues that impact the rest of its analysis: whether Relator sufficiently alleges CHI Defendants, as opposed to Baylor St. Luke's Medical Center, were involved in the scheme and whether Relator sufficiently alleges Stark Law violations that can serve as predicates for his FCA claims. The Court finds that both CHI Defendants are proper at this stage and that Relator has not sufficiently alleged the necessary financial relationships for any underlying Stark Law violations.

### A.  CHI Defendants Are Proper Defendants at this Stage

CHI Defendants argue they are not proper defendants in this lawsuit and Relator instead should have sued Baylor St. Luke's Medical Center, as it "houses" the International Services Department and allegedly received the improper return referrals from Provider Defendants. (Dkt. No. 302 at 7–9.) CHI Defendants argue that Baylor St. Luke's Medical Center is a distinct legal entity and that Relator's suit is an inappropriate attempt to "pin liability" on them, as the partial

owner and corporate parent, rather than on the entity directly involved in the alleged scheme. (*Id.* at 8–9.) According to CHI Defendants, Relator's allegations are insufficient to pierce the corporate veil and hold them liable for the conduct of International Services Department employees. (*Id.*)

Relator argues the Second Amended Complaint does not seek to pierce the corporate veil but instead asserts that staff at the International Services Department were employees or agents of CHI Defendants and *not* Baylor St. Luke's Medical Center. (Dkt. No. 309 at 106–11.) As employees or agents of CHI Defendants, according to Relator, they caused false claims to be submitted to the Government when they provided illegal kickbacks to Provider Defendants in exchange for Medicare/Medicaid referrals and are liable under the FCA for such conduct. (*Id.* (explaining liability under the FCA attaches to anyone who causes a false claim to be submitted, not just those who actually submit the false claim).) In other words, Relator argues CHI Defendants' own employees or agents perpetrated the scheme and it is "of no moment" whether the CHI Defendants or Baylor St. Luke's Medical Center received the return referrals or presented the false claims to the Government. (*Id.*)

The Court finds it inappropriate to dismiss either of the CHI Defendants at this stage of the proceedings. While the Second Amended Complaint can certainly be read as alleging a theory of liability that would require piercing the corporate veil—which Relator has now abandoned—it can also be read as alleging the theory Relator advances in his brief: that CHI Defendants are liable under the FCA because their own employees or agents in the International Services Department caused false claims to be submitted. First, Relator alleges a potential employment or agency relationship by asserting that staff in the International Services Department act as representatives of CHI Defendants and that CHI Defendants "play a significant role in [their] supervision, management, oversight, and payment." (Dkt. No. 273 ¶¶ 20–22.) He specifically alleges that these

staff receive paychecks and employment evaluations from Defendant CHI with CHI letterhead and that they have CHI-St. Luke's Health email addresses with corresponding signature lines. (*Id.* ¶ 20(a)–(b); *see id.* Ex. 3.)[5] Second, Relator alleges these staff paid the illegal kickbacks to Provider Defendants as representatives of CHI Defendants, which is supported by the various related checks and invoices attached to the Second Amended Complaint. (*See id.* Ex. 2 (checks and invoices from CHI and CHI-St. Luke's Health to referring physicians regarding international patients), Ex. 11 (same), Ex. 12 (invoices on CHI-St. Luke's Health letterhead), Ex. 13 (same).) Finally, Relator alleges the kickback scheme run by these staff ultimately led to the submission of false claims to the Government. (*Id.* ¶¶ 22, 304–07.)

The Court agrees with Relator that, should this theory of agency or employment succeed, CHI Defendants could be liable for FCA violations. Whether Relator's allegations regarding the relevant employment or agency relationships are, in fact, correct is an issue that should be decided at summary judgment. *Cf. Parikh*, 977 F. Supp. 2d at 677–78 (holding that questions of agency and employment relationships involve "a fact-intensive analysis that the Court cannot properly undertake" on a motion to dismiss). The Court must accept all well-pleaded allegations as true at this stage and finds that neither CHI nor CHI-St. Luke's Health should be dismissed. However, should CHI Defendants be correct that CHI, CHI-St. Luke's Health, and Baylor St. Luke's Medical Center are completely separate entities without overlapping employment or agency relationships, it would be fatal to Relator's case against them.

---

[5] Relator's other allegations also support his theory that the International Services Department staff are employees or agents of CHI Defendants. (*See* Dkt. No. 273 ¶ 20 (alleging the International Services Department distributes polices on both CHI and CHI-St. Luke's Health letterhead and issues or receives checks for international patients as either CHI or CHI-St. Luke's Health).)

### B. Relator Fails to Allege Underlying Stark Law Violations

"The Stark Law was enacted to address overutilization of services by physicians who stood to profit from referring patients to facilities or entities in which they had a financial interest." *United States ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394, 397 (4th Cir. 2012). To that end, the Stark Law prohibits a physician from making a referral for designated health services to an entity with whom the physician has a financial relationship and, in turn, prohibits that entity from presenting or causing to be presented a claim arising from such a referral. 42 U.S.C. § 1395nn(a)(1). A "financial relationship" is an ownership interest or a compensation arrangement involving any remuneration—"directly or indirectly, overtly or covertly, in cash or in kind"—between the physician and entity that is not subject to a listed exception. *Id.* § 1395nn(a)(2) & (h)(1).

