IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| EX REL. HICHEM CHIHI, *et al.,* | ) | |
| | ) | |
| *Plaintiff-Relator,* | ) | Judge Charles R. Eskridge III |
| | ) | |
| v. | ) | Magistrate Judge Sam S. Sheldon |
| | ) | |
| CATHOLIC HEALTH | ) | |
| INITIATIVES, *et al.,* | ) | |
| | ) | Civil Case No. 4:18-cv-00123 |
| *Defendants.* | ) | |

**[Proposed] Exhibit A to Plaintiff's Brief in Support of Objection**

**(Dkt. 334, at pages 14-15)**

**Transcript of January 27, 2022 Hearing**

**(see Trans. 3:12-3:20 and 28:4-28:5)**

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE SOUTHERN DISTRICT OF TEXAS

 3                           HOUSTON DIVISION

 4  CHIHI, ET AL.                  §     CASE NO. 4:18-cv-00123
                                   §     HOUSTON, TX
 5  VERSUS                         §     THURSDAY,
                                   §     JANUARY 27, 2022
 6  CATHOLIC HEALTH INITIATIVES,   §     12:05 P.M. TO 1:24 P.M.
    ET AL.                         §

 7
                            STATUS CONFERENCE
 8
                 BEFORE THE HONORABLE CHARLES ESKRIDGE
 9                    UNITED STATES DISTRICT JUDGE

10                            APPEARANCES:

11
         FOR THE PARTIES:              SEE NEXT PAGE
12
         COURT REPORTER:               RACHEL WILLBORG
13
         COURT CLERK:                  SHANNON JONES
14

15

16

17

18

19

20                    TRANSCRIPTION SERVICE BY:

21                    Veritext Legal Solutions
22                   330 Old Country Road, Suite 300
                          Mineola, NY 11501
23             Tel: 800-727-6396 ▼ www.veritext.com

24    Proceedings recorded by electronic sound recording; transcript
                  produced by transcription service.
25
```

```
 1                              APPEARANCES:

 2

 3   FOR THE PLAINTIFF:          LOEVY & LOEVY
                                 Ruth Brown
 4                               311 N. Aberdeen Street
                                 3rd Floor
 5                               Chicago, IL 60607
                                 312-243-5900
 6

 7   FOR THE DEFENDANTS:         SCOTT CLAWATER HOUSTON, LLP
                                 Sam Houston
 8                               2727 Allen Parkway
                                 Suite 500
 9                               Houston, TX 77019
                                 713-650-6600
10
                                 POLSINELLI, P.C.
11                               Kevin Coffey
                                 150 N. Riverside Plaza
12                               Suite 3000
                                 Chicago, IL 60606
13                               312-819-1900

14                               REED SMITH, LLP
                                 Frederick Robinson
15                               1301 K Street NW
                                 Suite 1100 East Tower
16                               Washington, D.C. 20005
                                 202-414-9259
17
                         (APPEARING TELEPHONICALLY)
18

19

20

21

22

23

24

25
```

```
 1            HOUSTON, TEXAS; THURSDAY, JANUARY 27, 2022; 12:05 P.M.

 2                 THE COURT:  Chihi versus Catholic Health Initiatives,

 3      et al.  It's 18-cv-123.  Ms. Brown's here on behalf of the

 4      Plaintiffs and the relator.  Mr. Coffey and Mr. Funk are here

 5      on behalf of the hospital defendants.  Mr. Robinson, you're

 6      here on behalf of Baylor College of Medicine, right?

 7                 MR. ROBINSON:  Correct, as well as Doctors Sista and

 8      Katz.

 9                 THE COURT:  Okay.  And Mr. Houston is here on behalf

10      of Mr. Hoffman.  Last week, I gave the parties a tentative

11      ruling.  We didn't put it on the record.

12                 My tentative ruling would be too to dismiss with

13      prejudice the hospital defendant, CHI, but not dismiss

14      defendant, CHI St. Luke's, but to allow the Relator to name,

15      only amend to name Baylor Saint Luke's Medical Center.

16                 The tentative was to dismiss the 32 provider

17      defendants without prejudice except keep in the case Dr. Alan

18      Hoffman.  It was also to dismiss the false claims, the reverse

19      false claims count, Count 3, the conspiracy, Count 4, and the

20      Stark violation as to CHI and CHI St. Luke's Health.

21                 I gave the parties one week to think about this and

22      see if they could come to an agreement regarding my tentative.

23      They couldn't come to an agreement, so we will issue a formal

24      memorandum and recommendations probably along those lines.