Both CHI Defendants and Provider Defendants moved to dismiss Relator's FCA claims predicated on Stark Law violations for various reasons, including that they are not the type of entities regulated by the Stark Law and that Relator has not alleged the necessary financial relationships between them. (Dkt. No. 302 at 31–33; Dkt. No. 303 at 27–30.) Relator argues he has sufficiently alleged underlying Stark Law violations resulting from a financial relationship—specifically, an indirect compensation arrangement—between Provider Defendants and Baylor St. Luke's Medical Center. (Dkt. No. 309 at 108–11.) Thus, according to Relator, any related claims Defendants caused to be submitted to the Government were tainted and violated the FCA. (*Id.*)

The Court disagrees with Relator that he has sufficiently alleged an indirect compensation arrangement between Provider Defendants and Baylor St. Luke's Medical Center. To do so, Relator must allege: "(1) there exists an unbroken chain of any number of persons or entities that have financial relationships between them, (2) the referring physician receives aggregate

compensation that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing the designated health services, and (3) the entity has knowledge that the compensation so varies." *United States ex rel. Bruno v. Schaeffer*, 328 F. Supp. 3d 550, 558 (M.D. La. 2018) (quotations and alterations omitted); *see* 42 C.F.R. § 411.354(c)(2). As to the third element, Relator must allege the entity "has actual knowledge of, or acts in reckless disregard or deliberate ignorance of, the fact that the referring physician . . . receives aggregate compensation that varies with the volume or value of referrals or other business generated by the referring physician." 42 C.F.R. § 411.354(c)(2)(iii). Relator fails to sufficiently allege knowledge on the part of Baylor St. Luke's Medical Center.[6]

Relator has chosen to pursue the theory that staff in the International Services Department—those who orchestrated the scheme and provided the remuneration to Provider Defendants—were employees or agents of CHI Defendants and *not* Baylor St. Luke's Medical Center. (*See* Dkt. No. 309 at 106–07 ("[T]he [CHI Defendants'] agents and employees (not agents and employees of [Baylor St. Luke's Medical Center] developed and implemented a scheme to pay doctors in order to induce referrals to [Baylor St. Luke's Medical Center].").).[7] Allegations as

---

[6] Given that Relator is pursuing the theory that there is an indirect financial relationship between Baylor St. Luke's Medical Center and Provider Defendants, he must allege knowledge as to Baylor St. Luke's Medical Center in order to allege any underlying Stark Law violations. This is not true for underlying AKS violations, however, because that statute does not require the same financial relationship between Baylor St. Luke's Medical Center and Provider Defendants. Relator need only allege under the AKS that Baylor St. Luke's Medical Center received the improperly induced referrals and submitted the tainted claims to the Government. The named Defendants could then be liable for causing such tainted claims to be submitted.

[7] Relator at one point argues the CHI Defendants' unspecified subsidiaries, rather than CHI Defendants themselves, provided the remuneration to physicians. (Dkt. No. 309 at 94–95.) If Relator is referring to Baylor St. Luke's Medical Center and the International Services Department staff, this theory fails because he expressly disavows that these staff members were acting as employees or agents of Baylor St. Luke's Medical Center. (*Id.* at 106–07.) If Relator is referring to Baylor St. Luke's Medical Center and some other unidentified staff, the complaint is completely

to knowledge of these employees or agents thus are not allegations as to knowledge of Baylor St. Luke's Medical Center.[8] And, contrary to Relator's assertion, he has not adequately alleged that Baylor St. Luke's Medical Center knew there was a connection between the volume of referrals it received from certain physicians and the amount of kickbacks CHI Defendants provided to those physicians. (*See id.* at 110.) Relator's lone assertion that management of the International Services Department regularly met with management of Baylor St. Luke's Medical Center—an assertion Relator himself fails to point out in his brief—is conclusory and based only on "information and belief" without supporting facts. (*See* Dkt. No. 273 ¶ 153.) Relator has therefore failed to allege the third element of an indirect compensation arrangement between Provider Defendants and Baylor St. Luke's Medical Center.

Because Relator has failed to allege an indirect compensation arrangement or explain how a prohibited financial relationship otherwise exists, he has failed to allege any underlying Stark Law violations that could have made the submitted claims false under the FCA. Relator's FCA claims thus must be dismissed to the extent they are predicated on Stark Law violations and the Court need not address Defendants' other related arguments. However, the same FCA claims could still be predicated on AKS violations, as discussed below.

---

devoid of such allegations and this theory cannot stand. The Court thus proceeds with Relator's primary theory that CHI Defendants, through their own employees or agents in the International Services Department, orchestrated the scheme and provided the remuneration.

[8] As an alternative argument on why it was proper to sue CHI Defendants and not Baylor St. Luke's Medical Center, Relator asserts that the allegations as to CHI Defendants in the complaint "should be fairly read to include [Baylor St. Luke's Medical Center]" because he "described" CHI-St. Luke's Health as "including" Baylor St. Luke's Medical Center. (Dkt. No. 309 at 111.) However, Relator fails altogether to explain why it would be appropriate to treat these entities—one of which is only partly owned by the other—as one and the same. He also fails to plead sufficient factual allegations that would allow the Court to do so. In fact, elsewhere in the complaint, he explicitly defines CHI Defendants as CHI and CHI-St. Luke's Health only. (Dkt. No. 273 ¶ 2.) This argument lacks merit.