25                 So let me start with the hospital defendants.  Mr.
```

1    Coffey, you wanted to be heard.

2          MR. COFFEY:  Thank you, Judge.  As I mentioned

3    previously, there are certain rulings that we are inclined to

4    accept and some tentative rulings that we'd like to object to.

5    So I thought it might make sense to run through our

6    understanding of the tentative rulings and our position and

7    then follow up with our rationale.

8          THE COURT:  Sure.  Okay.

9          MR. COFFEY:  Thank you, Judge.  So the hospital

10   defendants are willing to accept the recommendation to dismiss

11   all counts, 1 through 9 against Catholic Health Initiatives

12   with prejudice.  We also accept --

13         THE COURT:  Let me stop you one second, Mr. Coffey.

14   I forgot to mention, I didn't say that I would keep -- right,

15   as to the defendants that are staying in, I would keep the

16   Texas claims alive, but go on.

17         MR. COFFEY:  Okay.  Thanks, Judge.  In addition, we

18   would be accepting the recommendation to dismiss the Stark

19   based claims against all the hospital defendants to the extent

20   that dismissal would also be with prejudice.  And we would

21   accept the recommendations to dismiss Relator's false claims

22   count, which is Count 3; the conspiracy count, Count 4, against

23   the hospital defendants to the extent those will also be

24   dismissed with prejudice.

25         The hospital defendants would be inclined to object

1   to the Court's recommendation to deny the PMFPA claims which

2   are laid out in Counts 5 through 9.  We'd also object to the

3   Court's recommendation to deny the hospital defendant's motion

4   to dismiss as to the AKS based false claims.  And we'd also

5   object to the Court's recommendation to allow Relator to add

6   nonparty Baylor Saint Luke's Medical Center which is not

7   represented at this hearing today, to add that defendant, to

8   add Baylor Saint Luke's Medical Center as defendant as this

9   late stage.  So we'd object to that as well, Your Honor.

10          THE COURT:  Anything else, Mr. Coffey, Judge?

11          MR. COFFEY:  Judge, we can go through with our

12   rationale now or we can hear from the other defendants as to

13   what they're willing to accept.

14          THE COURT:  No, I would go -- let me hear your

15   rationale.

16          MR. COFFEY:  Okay.  Judge, starting with the Court

17   recommendation to allow Relator to add Baylor Saint Luke's

18   Medical Center at this late stage, a few reasons we are

19   inclined to object to that, we don't think it's proper.  As we

20   mentioned, Baylor Saint Luke's Medical Center is a nonparty and

21   is not represented by counsel.  However, will be making these

22   arguments, you know, from our perspective.  It's a separate

23   legal entity with its own Board.  It's got 12 members.  They're

24   separate owners, separately licensed.  It's got its own MPI.

25   And so this is not as simple as, you know, swapping in Baylor

1    Saint Luke's Medical Center or just adding it.  There's no

2    overlap with the Board of Directors between Baylor Saint Luke's

3    Medical Center or any of the hospital defendants.  And as we

4    mentioned in our last hearing, Judge Eskridge already informed

5    Relator that he was not to amend his complaint.

6            And we'd like to quickly run through the history and

7    make it clear for the record that Relator was, in fact, put on

8    notice of the hospital defendants' arguments as to Baylor Saint

9    Luke's Medical Center.  And Relator made a very intentional and

10   informed decision not to include Baylor Saint Luke's Medical

11   Center.  This was his choice and he should be required to stick

12   with it at this point.

13           And one thing I wanted to make clear, Judge, at the

14   last hearing, Ms. Brown had indicated in response to your

15   question as to why the Relator had not added Baylor Saint

16   Luke's Medical Center that perhaps there was somebody else

17   within her law firm or another law firm that drafted the

18   initial complaint.  To be clear, it's not a law firm's

19   complaint, of course, it's the Relator's complaint.  But also

20   Ms. Brown has been in contact with counsel for the hospital

21   defendants since as early as November 2018.  So that was after

22   the initial complaint was filed under seal but before any

23   amendments were filed.  She had indicated, Ms. Brown that is,

24   in December 2018 that Relator planned to file a first amended

25   complaint.  And so regardless, as I said, who drafted the

1   complaint, it is Relator's complaint and both counsel and

2   Relator, himself, were on notice of these issues.

3            On April 4, 2019, the hospital defendants filed their

4   first motion to dismiss the first amended complaint.  In it, we

5   explicitly informed Relator CHI and CHI Saint Luke's were not

6   properly named as defendants based on the facts that were

7   alleged in the first amended complaint.  And that's Docket 169

8   at Page 6.  I'm not going to read all of our arguments into the

9   record, but there's a few notable passages I think bear

10  mentioning.

11           We argued in relevant part that the majority of

12  Relator's allegations put SLMC and not CHI Saint Luke's or CHI

13  at the center of the purported kickback scheme.  We said once

14  it was clear that the underlying conduct was allegedly carried

15  out by individuals within Baylor Saint Luke's Medical Center

16  and designed to induce referrals to the hospital -- and this is

17  a quote -- "It is unclear why CHI or CHI Saint Luke are named

18  as defendants in this case."

19           We also pointed out that Relator did not identify any

20  individuals who work for those distinct legal entities or

21  alleged how they participated in the alleged kickback scheme.

22           So Relator was clearly on notice of these arguments

23  as early as April of 2019, about three years ago.

24           Before responding to the first motion to dismiss,

25  Relator sought leave to file a second amended complaint in the

1    middle of the briefing process.  Even in the faith of the

2    argument that I just raised, Judge, the proposed second amended

3    complaint did not include Baylor Saint Luke's Medical Center.

4    That was, again, an intentional decision on the part of

5    Relator.  When Relator did respond to CHI, CHI's first motion

6    to dismiss, and this was on May 31st, 2019, he again stated in

7    very clear terms that he did not intend to add Baylor Saint

8    Luke's Medical Center as the defendant.

9            So there he said that he had provided specifics as to

10   who engaged in the fraud.  He said the fraud was spearheaded by

11   just two hospital descendants and he clearly wrote Catholic

12   Health Initiatives and CHI Saint Luke's who jointly operated

13   and managed the International Services Department.  He also

14   noted that the hospital defendants acted through their agent

15   employees, Miss Matar and Miss Sanchez.

16           In other words, Judge, Relator clearly articulated

17   his position that it was CHI or CHI Saint Luke's employees that

18   carried out the acts that are at issue in the first and second

19   amended complaints.  And there are no employees at Baylor Saint

20   Luke's Medical Center at issue in the complaint.

21           Again, the passages I just read are located at Docket

22   Entry 205, Page 45.

23           Later in his motion for leave to file a second

24   amended complaint, Relator stuck to his decision not to include

25   Baylor Saint Luke.  According to the Relator, the proposed

1    second amended complaint that was attached to that motion for

2    leave added detail regarding the hospital defendants'

3    relationships to the ISD.  And again, that's Docket 191 at Page

4    4.

5              So you know, in defendants' motion to dismiss the

6    second amended complaint, we once again argued this pleading

7    lack sufficient allegations against the hospital defendants and

8    that Relator's failure to name Baylor Saint Luke's Medical

9    Center as defendant was fatal.  We said in relevant part,

10   Baylor Saint Luke's Medical Center which is a distinct legal

11   entity from CHI Saint Luke's and was not named as a defendant

12   is not alleged to be a part of CHI.  That's at Docket 302, Page

13   7 to 8.

14             In response to that second motion to dismiss, Relator

15   doubled down on his decision not to include Baylor Saint Luke's

16   Medical Center.  He said -- and I quote -- "Whether BSLMC

17   itself presented the claims is of no moment."  He goes on to

18   say that the hospital defendants' agents and employees, not

19   agents and employees of the BSLMC developed and implemented a

20   scheme to pay doctors in order to induce referrals, BSLMC.  He

21   says at all relevant times, the ISD employees were all

22   employees and agents of the CHI defendants.  And that's at

23   Docket Entry 309, Pages 106-107.

24             So, you know, based on Relator's own statements, it

25   was clearly his decision not to include Baylor Saint Luke's

1   Medical Center as defendants.  Allowing him to do so now,

2   (indiscernible) his own intentions, but also would not be

3   proper under Rule 9(b).  It wouldn't be proper under Rule

4   15(a).  And it certainly would go against Judge Eskridge's

5   statement that Relator should not be allowed to amend the

6   second amended complaint any further.

7          THE COURT:  Before I have some questions for you, Mr.

8   Coffey, let me hear from Ms. Brown.

9          MS. BROWN:  Yes, Your Honor, a couple, a couple

10  matters.  You know at the time we filed the complaint and the

11  most recent amended complaint, the corporate structure of all

12  these entities was not entirely clear to us.  And we thought

13  that by naming CHI Saint Luke's we had included liability for

14  the acts of the Medical Center because of the way we understood

15  the corporate structure.  And also in the way that we laid out

16  the allegations, we defined CHI to include the hospital.

17          As our understanding has evolved, we think the

18  hospital, Baylor Saint Luke's Medical Center and CHI Saint

19  Luke's need to be in the case.

20          THE COURT:  Let me ask you this, let's just stay why

21  CHI Saint Luke's?  Tell me, tell me the paragraphs were you

22  sufficiently link them up with the conduct, with the kickback

23  conduct.

24          MS. BROWN:  Because our information and our

25  allegations -- and I'll get you the paragraphs in a second --

1    are that some of the individuals who put together the scheme

2    were employed by CHI Saint Luke.  And so in that way, CHI Saint

3    Luke's was exercising control over the scheme and causing it to

4    be implemented.  And its agents were, you know, caused it to be

5    implemented.

6            THE COURT:  Let me just stop you.  So if I understand

7    MR. Coffey's argument, is that nothing that you've actually

8    alleged in your second amended complaint supports that as far

9    as who these employees are, their position, that everybody

10   that's named or referred to is related to the Baylor Saint

11   Luke's Medical Center and not CHI Saint Luke's.  So that's what

12   I'm saying.  I know there's 300 paragraphs but that's what I'm

13   trying to get into.  If I don't, if I change my mind and don't

14   allow you, I want to know how CHI -- my confusion with CHI

15   Saint Luke's, Mr. Coffey, and the exhibits, it just says -- it

16   doesn't say, when you're looking at some of these folks, it

17   doesn't say Baylor Saint Luke's Medical Center, it just says

18   CHI.

19           MS. BROWN:  That's right, Your Honor, and I'll point

20   you to Paragraph 20 of the second amended complaint where the

21   relationship of CHI Saint Luke's to the ISD is outlined with

22   specific allegations.  The employees of the ISD  were receiving

23   paychecks and employment evaluations.  And from -- well are

24   considered -- scratch that.  I'm sorry.  Those are relating to

25   CHI but let me move to CHI Saint Luke's.  The Vice President

1   Tania Matar and Associate Director Sanchez and other

2   representatives and agents of the ISD used the CHI Saint Luke's

3   corporate email logo.  They have email addresses that end in

4   CHI Saint Luke's Health.  They're promoted as -- by CHI Saint

5   Luke's as their team.  There are, there are other details in

6   here as well, but there are paychecks from CHI Saint Luke's, or

7   there's letterhead, you know, they send out information on CHI

8   Saint Luke's letterhead for the ISD.  So this is a situation in

9   which, you know, our information is that some of these

10  individuals were employed by CHI Saint Luke's.  And, of course,

11  it may turn out --

12          THE COURT:  Let me let me stop you right there.  So

13  that was my confusion, Mr. Coffey, that it's not that -- let's

14  just say I don't allow Baylor in, right?  I still, from a

15  factual standpoint, for some of the things that she said -- and

16  I get your legal arguments and I think maybe you're right on

17  summary judgment -- but I just, I just couldn't tell at this

18  early stage -- I understand the legal argument that ultimately,

19  if you can prove that there are three separate entities and

20  then everything that she's saying is, and I know that, you

21  know, summary judgment, there is also factual disputes.  You

22  know, I can't decide factual disputes, but here, even at an

23  earlier stage, respond to what she's saying.

24          MR. COFFEY:  Sure, Judge.  And I think it's important

25  to repeat that, understanding that it wasn't clear the

```
1    corporate structure, we made it clear in our first motion to

2    dismiss where we explained that Baylor Saint Luke's Medical

3    Center was, in fact, a separate legal entity, and that there's

4    no allegations against Baylor Saint Luke's Medical Center

5    employees.  So she was put on notice.  And in the face of that

6    information, she continued and -- I apologize --

7              THE COURT:  So yeah, that's a good point.  So why,

8    Ms. Brown --  sorry, but if I don't interrupt, then I'll forget

9    what the answer is.  After they made those assertions in the

10   first amended complaint, then why are we where we are now?  Why

11   didn't you change it?  Unless you're going to say, hey, we

12   disagree.  We think we think that what he's saying is not true.

13   That's my concern is that -- is you allege this.  They're

14   saying that's not true.  Where's the evidence?  Because you

15   have to take the position that like -- and I don't mean that

16   you're calling him a liar, but what I'm saying is that you have

17   to take the position that what Mr. Coffey is saying factually

18   isn't true.