## V.     FALSE CLAIMS ACT ANALYSIS

The primary issue before the Court is whether Relator has sufficiently alleged Defendants participated in a remuneration scheme that violated the Anti-Kickback Statute and thus, upon the submission of related claims, violated the False Claims Act. The Court finds Relator has sufficiently alleged claims against CHI Defendants and Dr. Hoffman for causing the submission of false claims and the making of false records or statements under 31 U.S.C. § 3729(a)(1)(A) and (B) but has not done so for any other Provider Defendants. The Court also finds Relator has not sufficiently alleged claims against any Defendants for concealing an obligation to pay the Government under 31 U.S.C. § 3729(a)(1)(G) or conspiracy under 31 U.S.C. § 3729(a)(1)(C).

### A.  False Claims and Statements under § 3729(a)(1)(A) and (B)

The FCA imposes liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). The FCA also imposes liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* § 3729(a)(1)(B). The FCA defines "knowingly" to mean that a person has actual knowledge of the information, acts in deliberate ignorance of the truth or falsity of the information, or acts in reckless disregard of the truth or falsity of the information. *Id.* § 3729(b)(1)(A). It does not require specific intent to defraud. *Id.* § 3729(b)(1)(B). As explained above, a relator can meet the Rule 9(b) requirements by pleading the "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Grubbs*, 565 F.3d at 190. The Court first considers whether Relator alleges sufficient details of the scheme predicated on AKS violations and then considers whether there are reliable indicia that claims were submitted.

### 1.   Scheme based on Anti-Kickback Statute violations

The AKS prohibits the knowing and willful solicitation or receipt of remuneration in return for Medicare/Medicaid referrals and the knowing and willful offer or payment of remuneration to induce such referrals. 42 U.S.C. § 1320a-7b(b). "When it forms the basis of an FCA claim, an AKS violation must be pleaded with particularity." *United States ex rel. Ruscher v. Omnicare, Inc.*, No. 08-CV-3396, 2014 WL 2618158, at *7 (S.D. Tex. June 12, 2014). "[T]o allege the particulars of a scheme to offer kickbacks, relator must sketch how it was that [participants] provided remuneration . . . , the form of that remuneration, how and why [participants] believed that remuneration would induce new business, and how [participants] benefited from the remuneration" as well as "the timeframe in which the scheme took place and which components of the [participant] organization were involved." *Id.* at *10. However, when the alleged fraud consists of numerous acts over an extended period of time, the Rule 9(b) standard is somewhat relaxed and can be satisfied by representative examples of alleged wrongdoing. *Id.* at *10–11.

Relator's allegations against CHI Defendants and Dr. Hoffman as to underlying AKS violations are both plausible and pleaded with particularity. Relator alleges CHI Defendants, acting through staff in the International Services Department, provided kickbacks to Provider Defendants in exchange for Medicare/Medicaid referrals since at least 2011 and provides numerous examples of such kickbacks containing specific dates. (Dkt. No. 273 ¶¶ 2–4, 145–47, Exs. 6–7, 9, 11–13.) Relator outlines the four categories of alleged kickbacks—international patient referrals, complimentary interpreters, free administrative assistance, and international travel perks—and makes specific allegations as to three of these four categories. (*Id.* ¶¶ 184–267.) As to international patient referrals, Relator describes the value of such referrals and provides a list of numerous

patients that CHI Defendants referred to Provider Defendants. (*Id.* ¶ 192, Ex. 6.)[9] As to complimentary interpreters, Relator alleges that CHI Defendants provided such services over a thousand times between 2011 and 2016 and provides documentation with specific examples. (*Id.* ¶ 211, Ex. 6 (list of appointments with interpreters), Ex. 7 (over 100 pages of interpreter logs).)[10] As to administrative services, Relator alleges that the International Services Department staff scheduled appointments, issued reminders, sent bills, and collected payments on behalf of Provider Defendants and again provides documentation with specific examples. (*Id.* ¶¶ 226–29, Ex. 6 (emails regarding appointment reminders), Ex. 9 (records of appointments, including date, time, service, and provider), Ex. 11 (billing documents).)[11] Relator provides more than enough detail as to these categories of kickbacks at this stage. However, as to international travel perks, Relator provides only one general example with very little information and otherwise makes only the

---

[9] CHI Defendants argue Relator's central theory—that they should have referred international patients to in-house physicians instead of independent providers—is detached from reality because there can be no in-house physicians under Texas law. (Dkt. No. 302 at 16–18.) However, any issue with Relator's allegations in this regard does not render the entire scheme implausible, as the scheme does not turn on the distinction between in-house and independent physicians. It instead turns on the distinction between physicians that made more return referrals and those that made less return referrals. Defendants' argument, therefore, lacks merit.