19             MS. BROWN:  Well, we rely on the information that the

20   Relator has at this point.  This is prior to discovery and the

21   information that he has, has caused our understanding to

22   evolve.  You know what we see are documents on CHI Saint Luke's

23   letterhead, you know, payments, checks for payments that are

24   sent to CHI Saint Luke's Health, employees that are using CHI

25   Saint Luke's Health as their, you know, their email address.
```

 1   And at the same time, we understand that Baylor Saint Luke's

 2   Medical Center is the hospital where the scheme was, you know,

 3   the ISD was operating out of there.  And so we also included in

 4   our complaint, we decided CHI Health to include Baylor Saint

 5   Luke's Medical Center.  And these are the kinds of, you know,

 6   technical issues for that, you know, amendment is perfectly

 7   appropriate at this stage to include, you know, a corporate

 8   entity when there was some misunderstanding about the nature of

 9   the corporate relationship.  And entirely absent from

10   defendant's argument is any argument about prejudice, or before

11   the deadline to -- there hasn't even been a deadline to amend,

12   to add additional parties.

13          We disagree that Judge Eskridge said that we were not

14   amend, he only said that we were not to amend before a ruling.

15   And, you know, I think, you know, discovery has not yet begun.

16   You know, if you allow us to amend to add Baylor Saint Luke's

17   Medical Center, they will, of course, have an opportunity to

18   file a motion to dismiss and to raise any arguments that they

19   may want to raise.

20          THE COURT:  Let me stop you.  So, Mr. Coffey, so like

21   for example, when I was saying what was causing me confusion, I

22   looked at these exhibits, right?  The payments that are being

23   made from the provider -- sorry, from the hospital to the

24   provider, the checks say CHI Saint Luke's.  So I'm looking at

25   like Exhibit 2.  And then Exhibit 3, whenever the Relator is

```
 1    sending an email, it says, you know, International Patient
 2    Representative, CHI Saint Luke's and then underneath that,
 3    Baylor Saint Luke's Medical Center.  And so I guess my dilemma
 4    at this point is I know you're saying that that CHI Saint
 5    Luke's is a completely separate legal entities than Baylor
 6    Saint Luke's Medical Center, but if I'm just reading this and
 7    his point is that this was a scheme that both were involved in,
 8    both names are on there.  That's why last week I said I was
 9    inclined to leave them in because at this pleading stage, I
10    just, I don't know.  I mean, I'm just indifferent because it's
11    right on the document.  You know so it's not just him saying.
12              MR. COFFEY:  Sure.
13              THE COURT:  So let me ask you this, Ms. Brown, I mean
14    well, she's going to revert back to well, we don't know because
15    we haven't gotten discovery, but ultimately, what you're saying
16    is the evidence is going to play out that -- your position is
17    the evidence will play out that that nobody has any liability.
18    But regardless of that, CHI Saint Luke's has nothing to do with
19    the allegations that Relator is making, right?  I mean that's
20    ultimately your position is CHI Saint Luke's has nothing to do
21    with this because the Relator didn't work for CHI Saint Luke's.
22    The Relator worked for Baylor Saint Luke's Medical Center and
23    that Baylor's Medical -- Baylor Saint Luke's Medical Center is
24    actually providing hospital services where CHI Saint Luke's
25    Health is just a corporate entity.  I mean I got that, you
```

1    know, your star card.  I mean that's -- am I -- I don't want to

2    misinterpret your position.

3              MS. BROWN:  Was that --

4              THE COURT:  No, I was asking Mr. Coffey.  That's your

5    position?

6              MR. COFFEY:  You know, Judge, our position is that

7    regardless of what Relator is saying today, Relator's intent

8    and her statements were very clear.  In various briefings that

9    were filed with the Court, Relator stated that the employees

10   who allegedly directed the scheme were employees of CHI Saint

11   Luke's.  We notified Relator that's a separate legal entity.

12   The Relator chose to not add Baylor Saint Luke's Medical

13   Center.  It's not a technical issue at this point.  Relator is

14   required to plead fraud with specificity and particularity at

15   the outset.  Despite having multiple amendments and plenty of

16   time to add those details, Relator has not done that.  Relator

17   made an intentional decision not to add Saint Luke's.

18             It's also no secret discovery is not necessary to

19   determine one, what we're already saying through our briefings,

20   and two, that, you know, Baylor Saint Luke's Medical Center is

21   quite obviously, and very clearly, a separate legal entity.

22   Those documents are in the public domain that show that.

23   There's a 990 report, it's got its own MPI.  There's no

24   question about the separate legal -- the fact it's a separate

25   legal entity.

```
 1              THE COURT:  It's separate, I mean, I don't dispute

 2    that.  But if it's a separate legal entity, the check -- so,

 3    for example, the checks that they're saying that are part of

 4    the case -- you know, their theory of the kickback scheme is

 5    they're collecting, they're collecting money and they're paying

 6    the provider defendant.  Those payments that are coming from

 7    the hospital is not coming from Baylor Saint Luke's Medical

 8    Center.  But if we look at Exhibit 2, it's coming from Catholic

 9    Health Initiative.  And so that's what I'm saying.  It's not

10    just what she's saying.  It's just -- and then when we look at

11    like some of the cover pages within Exhibit 2, it says the

12    check is from Catholic Health Initiatives but then like the

13    payment breakdown is from the CHI Saint Luke's Health.

14              MR. COFFEY:  Sure.  And it's our understanding,

15    Judge, is Relator's argument is essentially that he need not

16    name Baylor Saint Luke's Medical Center as a defendant because

17    CHI Saint Luke's Health exercises a level of control over the

18    hospital and therefore is the correct defendant.  But what

19    you're referring to, letterhead and the use of checks, courts

20    have looked at that issue all over the country.  One in front

21    of me, I don't have it all in front of me, Judge, but in Wady

22    v. Provident Life, a Central District of California case, the

23    court held that the use of parent corporation's letterhead by

24    the subsidiary does not establish control or an alter ego

25    relationship.
```

1          THE COURT:  Was that at a summary judgment or a

2    motion -- so that's where, again where I may not disagree with

3    you at summary judgment, but this is a motion to dismiss.  Was

4    that decided at motion to dismiss?  Because that's what I was

5    saying last week.  I just don't know.  Like to me, you would

6    take depositions and that would be figured out during

7    discovery.  But if right now, the way I read her allegations is

8    that there's this scheme, and yes, he works for it ISD and he's

9    employed by Baylor Saint Luke's Medical Center, but the

10   employees from CHI Saint Luke's Health are in on this because

11   of these reasons.  And one of the reasons is the checks and the

12   payment and the documents have their name on.

13          And so if I'm taking that as true, that's my angst.

14   How do I, how do I decide that at a motion to dismiss?  I mean

15   I'll look at those cases, and I don't want, you know,

16   everything you tell me, Mr. Coffey, I'm not just going to willy

17   nilly.  I'm going to go back and look at this again.  But I

18   just don't know how I decide that at a motion to dismiss stage.

19          MR. COFFEY:  Well, Judge, from our perspective too,

20   it goes back to the pleading requirements under Rule 9(b) and

21   to allege that sort of all alter ego relationship and that

22   level of control with specifics with a heightened level of

23   detail on particularity, that detail is not in the complaint.

24   And when CHI Saint Luke's and the hospital defendants came back

25   and argued that these are separate legal entities and that

1    there's no evidence that Baylor Saint Luke's Medical Center,

2    you know, or that the hospital defendants engaged in the fraud,

3    rather than simply adding Baylor Saint Luke's Medical Center in

4    when Relator had the opportunity, and faced with those

5    arguments and faced with an understanding, the Relator did not

6    add Baylor's Saint Luke's Medical Center.

7             THE COURT:  Well, let me stop you there.  That's a

8    different argument.  Let's just say maybe I don't allow them to

9    add Baylor Saint Luke's Medical Center, but even if I don't,

10   how do I knock out CHI Saint Luke when you go through the

11   paragraphs that I mentioned, you know, the heart of their

12   complaints and then she's saying that we have these exhibits

13   with these documents that are in CHI Saint Luke's name, the

14   payments?

15            MR. COFFEY:  So, first of all, we believe that the

16   arguments that are alleged in the complaint should be specific

17   to the defendants that have remained.  Right?  And so the

18   question being, well, how do I, how do I get rid of CHI Saint

19   Luke's Health for the reasons we stated in our papers, right?

20   If we are, if we have whittled down to an AKS-based theory of

21   liability, from our perspective, there is not sufficient

22   allegations in the complaint that show intend to induce

23   referrals on the part of CHI Saint Luke's Health.

24            THE COURT:  Let me ask you a hypothetical, right.

25   Let's just say step outside of this case, that they have the