[10] CHI Defendants appear to argue the complimentary interpreters do not have value under the AKS. (*See id.* at 18–21; *see also id.* at 22 (making the same argument for administrative services).) The Court disagrees. *See Ruscher*, 2014 WL 2618158, at *8 ("Courts have interpreted the meaning of 'remuneration' broadly as anything of value in any form whatsoever[.]"). Moreover, Relator clearly alleges the interpreters were valuable to the Provider Defendants (Dkt. No. 273 ¶¶ 205–10), and the Court cannot discredit such allegations at this stage.

[11] CHI Defendants argue Relator's allegations as to this category fail because they provided free administrative services for all patients, not just those referred to Provider Defendants, and thus the services could not have been intended to induce referrals. (Dkt. No. 302 at 23; *see also id.* at 21 (making the same argument for complimentary interpreter services).) But this ignores Relator's central theory that CHI Defendants made more referrals to the physicians who referred back more Medicare/Medicaid patients and thus provided more free services to those physicians. In other words, the broad provision of free services does not mean certain physicians were not being rewarded with extra referrals and thus extra free services.

conclusory assertion that certain Provider Defendants were rewarded with "lavish" international trips. Such allegations are insufficient.

In turn, Relator alleges Provider Defendants referred their Medicare/Medicaid patients to Baylor St. Luke's Medical Center instead of other hospitals in the area. (Dkt. No. 273 ¶¶ 42, 197.) Several Defendants admit they did so. (Dkt. No. 302 at 17 (stating defendants such as Dr. Hoffman have admitting privileges at Baylor St. Luke's Medical Center)); *see United States ex rel. Singh v. Bradford Reg'l Med. Ctr.*, No. 04-CV-186, 2006 WL 2642518, at *7 (W.D. Pa. Sept. 13, 2006) (noting, on motion to dismiss, that defendants never asserted they did not refer Medicare/Medicaid patients). Relator also identifies an example of one such referral from October 2015, in which a physician at Defendant Bone and Joint Clinic of Houston referred a Medicare patient to Baylor St. Luke's Medical Center for surgery. (Dkt. No. 273 ¶¶ 182–83.) Contrary to Defendants' arguments otherwise, these allegations more than satisfy the 9(b) standards with respect to the details of the scheme. *See Parikh*, 977 F. Supp. 2d at 667 (explaining representative examples can be used to sufficiently plead FCA violations, including predicate AKS violations, based on similar scheme).

Relator also sufficiently alleges the CHI Defendants and Dr. Hoffman participated in the scheme and the CHI Defendants did so knowingly and willfully under the AKS.[12] Relator alleges the managers in the International Services Department directed staff to refer more international patients, and thus provide more free services, to physicians that referred Medicare/Medicaid patients back to Baylor St. Luke's Medical Center and less to those that did not. (Dkt. No. 273 ¶¶ 149–52, 156 (giving specific example of a meeting Relator attended in July 2017 during which

---

[12] "[A] person need not have actual knowledge of [the AKS] or specific intent to commit a violation of [the AKS]" in order to be liable. 42 U.S.C. § 1320a-7b(h); *see also United States v. St. Junius*, 739 F.3d 193, 210 & n.19 (5th Cir. 2013).

a manager stated staff needed to refer patients to one particular physician in order to "keep him happy").) Relator alleges these managers maintained a roster of physicians that provided return referrals and identifies several particular physicians on that roster, including Dr. Hoffman. (*Id.* ¶ 163.) Relator also provides emails from October 2016 in which a manager expressed a preference that Relator refer a patient to Dr. Hoffman. (*Id.* ¶¶ 158–61, Ex. 3.) Although CHI Defendants argue this email correspondence actually demonstrates the lawful business considerations that led to referrals (Dkt. No. 302 at 12–16), remuneration that has both lawful and unlawful purposes can still violate the AKS as discussed below. Finally, Relator alleges Provider Defendants knew the kickbacks were intended to induce referrals based on their volume, frequency, and value and provides detail as to the consistent stream of kickbacks Dr. Hoffman received from 2011 to 2016. (Dkt. No. 273 ¶¶ 282–85, Ex. 9; *see id.*, Ex. 5 (interpreters), Ex. 6 (interpreters and appointment reminders), Ex. 11 (invoices and checks), Ex. 13 (billing invoices).) Relator has sufficiently alleged CHI Defendants and Dr. Hoffman participated in the scheme and CHI Defendants did so knowingly and willfully.

The same is not true for the other Provider Defendants, however. In contrast to Dr. Hoffman, Relator fails to sufficiently allege other Provider Defendants received anything other than sporadic referrals or referrals during a limited timeframe. (Dkt. No. 273, Exs. 5–7, 11–13.) And allegations, for example, that Defendant Bone and Joint Clinic of Houston made a specific referral to Baylor St. Luke's Medical Center in 2015 do not, without more, make it a willful participant in an unlawful scheme. (*Id.* ¶ 183.) Likewise, Relator's allegation that CHI Defendants communicated directly with Provider Defendants about the scheme is entirely conclusory and inappropriately based on the assumption that they did so just because they openly communicated about the scheme within their own International Services Department. (*Id.* ¶ 284.) Relator's

allegations as to the other Provider Defendants' participation in the scheme at all are severely lacking in detail under Rule 9(b) and cannot survive a motion to dismiss.