```
 1   four buckets that they say are the kickback.  The complimentary
 2   international travel per the lucrative international patient
 3   referral, the complimentary interpreters and the complementary
 4   administrative assistant.  If we had like a prototypical case
 5   that, you know, day one -- so let me just start with one and
 6   see if you disagree.  On day one hospital provider gives any
 7   one of -- sorry hospital system gives any one of those to a
 8   provider.  The provider accepts it.  And then the next day
 9   starts referring Medicare patients back to the hospital.  I
10   mean if we had an easy case like that with those four -- do we
11   at least agree that that any of those four could potentially be
12   kickbacks if they induced a referral?
13             MR. COFFEY:  Judge, you know, it's a pretty low bar
14   under the AKS what constitutes remuneration, right, anything of
15   value.  It could be a Tic Tac or it could be --
16             THE COURT:  Right.
17             MR. COFFEY:  So we don't dispute that these things
18   have value and therefore technically there's remuneration under
19   the AKS.  The problem is that is one element of the AKS.
20             THE COURT:  Okay.
21             MR. COFFEY:  From our perspective, more importantly,
22   you have to show that there was a knowing and willful violation
23   of the AKS.  So that the defendants provided that remuneration
24   with the intent, the specific intent really to induce
25   referrals.  And there are things that courts look at to
```

 1  determine whether that intent was present.

 2          THE COURT:  Let me stop you there.  And that's --

 3  like I totally agree with what you're saying.  But then, so if

 4  I go to paragraphs in the complaint, 152, 154 to 157, then 160

 5  and 163 and I read those paragraphs in conjunction with

 6  documents they provided in the exhibit -- and now just looking

 7  at this at a motion to dismiss, not to say at summary judgment

 8  I wouldn't completely agree with you, I just don't know how I

 9  say that with what they provided in those paragraphs and with

10  the exhibits attached, that they don't they haven't alleged

11  enough.

12          MR. COFFEY:  So, Judge, our response to that is -- I

13  think using the Court's language from last week -- there was a

14  frequency of value and value of referrals, okay, and support

15  services that went along with that.  Again, that's

16  remuneration, we understand that.  And I think what the Court

17  is saying ---

18          THE COURT:  So let me -- sorry to interrupt.  So

19  that's why I knocked out the providers because you don't know

20  any of those answers and none of that was alleged.  I mean,

21  none of that was alleged or provided.  And there's no evidence

22  of any of that coming back from the provider.  But on the

23  hospital side, I think that there's enough, based on these

24  paragraphs and based on the documents they provided, to keep, I

25  want, you know, to keep CHI Saint Luke's in at this point.  And

1    ultimately, it's me, then at summary judgment if we don't get

2    to what you just said, then the case isn't going to survive

3    summary judgment.  So sorry to interrupt.

4            MR. COFFEY:  That's okay.  So from our perspective,

5    you don't get to discovery, and therefore you don't get to

6    summary judgment without providing well-pled facts.  And so I

7    think what they, what the hang up here, what the hang up that

8    we see here is that value, frequency of referrals, that's still

9    just referrals.  Last week, Your Honor mentioned, well, if we

10   can look at the benefits that were provided to Dr. Hoffman, for

11   example, and then we can tie that to some temporal proximity to

12   the referrals that were made and that would be evidence.

13           The problem is, Relator never alleged anything about

14   any of that.  There is no connection between this volume or

15   value and frequency of referrals, and anything that went back

16   to the hospital.  In fact, there's not any allegation of any

17   referral from the remaining defendants, the provider

18   defendants, not one referral.  So that would be sort of a leap

19   in logic.

20           The facts that are alleged in the complaint do not

21   provide enough facts from, okay, there was a value, there was a

22   frequency, there was certain volume of referrals to well, that

23   must have been intended to induce referrals back.  There is no

24   connection.  There's no allegation of the connection.  There is

25   no allegation of intent.  There's no allegation that there was

```
 1   a referral tracking, for example.  Without those pieces of
 2   information that are required under Rule 9(b), with
 3   specificity, the Court is not able, in our estimation, to make
 4   that jump and argue that or state that there is sufficient
 5   intent under the anti-kickback statute.
 6            THE COURT:  Yeah, I mean, so that's where I think
 7   when, when he's talking about the referrals in those
 8   paragraphs, 153, 154, 157, 160, 163, I mean so I totally agree.
 9   I mean the complaint only has one example of an actual patient
10   referral.  But then to me, the question is again the legal
11   question is there is sufficient details of the scheme to submit
12   false claims and is there sufficient reliable indicia to
13   support that?  And that's where, like I said, just at the
14   motion to dismiss stage, I come down that in Paragraphs 152,
15   154, 157, 160, 163, and exhibits.  But look I will -- you know
16   my two law clerks are on and we're all taking notes and we'll
17   look at what you said.  But so you finish.  I won't interrupt
18   you again at all, Mr. Coffey.  Tell me anything else you want
19   to add.
20            MR. COFFEY:  Sure.  And it's just something to go
21   back to adding Baylor Saint Luke's Medical Center.  From our
22   perspective, you know, there is a futility here.  The Relator
23   has already had three opportunities to state a claim under Rule
24   12(b)(6).  They do not include Baylor Saint Luke's Medical
25   Center and it would be futile to do it at this point.  The same
```

```
1    is true with respect to 9(b).  There's no details that can be
2    added at this point that haven't been included already.
3             We believe there is undue delay for the same reasons
4    we've already discussed and don't need to repeat those.
5    There's been a repeated failure to cure deficiencies and that,
6    I believe, is pretty self-explanatory as well.
7             And Relator's counsel asked if there was prejudice.
8    Certainly, the Baylor Saint Luke's Medical Center, which would
9    need to potentially seek representation and get up to speed.
10   Certainly it's the remaining parties who would have to have
11   this hanging over their heads for however long it may take.
12            I also believe that adding Baylor Saint Luke's
13   Medical Center at this place stage would really change the
14   complexion of this case entirely because now, you know, whereas
15   the two hospital defendants at issue now are not DHS entities,
16   which is required, for example, under the Stark Law, allowing
17   Relator to name a DHS entity would greatly prejudice the
18   remaining parties.  It would change the entire, as I said,
19   complexion of the case.
20            You know for those reasons and then those mentioned
21   in our briefing, we don't believe it's proper under Rule 9(b)
22   because that requires you to have the details of the outset,
23   not after discovery.  And it wouldn't be proper under Rule 15.
24            THE COURT:  Before I get to Mr. Robinson, Mr.
25   Houston, Ms. Brown, I'll let you speak uninterrupted.
```

 1              MR. HOUSTON:  So we're going --

 2              MR. COFFEY:  Thank you, Your Honor.

 3              MR. HOUSTON:  Oh, you said you said Ms. Brown.  I'm

 4    sorry.

 5              THE COURT:  Yeah, sorry.

 6              MS. BROWN:   Well, I want to turn back to the issue

 7    of amending to add Baylor Saint Luke's.  And you know, Relator

 8    proactively sought leave to amend prior to any ruling by the

 9    Court.  And during the last round of briefing, of course, we

10    agreed not to submit an amended complaint until there was

11    guidance from the Court.

12              And so I just want to note that the Relator should

13    not be punished for submitting proactive amended complaint.

14    He, you know, has not had guidance from the Court until right

15    now.  And, you know, that would encourage Relator to do the

16    opposite, which is to get, you know, get a court ruling

17    initially and only then seek leave to amend.  And this is a

18    complex case in terms of the substantive law and the pleading

19    requirements and the defendants' documents themselves are, you

20    know, show overlapping corporate responsibility for the same

21    actors and the same acts.

22              And so we would disagree there's been any bad faith

23    conduct or undue delay.  This would be the first request for

24    leave to amend after getting any guidance from the Court.  And,

25    you know, of course, the Plaintiff doesn't have access to

```
 1    discovery.  And we are -- the prejudice that was identified by
 2    Mr. Coffey is not really prejudice under the law.  Having to
 3    hire counsel is not, you know, and be a defendant in that case
 4    is not prejudice.  You know discovery can proceed while these
 5    issues are aired out.  So there's no reason why it would have
 6    to be, you know, it should delay the case in any way.  And so
 7    this is, this is a technical issue that can be easily cured for
 8    a lawsuit that, you know, is going to continue.
 9              THE COURT:  Ms. Brown, do you know why they didn't
10    name Baylor Saint Luke's after the first, after the first
11    amended complaint?
12              MS. BROWN:  After the first amended complaint, it
13    was, you know, it was -- it's been an evolving understanding of
14    the corporate structure and we thought that we had just, you
15    know, to defined Baylor Saint Luke's as a component of CHI
16    Saint Luke's Health.  That was our understanding.  And, you
17    know, now defendants are saying that we need to add Baylor and
18    we're happy to do so.
19              THE COURT:  They're not saying you have to -- right,
20    go ahead.
21              MS. BROWN:  But this is, we are not seeking to change
22    the allegations in any way.  We're just seeking to add, you
23    know, seeking to add this entity that's all over the documents.
24    That's, you know, it's alleged in the complaint and it's an
25    issue of corporate structure.  It's not, it's not changing the
```

```
 1  allegations in in any way.