Both sets of Defendants argue the alleged scheme is entirely consistent with law-abiding behavior and thus there were no underlying AKS violations. (Dkt. No. 302 at 10–26; Dkt. No. 303 at 24–25.) However, under the AKS, "[t]he presence of a legitimate business purpose for the arrangement . . . will not legitimize a payment if there is *also* an illegal purpose." *United States ex rel. Patel v. Cath. Health Initiatives*, 312 F. Supp. 3d 584, 596 (S.D. Tex. 2018) (quotations omitted), 792 F. App'x 296 (5th Cir. 2019). At the motion to dismiss stage, Relator need only plausibly allege that one purpose of the remuneration was to induce such referrals. *See id.*; *Ruscher*, 2014 WL 2618158, at *9. Relator here has done so and thus, contrary to Defendants' argument, any lawful alternative explanations cannot be given preference at this stage. The cases Defendants cite for their argument otherwise either do not involve the AKS, *United States ex rel. Integra Med Analytics, L.L.C. v. Baylor Scott & White Health*, 816 F. App'x 892 (5th Cir. 2020), or actually support the idea that a legitimate business purpose alone does not cause a relator's allegations to fail, *Patel*, 312 F. Supp. 3d at 596. This argument lacks merit. *See United States v. Marlin Med. Sols. LLC*, No. 21-CV-160, 2022 WL 190308, at *6 (W.D. Tex. Jan. 12, 2022).

Finally, both sets of Defendants argue Relator fails to adequately plead facts linking the remuneration with the referrals. (Dkt. No. 302 at 28–30; Dkt. No. 303 at 31–34.) CHI Defendants rely heavily on *United States v. Abundant Life Therapeutic Services Texas, LLC*, No. 18-CV-773, 2019 WL 1930274 (S.D. Tex. Apr. 30, 2019)—and particularly its finding that relator failed to allege one of the scheme participants, an elementary school principal, "did anything except receive the free items"—in support of their argument. (Dkt. No. 302 at 29.) However, the holding in *Abundant Life* does not compel the same result here. The relator there did not adequately plead the

basic allegation "that the principal or anyone else at the school ever referred a student to Abundant Life." 2019 WL 1930274, at *7. In fact, the relator alleged an entirely different party—an independent contractor to the organization providing the remuneration—made the improper referrals. *Id.* Relator's allegations here do not implicate such a disconnect. Indeed, Relator alleges the same Provider Defendants or physicians within those organizations both received the remuneration and made the referrals to Baylor St. Luke's Medical Center. He also provides an example of one such referral. (Dkt. No. 273 ¶¶ 183, 200.) Relator has sufficiently alleged a link between the perks and the return referrals at this stage in the proceedings. *See Patel*, 312 F. Supp. 3d at 599 (collecting cases in which improper remuneration clearly related to referrals).

In sum, Relator has provided more than enough detail to plausibly plead underlying violations of the AKS and the required who, what, when, where, and how of the alleged scheme. However, Relator's allegations of participation in the scheme are sufficient only as to CHI Defendants and Dr. Hoffman, not the other Provider Defendants.

### 2.  Reliable indicia that false claims were submitted

As explained above, a relator must also allege reliable indicia that lead to a strong inference the claims tainted by the AKS violations were submitted to the Government. *Grubbs*, 565 F.3d at 190. A person can be liable under the FCA for knowingly causing false claims to be submitted or knowingly causing material false statements or records to be made, even if he or she did not actually submit the claims. 31 U.S.C. § 3729(a)(1)(A) & (B); *United States v. Medoc Health Servs. LLC*, 470 F. Supp. 3d 638, 655 (N.D. Tex. 2020). At the pleadings stage, a relator is not required to identify particular claims resulting from the kickback scheme or plead the exact dollar amounts, billing numbers, or dates of the claims. *Parikh*, 977 F. Supp. 2d at 665; *Ruscher*, 2014 WL 2618158, at *21. Rather, allegations "such as dates and descriptions of [the] . . . services and a

description of the billing system that the records were likely entered into" will suffice because defendants are likely to be in possession of the relevant records. *Grubbs*, 565 F.3d at 190–91; *see also Colquitt*, 858 F.3d at 372 ("The details of particular claims submitted to the government may only be attainable for relators through discovery, which a dismissal on the pleadings forestalls altogether.").

Here, Relator's allegations provide reliable indicia that false claims were submitted to the Government and that CHI Defendants and Dr. Hoffman caused these claims to be submitted with the requisite knowledge they were false. *See* 31 U.S.C. § 3729(b)(1)(A) (explaining that knowledge of the falsity of the information can be actual knowledge, deliberate ignorance, or reckless disregard). Relator alleges CHI Defendants were orchestrating the entire scheme and provides documents—such as billing polices, invoices, and checks related to the alleged scheme—that make this inference plausible even if Baylor St. Luke's Medical Center was actually submitting the claims. (Dkt. No. 273, Exs. 1–2.) Relator also alleges Dr. Hoffman participated in the scheme and is familiar with the government guidance warning against improper referrals, making it plausible that Dr. Hoffman acted with deliberate ignorance or reckless disregard of the falsity of the claims submitted as a result of his Medicare/Medicaid referrals. (Dkt. No. 273 ¶¶ 164–66, 279–80.)[13] Finally, Relator gives at least one particular example of a referral to Baylor St. Luke's Medical Center in October 2015 leading to a false claim. (Dkt. No. 273 ¶¶ 22, 179–83.) Relator did not work in the billing department at Baylor St. Luke's Medical Center and thus has limited access to more particular information.