 2              So for those reasons and because this is our first

 3  opportunity for leave to amend after guidance from the Court

 4  and discovery has not commenced, there's no, there's been no

 5  deadlines set to amend parties, we think it's appropriate at

 6  this time.

 7              THE COURT:  I mean  --

 8              MR. COFFEY:  Your Honor, may I have an opportunity to

 9  respond.

10              THE COURT:  Yeah, let me.  So I know that we can all

11  infer Judge Eskridge meant, but it does -- my angst, Miss

12  Brown, is that someone made a strategic decision on your part

13  not to name Baylor Saint Luke's and now they're changing,

14  they're changing course when clearly this was an issue that was

15  raised.  So there was a round a briefing on the motion to

16  dismiss and the hope is that you get an opportunity to see what

17  they raise, and then you cure those things in the second

18  amended complaint.  But -- and I still feel like there may be

19  an issue of immunity.  I mean some of it, it just doesn't seem,

20  I don't know, logical why unless there was an immunity issue or

21  some concern like someone -- and I get you didn't draft the

22  complaint originally -- why someone wouldn't name Baylor Saint

23  Luke's without like a strategic decision because you're naming

24  CHI and CHI Saint Luke's.  It's just -- so that's where my hang

25  up is, the fairness to allow you to name them if someone has
```

```
1    already made a strategic decision.  We've gone through all this

2    briefing you take that risk and then you've got to live with

3    that risk.  But again, it doesn't, as I said before, it doesn't

4    change my opinion right now of leaving in CHI Saint Luke's, but

5    I am really on the fence about allowing you leave to amend for

6    that.  Is there anything else you want to add to what I just

7    said.

8              MS. BROWN:  You know, I don't want to repeat myself.

9              THE COURT:  Okay.

10             MS. BROWN:  Just that there's no strategic decision.

11   This is, you know, an evolving understanding of a complex

12   corporate structure and, you know, unclear documents as to the

13   structure and, you know, a lack of prejudice, a lack of bad

14   faith --

15             THE COURT:  I'm not saying any of that.  I'm saying -

16   - just because you make a strategic -- I mean if someone made a

17   strategic decision to have CHI and CHI Saint Luke's and it's

18   clear the Relator worked for Baylor Saint Luke's, and I mean

19   you're all good lawyers, like why -- that's where I guess my

20   confusion is.  Why, if you're going to name the other two, why

21   wouldn't you name the most likely party, which is the one that

22   he worked for versus like the most remote party which is CHI.

23   And so that's -- without saying there's bad faith, I mean I

24   understand Mr. Coffey's position that there's been multiple

25   rounds of briefing.  This issue was raised and it's just a
```

```
 1    matter of -- and I get it.  I wish it was as simple as just

 2    putting it in, but it's not because then I have to allow them

 3    the opportunity to file a motion to dismiss.

 4            And as he said, I do agree with their legal argument,

 5    that, you know, CHI and CHI Saint Luke's from a legal

 6    perspective, you couldn't have a Stark claim, but you could

 7    against -- from a legal, not whether it's true or not -- you

 8    could against Baylor.  And so that my hesitation of allowing it

 9    at this point.  Mr. Coffey, you wanted to respond.  So let me

10    let you respond.

11            MR. COFFEY:  Thank you, Judge, and I'll keep this

12    brief.  All indications here point or suggest at least that

13    keeping Baylor Saint Luke's Medical Center in was an

14    intentional strategic decision, as you referenced.  I think

15    counsel is attempting to minimize the importance of including

16    Baylor Saint Luke's Medical Center into this complaint at this

17    point.  It's not quite as complex as counsel is letting on.