---

[13] The same is not true for the other Provider Defendants because Relator has failed to make non-conclusory allegations as to their basic involvement in the scheme.

Relator's allegations, therefore, contain reliable indicia leading to a strong inference that CHI Defendants and Dr. Hoffman caused false claims to be submitted to the Government in violation of the FCA. *See, e.g.*, *Colquitt*, 858 F.3d at 372 (finding a strong inference that hospitals submitted claims to Medicare because relator adequately alleged certain medical procedures to be common and defendants "would most likely have billed Medicare had they performed [such] procedures"). Indeed, the rest of the well-pleaded scheme would "make no sense at all without presentment of false claims." *Ruscher*, 2014 WL 2618158, at *22. Relator's claims under § 3729(a)(1)(A) and (B) against CHI Defendants and Dr. Hoffman only (Counts I and II) should be permitted to proceed.

### B.  Reverse FCA Claims under § 3729(a)(1)(G)

The FCA imposes liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). This is known as the reverse FCA provision because "the defendant's action does not result in improper payment by the government to the defendant, but instead results in no payment [from the defendant] to the government when a payment is obligated." *United States ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648, 653 (5th Cir. 2004). The purpose of this provision is "not to provide a redundant basis" to state an FCA claim and it is insufficient for a relator to merely recast his allegations under the other FCA provisions as violations of the reverse FCA provision. *Ruscher*, 2014 WL 2618158, at *28 (quotations omitted); *see also United States ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 514 (E.D. Pa. 2010).

Relator here alleges Defendants concealed money to which the Government is entitled under the Stark Law, which contains an obligation to refund the money collected from the Government based on a referral prohibited under that law. *See* 42 C.F.R. § 411.353(d). However, the Court has already found the Stark Law to be inapplicable to Relator's allegations, and thus he has not sufficiently alleged any obligation to repay money under that law. Moreover, Relator recognizes the alleged concealment pertains to the same money the Government allegedly paid in relation to his § 3729(a)(1)(A) and (B) claims and thus Relator's § 3729(a)(1)(G) claim is redundant. *See United States ex rel. Ligai v. ETS-Lindgren Inc.*, No. 11-CV-2973, 2014 WL 4649885, at *13 (S.D. Tex. Sept. 16, 2014) (finding reverse FCA claims insufficient because relator merely alleged a failure to refund the same false claims the Government paid and failed to identify an existing obligation to reimburse the Government), *aff'd*, 611 F. App'x 219 (5th Cir. 2015); *United States v. HCA Health Servs. of Okla., Inc.*, No. 09-CV-992, 2011 WL 4590791, at *8 (N.D. Tex. Sept. 30, 2011) (same). Relator's reverse FCA claim under § 3729(a)(1)(G) against all Defendants (Count III) should be dismissed.

### C.  Conspiracy under § 3729(a)(1)(C)

The FCA imposes liability on anyone who conspires to violate the statute. 31 U.S.C. § 3729(a)(1)(C). "[T]o prove a False Claims Act conspiracy, a relator must show (1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by the Government and (2) at least one act performed in furtherance of that agreement." *Grubbs*, 565 F.3d at 193 (quotations and alterations omitted). A relator must also demonstrate "that defendants shared a specific intent to defraud the Government." *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008) (quotations and alterations omitted); *Marlin Med. Sols.*, 2022 WL 190308, at *9 (explaining that FCA conspiracy requires shared specific intent,

even when other FCA claims do not, and requiring relator to plead such intent in order to survive a motion to dismiss). The Rule 9(b) particularity requirements apply "with equal force" to FCA conspiracy claims as they do to general FCA violations. *Grubbs*, 565 F.3d at 193; *see also Ruscher*, 2014 WL 2618158, at *26.

Relator has not sufficiently pleaded a conspiracy between any Defendants. As to CHI Defendants and Dr. Hoffman, Relator fails to sufficiently plead these Defendants entered into an unlawful agreement with specific intent to defraud the Government. First, the complaint is completely devoid of non-conclusory allegations that CHI Defendants and Dr. Hoffman communicated with each other regarding the scheme or made an agreement—express or otherwise—to exchange remuneration for referrals. While an agreement for the purposes of conspiracy can sometimes be "inferred when it is a natural consequence of the factual allegations," *United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, No. 08-CV-371, 2012 WL 1866586, at *2 (W.D. La. May 21, 2012), *aff'd*, 519 F. App'x 890 (5th Cir. 2013), this generally requires a level of detail Relator has not alleged here. *See, e.g.*, *Grubbs*, 565 F.3d at 193–94 (finding relator sufficiently pleaded conspiracy when defendants discussed scheme at a meeting right before relator had his first chance to participate in the scheme); *United States ex rel. Jamison v. McKesson Corp.*, No. 08-CV-214, 2009 WL 3176168, at *15 (N.D. Miss. Sept. 29, 2009) (finding relator sufficiently pleaded conspiracy when defendants shared documents and exchanged proposals related to the arrangement). Relator has not sufficiently alleged an agreement.