18            Baylor Saint Luke's Medical Center is the only

19    hospital that we're talking about here today.  It's the only

20    entity that submits claims.  It's the only DHS entity.  So not

21    including it had to have been some intentional decision.  This

22    idea that Saint Luke's Medical Center is somehow subsumed into

23    CHI Saint Luke's Health, it's not.  We made that clear from the

24    get-go.  They're separate legal entities.  But by that same

25    logic, there would have been no reason for Relator to add CHI
```

1  Saint Luke's Health because they also manage CHI, which is the

2  ultimate corporate parent.

3         So what we're talking about here is every -- I think

4  there's something like 20 entities under the CHI Saint Luke's

5  Health umbrella is now, by Relator's logic, is every one of

6  those entities also a defendant that can be added in this

7  complaint?  Without proper allegations that satisfy Rule

8  12(b)(6) and Rule 9(b), it would not be proper to pick and

9  choose which defendants are added after three iterations of the

10  complaint, after a couple of rounds of amendments, and after a

11  substantial amount of briefing and arguments in front of the

12  Court, especially arguments that specifically noted that CHI

13  and CHI Saint Luke's Health were not the proper defendants and

14  the reasons that we provided in support of that assertion.

15         THE COURT:  Ms. Brown, I don't want to beat up on

16  you.  I like to make things as simple as I can.  See CHI and

17  CHI Saint Luke's don't actually submit anything to Medicare.

18  It's Baylor Saint Luke's that actually -- so when we're talking

19  about like a false claim, it's someone, you know, someone gives

20  the kickback to the provider, the provider provides the

21  unlawful referral.  The referral is going to Baylor Saint

22  Luke's.  They're the one that's providing the medical services

23  and they're the ones that's submitting to Medicare.  Now I get

24  if CHI or CHI Saint Luke's had something to do with that and

25  were part of the scheme, they could also be liable.  But the

1    central figure is the one that's actually getting the referral

2    and doing the billing and that's, you know, I'm resaying what

3    he's saying, that you would think that that's the central

4    player that you want in your complaint because they're the ones

5    that actually submitting to Medicare, performing service, and

6    getting the payments from Medicare.

7           And so what's I'm trying -and I've been on both sides

8    of this -- but if you're sitting in a conference room and

9    you're deciding like, okay, who are we going to name in this?

10   Like how do you not name, how do you not name them without,

11   like, a lot of thought?  Because you have to know, right, like

12   if you don't know that, then the complaint on its face would

13   fall apart.  And it would seem like that would be the -- when

14   you're trying to figure out what's the, you know, the unlawful

15   scheme here and identifying the players, you would want to know

16   who's the one that's actually submitting the claims to Medicare

17   and getting the reimbursement.

18          And so it doesn't take away from my argument, CHI

19   Saint Luke's at this early stage could be a part of it, but I

20   think there's enough of the record that CHI Saint Luke's wasn't

21   the one performing the service.  They weren't the one billing

22   Medicare and they weren't, they weren't the ones billing

23   Medicare or performing the medical service.  Did you follow

24   what I'm saying?  But I mean, Mr. Coffee is saying it's pretty

25   obvious that Baylor Saint Luke's is the actual, you know,

 1    hospital that's providing a medical service.

 2            MS. BROWN:  Yes, I understand that what you're

 3    saying.  All I can say is that, you know, as I said before,

 4    that the corporate structure of these entities wasn't entirely

 5    clear for us.  If we could do it over again, I think we would

 6    have named them from the beginning.  We can't go back and do

 7    that.  This is the first opportunity that we have had with the

 8    Court's guidance to, to leave to amend.  We're still within the

 9    statute of limitations for bringing claims against this entity.

10    There are no, there's no prejudice to this.  You know it's an

11    issue of technical and corporate structure.

12            They'll have an opportunity to file a motion to

13    dismiss if there are any immunity issues.  You know, I guess we

14    just, you know, there was no bad faith on our part.  No

15    strategic decision other than, as I'm telling you, that we

16    were, we had confusion about the corporate structure and, you

17    know, I think part of that confusion was because it's not clear

18    the way these entities operate, you know, who's running the

19    International Services Department based on who's paying the

20    checks, who's, you know, who's letterhead it's on, you know,

21    whose employees are at issue.  You know it's the confusion

22    caused by the way that the businesses operated that I think,

23    was, you know, lead to our confusion.  So we would ask again

24    for the Court to allow us to leave to amend Baylor.

25            And independently of that, we think, you know, as

1    you've addressed, CHI Saint Luke's is liable because, you know,

2    our understanding and our allegations are that their employees

3    were orchestrating the scheme.

4            THE COURT:  Mr. Robinson.

5            MR. ROBINSON:  Thank you, Your Honor.  Let's talk,

6    let's shift gears now then and talk about the provider, the

7    other provider defendants other than Dr. Hoffman, who Mr.

8    Houston will address.

9            We agree that they should all be dismissed, but we

10   think they need to be dismissed with prejudice.  We think the

11   case law, whether you look at the Fifth Circuit's decision in

12   Webb, the decision in Grubs, or any of the other cases that we

13   cited in our brief, the purpose of Rule 9(b) is to force the

14   Relator to put what they know on the record when they plead and

15   it is not.  It's a gate to discovery.  And to say, well, you

16   know, maybe sometime down the road you can come back and you

17   know, after you've had discovery, then you can come back and

18   try to add some of these provider defendants back in, that's

19   completely antithetical to the purposes of Rule 9(b).  In fact,

20   that's the argument that Fifth Circuit specifically rejected in

21   the Webb case when the Relator was saying, please let me come

22   back.  I can amend after discovery.  The Fifth Circuit said no.

23           So this really needs, this was put up or shut up time

24   when they filed the second amended complaint and they didn't

25   put up.  And so at this point, the fact that they have

Page 34

1    inadequately pled their claims means they don't get discovery

2    and a chance to come back.

3            So in addition, we think that further amendment would

4    be futile.  It had three chances to get it right, very clear

5    that the Relator doesn't know anything about the provider

6    defendants and what they did or even about any communications

7    between the CHI defendants and any of the provider defendants.

8    I mean there are a few information and belief allegations in

9    the complaint, but none of that is enough to satisfy the Rule

10   9(b) requirements.

11           We can't have some sort of hybrid situation here

12   where they're not given leave to amend now, but they're given

13   leave to amend a year from now or something like that.  The

14   rules on dismissals don't allow that kind of a hybrid approach.

15   They shouldn't be given leave to amend.  Is means that should

16   be it for the provider defendants.

17           And then lastly, I would just point it out.  You've

18   seen our arguments about the immunity defense that Baylor

19   College of Medicine has.  So we also think that further

20   amendment as to Baylor College of Medicine would be futile as

21   well.

22           THE COURT:  Mr. Houston.

23           MR. HOUSTON:  I would echo.  I represent other

24   provider defendants, Your Honor, and I would echo on behalf of

25   the other provider defendants that we believe that the

 1    dismissal should be with prejudice for the reasons stated.  I
 2    believe he stated it sufficiently enough that I do not wish to
 3    state it over again.
 4           I'd also point out for the record that again, I
 5    understand this, that you are contemplating the memorandum of
 6    recommendations to the Court.  And, of course, these are just
 7    preliminary --
 8           THE COURT:  Let me interrupt.  Let me say I'll
 9    research again.  I didn't ask Mr. Robinson.  I'll research
10    again the with or without prejudice.  My concern was the
11    Relator is throwing this up.  It would have been discovery.
12    They find -- they've alleged this, and I think sufficiently,
13    against the provider -- against the, I'm sorry, the hospital
14    defendants but not the provider defendants.  But I don't think
15    for, you know, as we've discussed last week and this week, that
16    there's enough to survive a motion to dismiss the complaint.
17    But what about during discovery if they find a treasure trove?
18    And that that's where I have to go back on the law and see what
19    Mr. Robinson was saying.  But I will, I promise you I will
20    research that.  But go on.
21           MR. HOUSTON:  So, okay, so that would be the first
22    point as to the other provider defendants.
23           Now with regard to Dr. Hoffman, for the reasons
24    stated by both Mr. Coffey, I believe, I think that you could
25    make the exact same arguments as to Dr. Hoffman.  If you look

1    through the pleadings carefully, all that really differentiates

2    Dr. Hoffman from the other providers, which I believe you've

3    already said there isn't sufficient allegations, particularly

4    as to any benefit they expected, that they were the signatory,

5    did they have the expectation?  And there simply wasn't enough

6    there.  The only difference with Dr. Hoffman is there is a

7    larger volume of international patients, but there's exactly

8    the same as the rest.  There's no allegations -- and I'm not

9    going to talk about evidence here, but I will talk about the

10   one bit of evidence they did attach.  But there's no sufficient

11   allegations under Rule 9(b)with the specificity to show that

12   either Dr. Hoffman expected and thought that he was expected to

13   refer Medicare/Medicaid patients back to Saint Luke's.  I'll

14   use it -- I'll lump it together.  We talked a lot about

15   entities.  I'll lump it together, to Saint Luke's in return for

16   these international patients.  There's no allegations relating

17   to what Medicare/Medicaid patients he did refer back or if

18   there was any email saying your volume of -- or an allegation

19   that his volume, they ever questioned your volume of Medicare

20   Medicaid patients.  Under I think as the Court noted, Exhibit

21   9, there was a large number of international patients that went

22   through Dr. Hoffman's office.  There's no question about that.

23   But I mean, that doesn't make the case against Dr. Hoffman any

24   more than the rest of them.  There were allegations that other

25   doctors had international patient referrals.  But I think, and

1    believe me, I believe I think it should be pointed out and one

2    of the objections we'll raise, which, of course, I'll need to

3    see your final memorandum if I don't persuade you today, that

4    Dr. Hoffman is any different is, I think -- and they did attach

5    one exhibit.  And that was Exhibit 3, which we spoke about

6    earlier with reference to Paragraph 25 of the complaint, which

7    is all the totality of the allegations against Dr. Hoffman.

8    And Exhibit 3 I think can be used, but since it was attached to

9    their motion, I mean their pleadings, for and against them, but

10   it's pointed out in Exhibit 3 that Dr. Hoffman provided

11   excellent service to the international patients.  So certainly

12   that would be an explanation and perhaps it's the only

13   explanation in the pleadings as to why he received these large,

14   these volumes of international patients, but certainly nothing,

15   no allegation, no specific allegations that would be required

16   by Rule 9(b) as to Dr. Hoffman that a) he was referred all of

17   these international patients because he was sending back

18   Medicare patients, and b) that he expected and was expected or

19   knew that he was receiving any international patients because

20   of his referral back or anything of that nature.

21        What is showed, which is probably the case, is Dr.

22   Hoffman took care and took good care of international patients

23   and there is certainly nothing wrong with that.  It's lucrative

24   for the hospital.  It's lucrative for all, but it's not a

25   violation of any the Stark rules or any of the rules alleged.