Second, even if Relator did sufficiently allege an agreement between CHI Defendants and Dr. Hoffman, he fails to allege such an agreement was made with specific intent to defraud the Government. Relator does sufficiently allege CHI Defendants knowingly and willfully violated the AKS and knowingly caused false claims to be submitted under the FCA. And Relator does

sufficiently allege Dr. Hoffman participated in the scheme and acted with deliberate ignorance or reckless disregard in causing false claims to be submitted under the FCA. However, it does not necessarily follow that Relator sufficiently alleges a shared specific intent. *See Marlin Med. Sols.*, 2022 WL 190308, at \*9, 13 & n.9 (finding allegations that were sufficient to plead defendants knowingly and willfully violated the AKS and acted with deliberate ignorance or reckless disregard as to the falsity of related claims were not sufficient to plead agreement with the specific purpose to defraud the Government and noting these conclusions were not inconsistent given FCA conspiracy requires specific intent and the AKS and other FCA provisions do not). Moreover, the Court's finding as to Dr. Hoffman was based on the volume, frequency, and value of referrals he received from CHI Defendants and not based on his actual knowledge of any scheme.[14] Relator's conspiracy allegations as to CHI Defendants and Dr. Hoffman are insufficient.

As to the Provider Defendants except Dr. Hoffman, Relator has failed to plead any particular facts as to their involvement in the scheme and thus they could not have agreed to submit false claims or otherwise conspired to violate the FCA. *See Health Choice Grp., LLC v. Bayer Corp.*, No. 17-CV-126, 2018 WL 3637381, at \*53 n.18 (E.D. Tex. June 29, 2018), *report and recommendation adopted*, 2018 WL 3630042 (July 31, 2018); *United States ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp. 2d 487, 509 (S.D. Tex. 2003) (finding conspiracy claim failed as a matter of law because relator's other FCA claims were insufficient), *aff'd*, 111 F. App'x 296 (5th Cir. 2004). Relator's FCA conspiracy claim under § 3729(a)(1)(C) against all Defendants (Count IV) should be dismissed.

---

[14] *See Farmer*, 523 F.3d at 343–44 (finding defendants' signatures on certain forms under suspicious circumstances were not enough to survive summary judgment on conspiracy because a jury could not reasonably infer both defendants were actually aware of the suspicious circumstances or agreed—even tacitly—on a plan to defraud the Government).

## VI.    TEXAS LAW ANALYSIS

Relator asserts five claims under the Texas Medicaid Fraud Prevention Act ("TMFPA"), Tex. Hum. Res. Code § 36.002, based on the same facts described above. (Dkt. No. 273 ¶¶ 325–48.) The TMFPA imposes civil liability for a number of unlawful acts affecting the Texas Medicaid program. *United States of Am. v. Dental Health Programs, Inc.*, No. 18-CV-463, 2021 WL 3213709, at *7 (N.D. Tex. July 29, 2021). While the TMFPA is similar to the FCA in "aim and tactic," the two statutes contain potentially significant textual differences. *In re Xerox Corp.*, 555 S.W.3d 518, 535 (Tex. 2018); *see United States ex rel. Young v. Kindred Healthcare, Inc.*, No. 18-CV-806, 2022 WL 126486, at *4 (W.D. Tex. Jan. 13, 2022). As a result, the TMFPA may "reach[] a broader range of false or fraudulent conduct less closely tied to the Medicaid claim submission process." *Patel*, 312 F. Supp. 3d at 607; *see United States ex rel. Jacobs v. Walgreen Co.*, No. 19-CV-5021, 2021 WL 4054308, at *4 (S.D. Tex. July 28, 2021) ("The textual differences in the TMFPA require a separate interpretation from the FCA that may capture a greater scope of misconduct."), *aff'd*, No. 21-20463, 2022 WL 613160 (5th Cir. Mar. 2, 2022).

Defendants argue the Court should dismiss Relator's TMFPA claims for the same reasons as the FCA claims or should decline to exercise supplemental jurisdiction over them. (Dkt. No. 302 at 34–35; Dkt. No. 303 at 48–49.) Relator argues Defendants "completely fail[] to grapple meaningfully with the important distinctions between [the FCA and TMFPA], the underlying federal and state anti-kickback statutes, and their corresponding pleading requirements." (Dkt. No. 309 at 123.) Texas filed two Statements of Interest—one during the first round of motions to dismiss (Dkt. No. 204) and one during this round of motions to dismiss (Dkt. No. 308)—that point to the material differences between the TMFPA and FCA. Defendants dispute the relevance of any such differences in this case. (Dkt. No. 310 at 7–9.)