```
1           So we would incorporate the arguments that I think
2  have been raised in writing and our moving papers in the
3  providers motion to dismiss the second amended complaint, which
4  was filed on November 16.  We would incorporate the arguments
5  raised by Mr. Coffey, who enunciated it much better than I can,
6  I believe, on the specifics of what is required in these
7  particular cases.  I would incorporate a little bit of what Mr.
8  Robinson said and what the Court has said about all the other
9  providers and would just urge you to look at it again and see
10 that Dr. Hoffman is no different other than he has a larger
11 volume, but that doesn't mean that he should be the one left.
12 And I'm not sure he's even necessary for this particular matter
13 but I do believe that there's not enough pleadings at this
14 stage and that he should be dismissed pursuant to 12(b)(6) and
15 12(b) and 9(b) and it should be with prejudice.
16           And those would be the exact probably the same
17 allegations or objections I would raise if you do issue a
18 memorandum, Your Honor, but I wanted to give you a heads up on
19 it.
20           THE COURT:  Sure.  So, Mr. Houston, so again, we
21 don't know because we don't have, you know, there's just one
22 example of a supposed false claim in the complaint.  Right.  So
23 in that situation, you know, my view of the law is did the
24 Relator overcome 9(b) when they're not providing more than one
25 example of a false claim, or providing actual false claims data
```

1    in the complaint?  Is there sufficient details of the scheme to

2    submit false claims and is there sufficient reliable indicia.

3    So why I thought, why I thought Dr. Hoffman was different was I

4    didn't believe as to all the other providers that there was

5    sufficient reliable indicia because I thought the other

6    exhibits were sporadic as far as times.  Right?

7            I mean I think we can assume, and for legitimate

8    reasons, that all of the providers that named at some point

9    have referred back Medicare patients back to the hospital.  But

10   the question is, is that, you know, were they induced?  And was

11   that a kickback?  Well, we don't know.  And there could be

12   legitimate reasons even if there was a lot of volume.

13           But all we know from the complaint is sporadic

14   allegations and documents as to every provider except your

15   client.  And I thought two things.  So Exhibit, Exhibit 9, they

16   show activity to him going every year from 2007 to 2017 that

17   they're doing things for him out of one of those four buckets.

18   And that's what I thought differentiated.  They're showing a

19   relationship with him as the four things that they're alleging

20   are kickbacks every year from those dates.

21           And then we can turn to that one email and I don't

22   necessarily say that it's, there's something nefarious, but the

23   email that they have that we've debated about shows at least

24   somebody on the hospital side was saying, hey, we would like --

25   and there may be perfectly lawful reasons -- but we would like

 1   international patients to be referred to Dr. Hoffman.

 2           And so to me at the pleading stage, again, this could

 3   all be different at summary judgment, I think he's different

 4   because of the -- I do believe the volume, as you said, doesn't

 5   show anything.  I think the volume, for me, is enough

 6   sufficient reliable indicia just to keep him in.  And that's

 7   why I thought he was different than everybody else.

 8           MR. HOUSTON:  And I get that.  And I guess what we're

 9   -- and I'm sorry I didn't mean to --

10           THE COURT:  No.  I'm done.  Go ahead.

11           MR. HOUSTON:  And I guess my argument today is -- and

12   I understand when you say is there a bigger part?  He's listed,

13   I mean he's talked about more.  But I believe that under the

14   rules and the cases that I've seen, particularly under Rule

15   9(b), when you make these allegations of fraud, it requires

16   more than just the quid, which is what they've shown.  But

17   there's nothing about a pro quo.  There's a larger quid with

18   him, but no specific allegations as to this large volume.  What

19   was the expected?

20           And, in fact, again, I guess Exhibit 3, which again,

21   they seem to say indicates that the hospital preferred him for

22   international patients.  Well, it says in that exhibit, which

23   we take is true, I guess that they referred him international

24   patients because he does a good job on them.  And I think you

25   have to reach great links that aren't either pleaded, supported

1  by the evidence or anything, but just requires supposition

2  well, he got a large volume of international business.  They

3  seem to like him.  Therefore, there's a scheme.  And I guess

4  its value is what I'm hearing you say, but --

5         THE COURT:  Not just in value, that's where I'm

6  looking at specifically Paragraphs 152, 154, 156, 157, 160 and

7  163.  I've got to take those statements that Relator is saying

8  is (indiscernible).  Where it's, it's saying in those that who

9  the preferred providers are.  I'm summarizing this, but

10  basically they're giving those four buckets of things of value

11  to these providers in return for Medicare referrals and that

12  they could be on a preferred list the more that they refer.

13         Now, ultimately, again, that may not be true or there

14  may be other reasons, but at this stage, I don't know how I

15  can't take that is true.  Even if, I mean, that's the

16  allegation, there's -- that's what I'm saying is they're

17  reliable indicia to back up those allegations?  And that's

18  where I go back to Exhibit 9 and say, okay, every year from

19  2006 to 2017, he's getting one of those four buckets or

20  something of value.

21         MR. HOUSTON:  But I guess my final -- and I'm looking

22  at 152.  And I mean those paragraphs relate to knowledge or

23  what was alleged against Saint Luke's but there's no

24  allegations as to Dr. Hoffman that even if he knew about it,

25  felt like he had to prefer more Medicare.  I mean there's not,

1    that is not specific as to him.  Maybe and again, I'm not going

2    to get it into it.  Maybe, that may or may not survive a claim

3    against the entity, in particular the biller, but as far as the

4    doctor and making that particular specific allegation or, you

5    know, and again, I'm not going to say evidence, but that

6    allegation, that's just not (indiscernible) to him, to me

7    anymore than some of my other clients.  And I believe, I agree

8    with you as to all the providers.  I just don't think he's

9    different and that would be our objection as to Dr. Hoffman,

10   the objection we raised  that he's really no different even

11   though there's a larger volume.  The allegations do not meet

12   the standards required by 9(b), which were really high in these

13   cases when you're alleging these types of cases against these

14   physicians.  So he should be dismissed with prejudice as well.

15          THE COURT:  Thank you.  Anybody else, anybody else

16   want to be heard?  Any final statements?

17          MS. BROWN:  Yes.  Your honor.  I just want to be done

18   a few points.  First of all with regard, I guess I'll go in

19   backwards order, starting with Dr. Hoffman's arguments.  You

20   know on the emails, I think Your Honor has already discussed

21   them.  And I would just say again I think that the defendant's

22   argument here where they're picking an interpretation of those

23   emails is directly contrary to the analysis of the

24   (indiscernible) case.  So I just point the Court to our brief

25   on that, and that case in particular.

1            With regard to the defendants, the doctor, the

2    physician and physician group defendants that the Court is

3    inclined to dismiss without prejudice, we wanted to stress that

4    you know, from the Relator's perspective, they should be, they

5    should be dismissed without prejudice.  And, you know, the, you

6    know, I understand what the Court is saying about reliable

7    indicia against Dr. Hoffman based on the specific exhibits that

8    were provided with respect to him.  But from the Relator's

9    perspective at the pleading stage, those were, those facts were

10   not required to state a claim because the Relator is allowed to

11   allege extensive volume, high frequency, significant value,

12   using factual allegations.  And he doesn't need to provide, you

13   know, he provided so many examples of remuneration to these

14   physician defendants.  You know many examples of kickbacks for

15   each physician.

16           And so, you know, our reading of the of the case law

17   is that he did enough at the pleading stage to survive against

18   them.  So, you know, we understand that the Court is inclined

19   to dismiss them without prejudice, and we contend "the without

20   prejudice" is important there because, you know, our

21   understanding of the law is that the allegations are sufficient

22   as to all of the providers because of the extensive allegations

23   as a whole that showed that there was such an extensive volume

24   and frequency and flow to this set of preferred providers.

25           So I just wanted to put that on the record and then,

```
 1   you know, that the counsel for the other providers mentioned,

 2   you know, that they would be prejudiced if they're, you know,

 3   if they're not dismissed without prejudice.  And I just wanted

 4   to remind the court that, of course, at any point, you know, if

 5   we wanted to add one of them back in, we would have to file a

 6   motion to amend and they could raise at that time any

 7   objections that they had about, you know, and they wouldn't be

 8   abstract about, you know, the course of discovery or the

 9   progress of the case.  So, I just wanted to urge the Court to

10   dismiss without prejudice any providers that it is inclined to

11   do so.

12            MR. ROBINSON:  Your Honor, can I make one point?

13            THE COURT:  Sure.

14            MR. ROBINSON:  I want to just comment briefly,

15   because you've referenced this issue about the reliable indicia

16   standard.  I just want to make it clear it's not -- the cases

17   we're talking about are not reliable indicia of the kickback.

18   It's actually -- that actually needs to be reliable indicia

19   that false claims were filed and here, so it's not the fact

20   that there might be more detail about what was given to Dr.

21   Hoffman, does not create any reliable indicia that, as a result

22   of that, false claims were filed with Medicare and Medicaid.

23   That's what the reliable indicia as to relate to.  And if you

24   look at the Fifth Circuit and the Western District decision in

25   the integra Med, right, it's got to be reliable indicia that
```

1   there was a scheme to submit false claims to Medicare and that

2   some false claims are actually submitted.

3           And here, there's nothing other than just rank

4   speculation except with respect to this one Dr. Waters, who

5   wasn't even a defendant, that any of these doctors made a

6   referral to the hospital because of these alleged kickback.

7           THE COURT:  Let me ask you that.  In the complaint,

8   and you may dispute it, they're saying that 42 percent of the

9   revenue or 42 percent of their billings come from Medicare.

10  And so that they be disputed going forward, but that's, that's

11  a significant amount of revenue that they derived from

12  Medicare.  And there's no, nobody's, nobody's refuting that

13  they made Medicare referrals to the hospital providers.  The

14  question is: Were those referrals induced by kickbacks?

15          And so when I'm looking at the reliable indicia, if

16  these, if these four, these four buckets are clearly

17  remuneration and this one doctor for 11 years is getting a lot

18  of those four buckets, to me at a pleading stage that's

19  reliable enough.  It may not be at summary judgment because we

20  don't, we don't, you know, we'll see more.  But I don't know

21  how I can't say that motion to dismiss stage, if you have a

22  doctor that's receiving this and 42 percent of the hospital's

23  revenue is coming from Medicare?

24          MR. ROBINSON:  Well the 42 percent from the hospital

25  is really not the right fact.  Do you really have to look at if

1    you had information about the doctors' patients.  For example

2    if you knew -- there was a case and I can't remember the name

3    of the case, but there's a case in the medical device field

4    where there was an alleged kickback and because 80 percent --

5    there was data that showed that 80 percent of the devices were

6    used in the Medicare population because it was for people over

7    65, all right, that the court said was reliable indicia because

8    it related to what the physicians were doing, not and whether

9    it was likely that there were false claims referred by these

10   doctors that hit the Medicare books.

11            THE COURT:  I'm going to interrupt.  Again, to go

12   back to what whether it's true or not.  You know I don't know.

13   But go back to what they're specifically alleging in 152, 154,

14   and 155.  In those paragraphs, they're talking about like

15   Paragraph 160, Dr. Hoffman was preferred for ISD referrals

16   because he was a consistent source of referrals of Medicare and

17   Medicaid patients back to CHI Saint Luke's.  The Relator has

18   attended dozens of ISD staff meetings where VP Matar and

19   Associate Director Sanchez instructed ISD to refer as many

20   patients as possible to Dr. Hoffman.  So I mean that's, that's

21   a statement and then what do I have that's reliable?

22            So they're saying here, the Relator is saying that

23   he's providing all of these Medicare referrals.  And what I'm

24   saying is for this 11-year period, there's evidence that he was

25   receiving a lot of these four buckets of improper remuneration.