The Court need not address any differences between the FCA and TMPFA given the facts of this case. The Court's finding that the FCA claims under § 3729(a)(1)(A) and (B) should survive as to CHI Defendants and Dr. Hoffman applies equally to the analogous TMFPA claims under § 36.002(1), (2), (4), and (13) (Counts V, VI, VII, and IX) because the TMFPA is potentially broader rather than narrower in scope. Indeed, Defendants do not argue claims that survive under the FCA should nonetheless be dismissed under the TMFPA. The Court's finding that the FCA claims under § 3729(a)(1)(A) and (B) should be dismissed as to all other Provider Defendants also applies to the analogous TMFPA claims because that finding was based on Relator's total failure to allege Provider Defendants' basic involvement in the scheme and not just his failure in any area where the TMFPA is potentially broader. Finally, the Court's finding that the reverse FCA claim under § 3729(a)(1)(G) should be dismissed as to all Defendants also applies to the analogous TMFPA claim under § 36.002(12) (Count VIII) because that finding was based on the duplicative nature of the claim and the lack of obligation to repay the Government rather than on any reason Relator or Texas identifies as potentially broader under the TMFPA. In sum, Relator's TMPFA claims under § 36.002(1), (2), (4), and (13) against CHI Defendants and Dr. Hoffman only (Counts V, VI, VII, and IX) should survive and all other TMPFA claims should be dismissed.

## VII.   LEAVE TO AMEND

Federal Rule of Civil Procedure 15 governs amendment of the pleadings. A party may amend its pleading once as a matter of course within certain time limits or otherwise only with consent of the opposing party or leave of the court. FED. R. CIV. P. 15(a). The court should freely grant leave to amend "when justice so requires" and must entertain a presumption in favor of leave. *Id.*; *see Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 425 (5th Cir. 2004). Leave to amend is not automatic, however, and courts have discretion to deny leave in the face of undue

delay, bad faith, repeated failure to cure deficiencies, prejudice, and futility of amendment. *Wright v. Allstate Ins. Co.*, 415 F.3d 384, 391 (5th Cir. 2005). Moreover, "[a]t some point a court must decide that a plaintiff has had fair opportunity to make his case; if, after that time, a cause of action has not been established, the court should finally dismiss the suit." *Jacquez v. Procunier*, 801 F.2d 789, 792 (5th Cir. 1986).

Relator here has already filed three complaints. (Dkt. Nos. 1, 5, 273.) While it is true Relator filed the First Amended Complaint before serving Defendants, he filed the Second Amended Complaint after the benefit of numerous motions to dismiss. In fact, Defendants filed thirteen separate motions to dismiss that addressed several key issues relevant to this Memorandum—namely, the lack of allegations as to the Provider Defendants (Dkt. No. 164 at 9–13), the lack of financial relationship necessary under the Stark Law (Dkt. No. 171 at 15–17), CHI Defendants' role in the alleged scheme (Dkt. No. 169 at 6–7), the duplicative nature of the reverse FCA claim (*id.* at 26–27), and the lack of conspiracy agreement (Dkt. No. 164 at 13–14). In other words, the shortcomings warranting dismissal were largely pointed out before Relator filed his Second Amended Complaint.

Relator argues he should be given leave to amend because he has not had the opportunity to do so with the benefit of the Court's guidance and because Rule 15's bias in favor of leave to amend, particularly applicable to FCA cases, requires that he be given another opportunity to "connect the dots" or address other issues identified. (Dkt. No. 309 at 126–28.) These arguments are unavailing. First, Relator is not entitled to the benefit of the Court's guidance before his claims are dismissed with prejudice, even if that is often the result after a 12(b)(6) dismissal. Second, although Relator cites cases in which other relators under the FCA had several opportunities to amend, he fails to explain why those cases are similar to this one. (*See id.* at 127–28.) Relator

appears to attribute the additional chances to amend in those FCA cases to the idea that "reasonable minds can—and will—differ" on whether Rule 9(b)'s pleading requirements have been met. (*Id.* at 127 (quotations omitted).) However, many of the deficiencies here stem from the complete lack of non-conclusory factual allegations as to certain Defendants or certain claims. The Court has no reason to believe further amendment would cure the fundamental deficiencies it has identified.

Relator has been given sufficient opportunity to state his best case and should not be given leave to amend. *See, e.g.*, *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 566–67 (5th Cir. 2002) (affirming dismissal without leave to amend under Rules 12(b)(6) and 9(b), even though defendants did not file any earlier motions to dismiss, because plaintiffs had already filed three complaints attempting to allege the same claims and thus they were given "ample opportunity" to plead their best case). To the extent Relator's claims are dismissed, therefore, they should be dismissed with prejudice.[15]

## VIII.   CONCLUSION

Based on the foregoing, the Court **RECOMMENDS** that CHI Defendants' Motion to Dismiss (Dkt. No. 302) and Provider Defendants' Motion to Dismiss (Dkt. No. 303) be **GRANTED IN PART** and **DENIED IN PART** as described above. Relator's FCA claims under § 3729(a)(1)(A) and (B) against CHI Defendants and Dr. Hoffman only (Counts I and II), to the extent they are predicated on the Anti-Kickback Statute, should remain. Relator's TMFPA claims under § 36.002(1), (2), (4), and (13) against CHI Defendants and Dr. Hoffman only (Counts V, VI, VII, and IX) should also remain. All other FCA and TMFPA claims (Counts III, IV, and VIII) should be dismissed with prejudice.

---

[15] Because the Court finds leave to amend otherwise improper, it need not address the parties' related dispute as to what occurred at the December 4, 2019 hearing.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the Undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas on March 31, 2022.

Sam S. Sheldon
United States Magistrate Judge