```
 1              MR. ROBINSON:  So again, you need the beef, you need
 2     the beef on the other side of the transaction too.  They're
 3     just, they're just saying and he referred a lot of Medicare
 4     patients.  That's not enough.  Unless you have a choice, if
 5     you're a Relator, you have a choice.  You need to give the
 6     specifics or, you know, you set out enough facts that gives
 7     reliable indices that there were, in fact, that there must have
 8     been Medicare referrals.
 9              So in the case of the devices that are only used in
10     the Medicare population, that the courts have said are reliable
11     indicators.  But here they've got nothing.  They didn't give
12     the specifics and they didn't give any reason for you to
13     believe that the statement about referrals by Dr. Hoffman or
14     anybody else is true.  And they had to do one or the other.
15     And this is a pleading standard.  So, you know, this whole
16     reliable indicia test is a pleading standard under 9(b).  So
17     you can't say that they can provide the reliable indicia later
18     on after discovery.  Now is the time that they have to do it.
19              THE COURT:  But the documents disagree because they
20     are saying -- the complaint is saying that you can't become a
21     preferred practitioner unless you refer back a lot of Medicare.
22     And so that's a conclusory allegation.  Right?
23              MR. ROBINSON:  Right.
24              THE COURT:  So what did they do to back that up?
25     They provide an 11-year history of giving him things, four
```

```
 1    different things that they allege during those eleven years,
 2    every year, of what they classify as improper remuneration.  So
 3    I don't know how at the pleading stage if they're making that
 4    assertion and they're showing the potential of giving him
 5    kickbacks, how that's not -- again, it could be different at
 6    summary judgment, but I have to take what they're alleging as
 7    true if there's, if there's sufficient details and their
 8    sufficient reliable indicia.
 9              I mean so I know we disagree but -- and, you know,
10    maybe we'll agree at summary judgment, but for right now that
11    was how I differentiated him from the other doctors.  That it
12    was sporadic against the other doctors.  And I didn't find that
13    reliable.
14              MR. ROBINSON:  My only point is that the reliable
15    indicia have to not be about the quid.  It has to be about the
16    quo.  And they either needed to say here is a list of all these
17    referrals from Dr. Hoffman or --
18              THE COURT:  If he doesn't work in the Billing
19    Department, how is he going to get that?  At the pleading
20    stage?  He's in the ISD Department and he doesn't have access
21    to that.  How is, how is he going to get access to that?
22              To my understanding, the Fifth Circuit is if you
23    don't have access to that, you have to allege enough to show
24    that it's reliable.  And so he doesn't -- he can't provide
25    examples.  And so what does he -- you know, I'm just looking on
```

1    balance.  What does he provide?

2            MR. ROBINSON:  Well he would have to create, maybe he

3    would have information about a pattern where Dr. Hoffman's

4    referrals went up every time he got a patient from the

5    hospital.  I mean there has to be something other than they're

6    saying he, or any of the other doctors, send people over

7    because we don't know.  And what if all he sent over were

8    private commercial insurance patients?

9            THE COURT:  I mean then he's going to be out on the

10   summary judgment.

11           MR. ROBINSON:  Right.

12           THE COURT:  He'll be out on summary judgment even if

13   he sent Medicare, but there's no correlation between what he

14   referred and remuneration that he was receiving.  That where

15   I'm saying we go back to what I said last week that there could

16   all be a legitimate reason for everything the defendants were

17   doing.  But I just don't know as to him how I can make that

18   determination right now.

19           MR. ROBINSON:  Well that's why I think I would urge

20   you to look at the integra Med case again.

21           THE COURT:  Okay.

22           MR. ROBINSON:  Because there, the court said there

23   was a perfectly -- if there was a perfectly benign explanation

24   at the pleading stage, the case is gone.

25           THE COURT:  But I think that -- if my memory goes,

1    was that a District Court case and not a Circuit case?  Most of

2    the cases that you all cited were summary judgment cases.  But

3    where was that, where was that case decided?

4              MR. ROBINSON:  It was a District Court case that was

5    later affirmed by the Fifth Circuit.

6              THE COURT:  Okay.

7              MR. ROBINSON:  Okay.  So we have -- we've provided

8    the cites but it was affirmed.

9              THE COURT:  Okay.  I'll read that case.

10             MR. COFFEY:  Judge, if I may?

11             THE COURT:  Sure.

12             MR. COFFEY:  Just a couple more points here.  Your

13   Honor, you raised a very good point about Relator not having

14   access to the billing information or data about Medicare

15   referrals and they've gone back to Baylor Saint Luke's Medical

16   Center, that's true and that's because nobody at ISD had access

17   to that information because what they were interested in was

18   providing services to international patients.  And so that sort

19   of expresses that this whole claim lacks responsibility, right?

20             You've got people who work at ISD who have absolutely

21   zero insight into the Medicare/Medicaid referrals that are

22   coming from the community positions, if at all, to the

23   hospital.  And there's nothing in the complaint that allows us

24   to peek under the hood and take a look at that.  There's not

25   one detail about those referrals.  So Tania Matar and Angie

1    Sanchez, they don't have access to that information.  They're

2    not alleged to have access to that information.  There's not

3    well put allegations about tracking referrals of Medicare

4    Medicaid patients.

5            So when you talk about the wealth of information in

6    the exhibits and how that shows remuneration, that may be true

7    that it shows remuneration.  But again, that's the first

8    element of an AKS violation.  You have to plead with

9    particularity under Rule 9(b) that there's also this intent and

10   that's how you have the indicia of reliability, right?  There's

11   a, there's a scheme with an intent to induce.

12           What's pled in the complaint does not meet that

13   pleading burden for the reasons we've stated.  There's no way

14   to say that the remuneration on the one hand was actually

15   provided with the intent on the other hand to induce referrals.

16           Well, the last, the last point I wanted to make to

17   you, Judge, is that we agree that the sporadic nature of the

18   referral and the interpreters and the support services that

19   went to the dismissed provider defendants, that was in fact

20   sporadic, we just want to clarify too that would speak to a

21   lack of intent on the hospital defendants' part as well.

22           THE COURT:  Go ahead, Ms. Brown.

23           MS. BROWN:  Your honor, just in response to those

24   points that Mr. Coffey made.  There are direct allegations in

25   the complaint of tracking and the knowledge that the idea of

1    the ISD staff had of the number of referrals that were provided

2    by these preferred physicians, such as Paragraph 153, the

3    Integra Med case is a factually different case where the

4    defendants were acting in a way that was consistent with legal

5    requirements.  So it was a case, it was one of those cases that

6    doesn't implicate the one purpose rule where even if you have a

7    lawful purpose but you also have an unlawful purpose, that's a

8    violation.  So I think that's the issue with that, with that

9    citation.

10          And then, you know, on the issue of reliable indicia

11   of false claims submissions, we would just point you to our

12   briefing on that issue.  That's all.

13          THE COURT:  Anything else?

14          MR. COFFEY:  And, Judge, I promise this is it with

15   respect to Paragraph 153.  In our first motion to dismiss the

16   first amended complaint, we stated that there was no, for

17   example, allegations about referral tracking.  Before Relator

18   responded to our motion to dismiss, they submitted the proposed

19   second amended complaint which then had allegations about

20   referral tracking.  Our point is that those allegations are

21   threadbare.  They're not pled with particularity and pointing

22   to Ms. Brown's example of Paragraph 153, it says, in very

23   conclusory fashion, also put on information of belief, which

24   was not proper, that the senior ISD staff tracks the number of

25   Medicare referrals.  And how do they know that?  They had

1    meetings.  But there's no 9(b) particularity around this

2    allegation.  When were the meetings held?  Was Mr. Chihi

3    present?  Who was present?  What did they discuss?  This is the

4    who, what, where, when that you need to satisfy Rule 9(b).  And

5    this example perfectly shows that it's not present in the

6    complaint.

7              THE COURT:  So when I was fighting the paragraphs I

8    found most persuasive, I didn't include 153.  I said 152, 154

9    to 157, 160 and 163.

10             So okay, so this is what we'll do.  I'm hoping this

11   is going to be our priority that we get this.  This will be our

12   number one priority to get this done so you can get your

13   objections on record.  But I appreciate it.  This was really

14   the longest hearing I've ever held, so this was really helpful.

15   Okay.  Thank you, all.

16

17        (Hearing adjourned at 1:24 p.m.)

18                         * * * * *

19

20

21

22

23

24

25

```
 1                  C E R T I F I C A T I O N

 2

 3       I, Sonya Ledanski Hyde, certified that the foregoing

 4   transcript is a true and accurate record of the proceedings.

 5

 6

 7

 8   Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  April 15, 2022
```